Law Office of Mahir T. Sherif
MAHIR T. SHERIF, Esq. (SB# 135021)
3376 30th Street
San Diego, CA  92104
Ph:  619-297-4444
Fx:  619-297-4115

Attorney for Defendant, Nuradin Abdi

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION AT COLUMBUS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.:  2:04CR88 |
| | ) | |
| Plaintiff, | ) | (Honorable Algenon L. Marbley) |
| | ) | |
| vs. | ) | |
| | ) | |
| NURADIN ABDI, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS**
**STATEMENTS FOR VIOLATIONS OF HIS FIFTH AMENDMENT RIGHTS**

**TABLE OF CONTENTS**

**Page**

I.   SUMMARY …………………………………………………………………...5

II.  STATEMENT OF FACTS…………………………………………………………7

III. ARGUMENT…………………………………………………………………13

     A.  Where a Person Is Held in Complete Isolation, Interrogated Intensely
        for Long Periods, Psychologically Coerced and Made False Promises
        the Relinquishment of His Rights Is Not Voluntary……………………….…13

          i.  Defendant's Fifth Amendment Right and Miranda
            Requirements…………………………………………………………13

         ii.  Waiver of Miranda Rights Must Be Knowing and Voluntary……..….14

        iii.  Making a Determination Under "The Totality of the
            Circumstances………………………………………………………15

             1.  Defendant's Characteristics………………………...……16

             2.  The Setting of the Interrogation: Mr. Abdi Was Held
                and Questioned Incommunicado While Being Told His
                 Only Way Out Was to Cooperate……………………..……16

             3.  The Officers Cajoled and Tricked Mr. Abdi by Guising
                 Their Interrogations Under the Veil of Immigration and
                 Secondly by Making Him Believe Their Questioning
                 Was Not Regarding His Own Activity, but Their
                 Concern with Another Individual…………………………..27

     B.  Mr. Abdi's Statements Made On and After November 29, 2003 Were
        Not Voluntarily Made, They Are the Product of Coercion, Oppression
        and False Promises of Leniency and Benefits Offered from the
        Government Amidst Incommunicado Interrogations………………..……..30

          i.  Where a Suspect Is Held Incommunicado, Is Told His Only
            Way Out Is Through Cooperation, Is Subjected to Lengthy
            Questioning Over a Prolonged Time Period, and Is Made False
            Promises His Will Is Overborne and His Statements Are Not
            Voluntary………………………………………………………...31

     C.  On November 29, 2003 Agents Violated Mr. Abdi's Right to
        Miranda Warnings as None Were Presented to the Defendant and He
         Was Subject to a Custodial Interrogation…………………………..…….32

# TABLE OF AUTHORITIES

## CASES

**Page**

Arizona v. Fulimante
499 U.S. 279 (1991)……………………………………………………………. 30

Bram v. United States
168 U.S. 532 (1897)…………………………………………………..15, 18

California v. Beheler
463 U.S. 1121 (1983)………………………………………………………32

Colorado v. Spring
479 U.S. 564 (1987)………………………………………………15, 27, 28, 31

Crane v. Kentucky
476 U.S. 683 (1986)………………………………………………....……15

Culombe v. Connecticut
367 U.S. 568 (1961)……………………………………...…………………30

Dickerson v. United States
530 U.S. 428 (2000)…………………………………………………..5, 31, 32

Fare v. Michael C.
442 U.S. 707 (1979)……………………………………………...………….15

Grades v. Boles
398 F.2d 409 (4th Cir. 1968)…………………………………...……………16

Huto v. Ross
429 U.S. 28 (1976)……………………………………….…………..15, 18

Illinois v. Perkins
496 U.S. 292 (1990)…………………………………………...…………14

Jackson v. Denno
378 U.S. 368 (1964)……………………………………………………..15

Johnson v. Zerbst
304 U.S. 458 (1938)…………………………………………………...14

Lego v. Twomey
404 U.S. 477 (1972)…………………………………………...……15

Mincey v. Arizona
437 U.S. 385 (1977)……………………….……….……….………15, 31

Miranda v. Arizona,
    384 U.S.436 (1966)……….…….…………….…… 5, 6, 13, 14, 15, 21, 23, 27

Moran v. Burbine
    475 U.S.412 (1986)……………………………………….……….14, 27

North Carolina v. Butler
    441 U.S. 369 (1979)…………………………………...………14

Rhode Island v. Innis
    446 U.S. 291 (1980)……………………………………...………33

Schneckloth v. Bustamante
    412 U.S. 218 (1973)……………………………...……….15

Spano v. New York
    360 U.S. 315 (1959)………………………...……………6, 15, 18, 30

States v. Napior
    900 F.2d 260 (6th Cir. 1990)……………………….………….28

Tague v. Louisiana
    444 U.S. 469 (1980)………………………………………..14

United States v. Bautista-Avila
    6 F.3d 1360 (9th Cir. 1993)…………………………………...……….30

**CONSTITUTION**

U.S. Const. amend V…………………………………………………………….13

## I.       SUMMARY

Mr. Abdi moves this Court for an order suppressing his statements that officers obtained by violating his Fifth Amendment right to be free from self-incrimination, as well, by violating the procedures set forth in Miranda v. Arizona, 384 U.S.436 (1966).  Mr. Abdi requests the Court find the officer's initial use of trickery and presentment to the defendant that he was in violation of immigration laws and then their later statement that they wanted him to tell them what they knew about another individual violated Mr. Abdi's Miranda rights in that he was not fully aware of the nature of the right he was abandoning or the consequences of this abandonment.  As a result, Mr. Abdi requests that all rights waivers signed by Mr. Abdi be deemed involuntary and not knowingly made and that all statements resulting there from be suppressed.

Secondly, Mr. Abdi moves this Court to further suppress statements obtained by the officers in violation of Miranda on November 29, 2003, as the officers failed to provide the defendant with any procedural safeguards required by Miranda on this date.  Mr. Abdi requests that all statements on this date be suppressed as they are all the result of a Fifth Amendment violation. Dickerson v. United States, 530 U.S. 428 (2000).

Third, Mr. Abdi moves this Court to suppress all statements obtained as a result of involuntary and unknowing waivers of the defendant's rights.  The defendant's position is that on day one, this Court should find psychological coercion and oppression existed as a result of specific statements the agents made to the defendant to force him into "cooperating".  Defendant moves for this Court to find that any waiver of his rights that resulted from this coerced, oppressive and forced "cooperation" is involuntary.  The defendant requests that any statement resulting from an involuntary waiver of his rights be suppressed as it was obtained in violation of the Fifth Amendment.  Alternatively, defendant requests that the Court find the defendant's waiver of his rights on day three (November 30, 2003) was the sole product of prolonged incommunicado interrogation, coercion, psychological pressure, false promises and trickery.  With repeated statements designed to force the defendant's waiver of his rights.  Mr. Abdi requests this Court find that his waiver on November 30, 2003 was not voluntary and all

statements resulting from it must be suppressed.  Moreover, defendant requests this Court find that the same incommunicado interrogation, coercion and psychological pressure permeated all subsequent Miranda waivers Mr. Abdi provided and that none were voluntarily made.  Thus, all statements on and after November 30, 2003 must be suppressed because they are the result of involuntary Miranda waivers.

Lastly, defendant moves this Court to find that on day one when Mr. Abdi was told he and his family were in danger of being deported and his only way out was if he cooperated, that his will was overborne and no statement thereafter by Mr. Abdi was voluntarily made.  In the alternative, defendant requests this Court find statements made on and after November 30, 2003 are the product of coercion and are involuntary.  By November 30, 2003, Mr. Abdi was now in his third day of isolation, he had had no contact with family and was not going to be permitted any contact with family.  He was made false promises "that if he cooperated, he would get to go home and be with his family" and "that he would get out" and not be deported.  He was repeatedly pressured to "cooperate" for several coercively stated reasons.  The fact that he was held in isolation was used to taunt him and pressure him to cooperate.  Thus, any statement made on or after November 30, 2003 was not voluntary, but was the product of coercion.  According to the Fifth Amendment jurisprudence such statements obtained involuntarily violate a fundamental sense of decency and must be suppressed. Spano v. New York, 360 U.S. 315, 320-21 (1959).  Defendant thereby requests the Court suppress all statements made by defendant on or after November 30, 2003 as they are involuntary and were obtained in violation of the Fifth Amendment.

///

///

///

///

## II. STATEMENT OF FACTS

Mr. Abdi is an immigrant.[1] At the time of his arrest he had been residing in the United States for five years.[2] Prior to his arrest he had one encounter with police agents,[3] in that he was questioned by the Federal Bureau of Investigations (FBI) in April 2003.[4] When he was questioned in April of 2003, he cooperated, answered the agent's questions and also permitted the agent to search his home.[5] Mr. Abdi believed this investigation was over and that his cooperation had permitted an easy dismissal of the agent's concern at that time.[6] This is the only encounter Mr. Abdi had had with police or government agents concerning any investigation.[7] Mr. Abdi has a high school education and studied for two years at a university in Syria.[8] He has no understanding of the law, especially American law.[9] As an immigrant, he did believe that agents of the government had the power to revoke his residency status in the United States.[10] Thus, he believed they could cause him to lose his legal status in the United States.

On November 28, 2003 at 5:00 a.m., Mr. Abdi was arrested and taken into custody.[11] Agents from both the FBI and Immigration Customs Enforcement (ICE) were present.[12] Mr.

---

[1] Declaration of Nuradin Abdi in Support of Motion to Suppress Statements for Violation of Defendant's Fifth Amendment Rights is attached as Exhibit A. *See* Page 1-Line25 (P1-L25).

[2] Exhibit A, P1-L19-20.

[3] Exhibit A, P1-L20-24.

[4] This and several other facts herein are also detailed in Defendant's Motion to Suppress All Statements Allegedly Made By the Defendant and All Evidence Seized in Violation of the Fourth Amendment filed with this Court on May 17, 2005. As well, Defendant's Motion to Dismiss for Outrageous Government Conduct has been filed separately and details the isolation and incommunicado circumstances under which Mr. Abdi was kept until his mental breakdown. The discussion here is therefore supplemented by and should be considered together with these motions and memoranda submitted by the defendant.

[5] Exhibit A, P1-L20-24.

[6] Id.

[7] Exhibit A, P1-L22, L25-27.

[8] Exhibit A, P1-L17-18.

[9] Exhibit A, P1-L25-28.

[10] Id.

[11] Exhibit A, P2-L1.

Abdi was informed by ICE agent, Robert Medellin that he was under arrest for immigration violations.[13] Mr. Abdi was taken to the FBI office in Columbus, Ohio.  Here, Agent Medellin told him that he had committed "a lot of immigration violations", that these violations would lead to his and his family's deportation.[14] He was further told that his "only way out" was for him to cooperate with the FBI's questioning.[15] Immediately, after being told this he was questioned by FBI Agent, Stephen Flowers.[16] Following this initial questioning by the FBI, Mr. Abdi was transported to an immigration office in Cincinnati, Ohio.[17] Here, he was placed in a cell.[18] Around lunch time, Agent Medellin came to Mr. Abdi in the cell.[19] Agent Medellin told Mr. Abdi that an order had come from the government to take him out of the streets.[20] This order was said to have come, because Mr. Abdi had committed a lot of immigration violations.[21] Agent Medellin then informed Mr. Abdi that he had been working for ICE for 27 years and that he had seen cases like this before.[22] He then again told Mr. Abdi that he needed to cooperate with them.[23] He mentioned Mr. Abdi's family and his children.[24] He stressed to Mr. Abdi that he needed to be with his family, especially his infant daughter who the Agent had seen earlier that day at Mr. Abdi's home.[25] Mr. Abdi specifically asked

---

[12] Please reference Declaration of Nuradin Abdi in Support of Motion to Suppress All Statements P2-L4-19. (Filed with this Court on May 17, 2005 as Exhibit D to *Memorandum of Points and Authorities in Support of Motion to Suppress All Statements Allegedly Made by the Defendant and All Evidence Seized*.)

[13] Exhibit A, P2-L2-3.

[14] Exhibit A, P2-L8.

[15] Exhibit A, P2-L10-12.

[16] Exhibit A, P2-L14.

[17] Exhibit A, P2-L19.

[18] Exhibit A, P2-L20.

[19] Exhibit A, P2-L21-22.

[20] Exhibit A, P2-L24-25.

[21] Exhibit A, P2-L25.

[22] Exhibit A, P2-L23-24.

[23] Exhibit A, P2-L26.

[24] Exhibit A, P2-L27.

[25] Exhibit A, P2-L27, P3-L1-2.

what he did, and was told again that he had committed immigration violations.[26] Agent Medellin then left Mr. Abdi alone in the cell with his lunch.[27]

Around 5:00 p.m. this same day, Agent Medellin returned again to Mr. Abdi in the cell.[28] Agent Medellin now commented to Mr. Abdi that this was going to be a long process, taking long hours. He told Mr. Abdi that he needed to be patient.[29] He again told Mr. Abdi he should cooperate.[30] In particular, this time he stated that if Mr. Abdi wanted it over faster he had to cooperate.[31] A couple of hours later, Mr. Abdi was transported to a jail where he was kept in isolation.[32]

The following day, Saturday, November 29, 2003 at approximately 11:00 a.m., Mr. Abdi was picked up at the jail by Agent Medellin and Richard Wilkens.[33] The agents transported Mr. Abdi back to the immigration office where he was again placed in a cell.[34] Mr. Abdi was then taken out of the cell and to an office for questioning. Both Agent Wilkens and Agent Medellin questioned Mr. Abdi at this time.[35] Agent Wilkens specifically questioned Mr. Abdi about his legal status in the United States. He asked him particulars about his asylum application.[36] Neither agent read Mr. Abdi his rights before asking him these questions.[37] He was not informed of his right to remain silent, of his right to an attorney, or that anything he said could be used against him.[38]

---

[26] Exhibit A, P3-L3-6.

[27] Exhibit A, P3-L7.

[28] Exhibit A, P3-L8.

[29] Exhibit A, P3-L8-10.

[30] Exhibit A, P3-L10.

[31] Id.

[32] Exhibit A, P3-L14-15.

[33] Exhibit A, P3-L16-17.

[34] Exhibit A, P3-L18.

[35] Exhibit A, P3-L19-21.

[36] Exhibit A, P3-L22-24.

[37] Exhibit A, P4-L1-4.

[38] Id.

After this initial questioning on Saturday, Mr. Abdi was taken back to the cell where he remained for about three hours.[39] Mr. Abdi was again visited by both Agent Wilkens and Medellin in the cell.[40] At this time he was told that the agents wanted to know "about other things".[41] Mr. Abdi was told that the agents had "a lot of information about him", and that he was not "telling them what they wanted to hear".[42] Mr. Abdi finally specifically asked the agents "What are you looking for?"[43] At this time, he was told that they wanted to know about Iyman Faris.[44] The agents then took Mr. Abdi back to the office and he was then questioned about Iyman Faris.[45] Mr. Abdi was not read his rights at this time.[46] This questioning lasted about one hour.[47] At this time, Mr. Abdi was talking to the agents about how he knew Mr. Faris.[48] Despite this, the agents began to tell Mr. Abdi that he was not cooperating.[49] Mr. Abdi was then told again that if he wanted to go home, he needed to cooperate.[50] Both his children and the fact that he was being held in isolation were mentioned to him at this time.[51] Mr. Abdi was then taken back to the cell where he remained until approximately 10:00 p.m.[52]

Around 10:00 p.m. on Saturday, Mr. Abdi was again taken from the cell to the office for questioning.[53] Now the FBI Agents, Stephen Flowers and John Corbin were present.

---

[39] Exhibit A, P4-L5.

[40] Exhibit A, P4-L6.

[41] Exhibit A, P4-L7.

[42] Exhibit A, P4-L7-8.

[43] Exhibit A, P4-L10.

[44] Exhibit A, P4-L12.

[45] Exhibit A, P4-L13-14.

[46] Exhibit A, P4-L13-17 details Mr. Abdi's recounting of the events that occurred on this date, it is void of the agents reading him his rights as is also stated at P4-L1-4.

[47] Exhibit A, P4-L15.

[48] Exhibit A, P4-L14.

[49] Exhibit A, P4-L16.

[50] Exhibit A, P4-L16-17.

[51] Exhibit A, P4-L17-19.

[52] Exhibit A, P4-L20.

[53] Exhibit A, P4-L20-21.

Agent Medellin told Mr. Abdi at this time that he needed to talk about "what he knew about Faris".[54] Mr. Abdi replied that he was not there for that. Mr. Abdi specifically stated (as he had been told) that he was there for an immigration violation, not this other questioning.[55] Mr. Abdi then asked to telephone his family and was denied this request.[56] At approximately 12:00 a.m. the agents then transported Mr. Abdi back to the jail where he was kept in isolation.[57]

The next day was Sunday, November 30, 2003. Mr. Abdi was retrieved from the jail at approximately 2:00 p.m.[58] Again, it was ICE agents who transported him. He was taken to the same immigration office for questioning. This time the questioning was initiated by FBI agents.[59] Agent John Corbin and Agent Stephen Flowers of the FBI asked Mr. Abdi to sign a waiver of his rights.[60] Mr. Abdi was told generally that the agents wanted to ask him some questions.[61] He was not told anything specific that the agents would be questioning him regarding.[62] There was no mention to Mr. Abdi that he was being questioned about his own possible criminal activity.[63] There was no mention to Mr. Abdi that he was being questioned at all about criminal activity.[64] Mr. Abdi believed he was now going to be questioned about Iyman Faris,[65] since this is what the agents specifically had told him they wanted to know about. He still believed he was only being held for possible immigration violations,[66] as he

---

[54] Exhibit A, P4-L21-23.

[55] Exhibit A, P4-L24-25.

[56] Exhibit A, P4-L26-27.

[57] Exhibit A, P4-L28, P5-L1.

[58] Exhibit A, P4-L2-4.

[59] Exhibit A, P5-L5.

[60] Exhibit A, P5-L7-8.

[61] Exhibit A, P5-L8-10.

[62] Id.

[63] Id.

[64] Exhibit A, P6-L1-2.

[65] Exhibit A, P5-L21-22.

[66] Exhibit A, P5-L27-28.

had been told repeatedly. Mr. Abdi signed the waiver, because he felt pressured.[67] At this point in time, he had been transported from his home in Columbus, Ohio approximately 100 miles to Cincinnati, Ohio.[68] He was not permitted any contact with his family whatsoever.[69] He was now being held in isolation for a third day.[70] He was not permitted any contact with persons other than agents and government staff.[71] The only activity he was being given was that he was being transported back and forth from the jail to questioning. At this point, Mr. Abdi had been told repeatedly he needed to cooperate[72] in order to get home or see his family. Mr. Abdi believed that when the agents told him he needed to cooperate, what they meant was he needed to sign this waiver and talk.[73]

After this, on several subsequent occasions the FBI agents obtained the same waiver of rights from Mr. Abdi.[74] There was never any occasion where it was explained to Mr. Abdi that he was being questioned about his own possible criminal activity.[75] On each occasion, Mr. Abdi was still under the same pressure of being held in isolation, of being permitted no

---

[67] Exhibit A, P5-L15-20. Waiver of Rights form for 11/30/03 is attached as Exhibit B it is noted the time the officer's wrote on this waiver is 10:40 p.m. Thus, there is a further violation in that the questioning began at 2:00 p.m. and the Waiver was signed at 10:00 p.m. However, defendant contends that regardless of the time when it was signed, any waiver signed on and after November 30, 2003 was involuntary.

[68] Exhibit A, P2-L6 and P2-L19.

[69] Exhibit A, P5-L15-17.

[70] Exhibit A, P5-L15.

[71] Exhibit A, P5-L17-18.

[72] Exhibit A, P2-L8-12 (he and his family are in danger of deportation and his "only way out is cooperation with the FBI); P2-L26 (he had committed a lot of violations, an order had came to take him off the streets, the officer had seen cases like this before and he needed to cooperate); P3-L1-2 (his family – his infant daughter needs him and in order for him to be with his family he needs to cooperate); P3-L9-10 (if he wants this over faster he has to cooperate); P4-L17 (if he wants to go home, he has to cooperate); P4-L18-19 (officer referencing the isolation); P4-L23 (his cooperation is not sufficing; he needs to talk about Iyman Faris).

[73] Exhibit A, P5-L21-24.

[74] Exhibit A, P6-L7-8, L11-24. Nine subsequent Waiver of Rights forms signed by the defendant are attached as Exhibit C. (Dates include: 12/01/03, 12/2/03, 12/3/03, 12/6/03, 12/7/03, 12/10/03, 1/06/04, 1/15/04, 2/17/04.)

[75] Exhibit A, P6-L12-13.

communication with his family and he still had no communication even with other inmates.[76] Mr. Abdi continued to believe the only way "out" for him as he had been told, was to continue to "cooperate".[77]  Mr. Abdi continued to believe that his waiving his rights and talking is what the government meant when they said he needed to cooperate.[78]  Thus, on each occasion the reason Mr. Abdi signed the waivers was because he was pressured and coerced by the government.[79]

### III.     ARGUMENT

**A.  Where a Person Is Held In Complete Isolation, Interrogated Intensely for Long Periods, Psychologically Coerced and Made False Promises the Relinquishment of His Rights Is Not Voluntary**

#### i.   Defendant's Fifth Amendment Right and Miranda Requirements

The Fifth Amendment privilege against self-incrimination governs the admissibility of most statements made by a defendant.  The Fifth Amendment requires that no person be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment. Miranda v. Arizona, 384 U.S.436 (1966).  Miranda set forth procedural safeguards effective to secure the privilege against self-incrimination.  Id. at 444.  The requirement is that law enforcement officers must warn a defendant that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. The safeguards must be given prior to the commencement of any interrogation. Id.  The purpose of the warnings is to guard against self-incrimination during "incommunicado interrogation" of

---

[76] Exhibit A, L22-24. *See also* Defendant's *Memorandum of Points and Authorities in Support of Motion to Dismiss for Outrageous Government Misconduct* which details the isolation Mr. Abdi was kept under and the length of time this isolation continued for.

[77] Exhibit A, P6-L21-23.

[78] Exhibit A, P6-L11-24.

[79] Exhibit A, P6-L21-22.

individuals in settings dominated or controlled by law enforcement officers. <u>Illinois v. Perkins</u>, 496 U.S. 292, 295 (1990).  Moreover, <u>Miranda</u> declared that custodial interrogation generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he does not otherwise do so freely." <u>Miranda</u> at 467.

### ii.  Waiver of <u>Miranda</u> Rights Must Be Knowing and Voluntary

Under the <u>Miranda</u> doctrine where officers secure a valid waiver of <u>Miranda</u> rights before they elicit incriminating statements, there is still a heavy burden on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retain or have appointed counsel. <u>Id</u>. at 475.  The relinquishment of the defendant's right must have been **voluntary** in the sense that it was the product of a **free and deliberate choice** rather than intimidation, coercion or deception. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  "The waiver must also be made with **a full awareness**, both of the <u>nature</u> of the right to be abandoned and <u>consequences</u> of the decision to abandon it." <u>Id</u>.  In making the determination of whether a defendant's waiver was knowingly and voluntarily made the court must look to the "totality of the circumstances surrounding the interrogation". <u>Id</u>. *See also* <u>Tague v. Louisiana</u>, 444 U.S. 469, 471 (1980) (government failed to show that petitioner waived his <u>Miranda</u> rights, because the arresting officer could not remember the statements that he read to the petitioner from a notice of <u>Miranda</u> right, whether he asked if he understood the rights, or whether he conducted any tests to determine if the defendant was literate or otherwise capable of understanding his rights).  At times, "the background, experience, and conduct of the accused" will indicate if officers secured a valid <u>Miranda</u> waiver. <u>North Carolina v. Butler</u>, 441 U.S. 369, 374-75 (1979) (*citing* <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938).  Any evidence that "the accused was threatened, tricked or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." <u>Miranda</u> at 476.

In any case, the government may make no use of a waiver, or any other statement, involuntarily obtained from a defendant in violation of the Fifth Amendment. Mincey v. Arizona, 437 U.S. 385, 398 (1977).  The burden is on the government to demonstrate a valid Miranda waiver. Lego v. Twomey, 404 U.S. 477, 488 (1972). And only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived. Fare v. Michael C., 442 U.S. 707, 725 (1979).

### iii.  Making A Determination Under "The Totality of the Circumstances"

In determining whether a waiver of Miranda rights was voluntary the same factors that influence a determination of voluntariness of confessions are to be considered. Colorado v. Spring, 479 U.S. 564, 573 (1987).  Ultimately admissibility always turns on the entire course of police conduct leading to a statement. Jackson v. Denno, 378 U.S. 368, 376 (1964).

Factors to be considered include the defendant's personal history, level of educational attainment, the physical condition of the accused, as well as the circumstances in which the officers elicit the statement. Crane v. Kentucky, 476 U.S. 683, 688 (1986).  As well, the length of detention, if physical force is used, and whether the questioning is repeated and of a prolonged nature were determinative factors in Schneckloth v Bustamante, 412 U.S. 218, 226 (1973).  Psychological pressure is just as determinative as physical force.  When law enforcement officers use psychological pressure to break down the will of an accused, all statements elicited thereby are deemed involuntary.  Spano v. New York, 360 U.S. 315 (1959). Moreover, promises of benefits or leniency by government agents may be impermissibly coercive, even if the government officials do not promise benefits of any significant value.  Huto v. Ross, 429 U.S. 28, 30 (1976); Bram v. U.S., 168 U.S. 532, 542-43 (1897) (holding that an admissible confession "must not be extracted by any sort of threats or

violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence") (internal quotations omitted).  As well, law enforcement officers' promises to reduce or dismiss criminal charges to secure an incriminating statement may have a particularly strong coercive effect.  Grades v. Boles, 398 F.2d 409, 412 (4th Cir. 1968).

### 1.  Defendant's Characteristics

Mr. Abdi is an immigrant.[80]  He has a high school education and studied at a university in Syria for two years.[81]  He has neither a professional degree, nor any experience in law or with law enforcement.  At the time of his arrest he had been living in the United States for five years.[82]  He had had one encounter with the police/FBI.  This encounter was in April 2003.  On this occasion, he was asked questions.  He cooperated by answering the questions and allowing the officers to search his home and this was the end of it.[83]  Mr. Abdi had no understanding of American laws, other than he believed if he did not do as the government asked they would take his legal status from him.[84]  When Mr. Abdi was arrested naturally he remembered this first encounter with the FBI and he recalled that his answering their questions was quickly concluded and enabled the investigation to come to an end.

### 2.  The Setting of the Interrogation: Mr. Abdi Was Held and Questioned Incommunicado While Being Told His Only Way Out Was to Cooperate

Mr. Abdi was arrested and transported 100 miles away from his home in Columbus, Ohio.[85]  He was transported, interrogated, and kept in a cell between interrogations on day

---

[80] Exhibit A, P1-L25-26.

[81] Exhibit A, P1-L18-19.

[82] Exhibit A, P1-L20.

[83] Exhibit A, P1-L20-25.

[84] Exhibit A, P1-L26-28.

[85] Exhibit A, P2-L6 and P2-L19.

one[86] for approximately fourteen hours[87] before being placed in the jail where he was housed. At the jail, he was placed in isolation.[88]  He was permitted no contact with other inmates, and was not to have contact with his family by phone, letter or through visitations.[89]

On the day of his arrest, day one, he was repeatedly told by the officers that he needed to cooperate.[90]  When the agents first had Mr. Abdi in an office on day one, the first thing Mr. Abdi was told was he and his family were in danger of being deported, and the "only way out" for Mr. Abdi and his family was for him to cooperate with the FBI agents.[91]  Mr. Abdi was then questioned by the FBI, and at the conclusion of this questioning the comment is made to Mr. Abdi "this is going to take a while".[92]  These initial words by the officers are the start of coercive and oppressive behavior by the officers.  Telling Mr. Abdi that he and his family may be deported puts all the power in the hands of these agents.  The agents know that Mr. Abdi is an immigrant.  They know he does not have U.S. citizenship.  They use this as leverage and power over him.  This power is then presented as a tyranny over Mr. Abdi when he is told "your only way out" is to cooperate with the FBI agents.[93]  By telling the defendant that "he

---

[86] The date of Mr. Abdi's arrest is Friday, November 28, 2003 this will be referred to as "day one"; Saturday, November 29, 2003 will be "day two"; and Sunday, November 30, 2003 will be "day three".

[87] Mr. Abdi was arrested at 5:00 a.m. and taken to the jail for housing at 7 p.m. that evening, equaling fourteen hours.

[88] Exhibit A, P2-L15.

[89] Again all details of the isolation are stated in Defendant's *Memorandum of Points and Authorities in Support of Motion to Dismiss for Outrageous Government Misconduct.*

[90] Exhibit A, P2-L8-12 (he and his family are in danger of deportation and his "only way out is cooperation with the FBI); P2-L26 (he had committed a lot of violations, an order had come to take him off the streets, the officer had seen cases like this before and he needed to cooperate); P3-L1-2 (his family – his infant daughter needs him and in order for him to be with his family he needs to cooperate); P3-L9-10 (if he wants this over faster he has to cooperate).

[91] Exhibit A, P1-L8-12.

[92] Exhibit A, P2-L14-18.

[93] Exhibit A, P2-L11-12.

has a way out" through cooperation, the agents are in fact telling him that his cooperation will "buy" him leniency.  This is the exact type of promise and leniency that has been held to be overly coercive and impermissible. *See* Spano 360 U.S. 315 (1959); Huto v. Ross, 429 U.S. 28 (1976); Bram v. U.S., 168 U.S. 532 (1897).  Here, the officers are suggesting immigration leniency.  It is analogous to the case where reduction in criminal charges is the offer made by agents.  In fact, the threat of being deported could be as harsh to an immigrant as criminal penalties. Thus, the officers at this point, made a promise to Mr. Abdi that coerced and pressured him to cooperate.  Pursuant to Spano, defendant's statements and/or waivers following this coercion are not voluntary and all statements resulting there from must be suppressed.

These oppressive, coercive and psychologically overbearing tyrannical statements continued.  At lunch time on day one, Mr. Abdi is told again that he needs to cooperate.  Now his children are mentioned by the agent.[94]  The fact that the agent saw Mr. Abdi's infant daughter on this same day is used as compelling pressure on Mr. Abdi "to cooperate".[95]  He is told "you need to be with your family" and "in order for him to be with them he needed to cooperate".[96]  Further statements are made by the officer at this time, which imply to Mr. Abdi that "cooperating" is his only option.  The officer tells Mr. Abdi he has been working for ICE for 27 years and that he has seen cases like this before (referencing that an order had come from the government to take Mr. Abdi "out of the streets"), and that he needs to cooperate.[97]  These words again are building up the tyranny even further, giving it more and more power over Mr. Abdi.  Now he has been told by a veteran who has "seen this before" that his only

[94] Exhibit A, P2-L21-28.

[95] Exhibit A, P3-L1-3.

[96] Id.

[97] Exhibit A, P2-23-25.

way is to cooperate. His family has now been used again to pressure his cooperation. After this Mr. Abdi is left with his lunch to sit in a cell[98] and contemplate his fate and whose hands that fate is in.

At dinner time on day one[99] Mr. Abdi is again cajoled, coerced and more pressure is added to the heaviness that has already been established. Mr. Abdi is told that "it's going to be long hours".[100] He has now been in custody for twelve hours, most of the time sitting in an isolated cell waiting for the agents to inform him of what is next. He is told if he wants to get this over faster, he has to cooperate.[101] Again, his way out is to "cooperate". These are not words that are said and a human can then dismiss them. This situation is one where Mr. Abdi has been told an order came from the government to take him off the streets.[102] That he is in danger of being deported,[103] and his family is in danger of being deported.[104] That this is going to take "a while".[105] That he should think of his children and he should cooperate.[106] And now finally that if he wants this over faster, he should cooperate.[107] Defendant asserts the analysis could stop at any point here and this Court should find that neither Mr. Abdi's statements nor any of his future rights' waivers were made voluntarily.

Finally, at 7:00 p.m. on day one, fourteen hours after his arrest Mr. Abdi is taken to a jail facility.[108] At this facility he is placed in complete isolation. The isolation was such that

[98] Exhibit A, P3-L7.

[99] Exhibit A, P3-L8.

[100] Exhibit A, P3-L9.

[101] Exhibit A, P3-L9-10.

[102] Exhibit A, P2-L24-25.

[103] Exhibit A, P2-L9.

[104] Id.

[105] Exhibit A, P2-L18.

[106] Exhibit A, P2-L27 – P3-L1-3.

[107] Exhibit A, P3-L9-10.

[108] Exhibit A, P3-L14-15

Mr. Abdi saw no other inmates.[109] He only saw the hands of guards when they brought him food which he was given through a window.  He had no schedule for showers, but had to request a shower.  He was taken in shackles to the shower and returned the same way.  He saw no one and was permitted no conversation with any person other than the agents who would come and retrieve him from the jail and take him for questioning.  These circumstances demonstrate the reality of the agents words "your only way out is to cooperate".  Defendant is put into a situation where literally his only way to anything is through these agents.  Especially, his only way to any human contact, any human interaction is through these agents in such an isolative situation.  Human beings are social creatures.  We were not created to be in isolation, and when we are placed in this situation, without any knowledge of whether an end to it is in sight, it bears a heavy burden on our heart and our soul.  The psychological pressure of being held in isolation coupled with the numerous statements to defendant all indicating that cooperation was his only way out is more coercive and oppressive than physical abuse.  Again neither Mr. Abdi's statements nor any of his <u>Miranda</u> waivers were voluntary due to the tyranny created by these agents. These agents created and enforced an oppressive, cajoling and coercive tyrannical force over the defendant.

Day two came and Mr. Abdi was retrieved by the ICE agents and taken for questioning.[110]  On this day, an agent references the isolation Mr. Abdi had spent the night in and asks "What do you think about it?"[111]  This is taunting the defendant with the incommunicado circumstances he is under and using it to pressure him.  It implies that this agent and the other agents have the power to implement this isolation, as the agent is

---

[109] Again, defendant incorporates by reference the Memorandum in Support of Motion to Dismiss for Outrageous Government Conduct wherein all of the jail "isolation" facts are detailed and substantiated.

[110] Exhibit A, P3-L16-17.

[111] Exhibit A, P4-L18-19.

demonstrating that he is aware of the isolation and is using this fact to add to the pressure on Mr. Abdi to "cooperate".  This is an extreme psychological pressuring tactic by this agent.  To throw in the defendant's face the isolation they are holding him under just before they are about to question him.  To do this after his first night in the isolation, creating a concern in the defendant (in any person in the same circumstances) of how long it may continue if he doesn't "cooperate".

On day two Mr. Abdi is then questioned regarding his legal status, his asylum application and his wife.  Mr. Abdi answers the agent's questions and is forthright with information, only because he is in fear and has been pressured and coerced into doing so by these agents.[112]  At this point, Mr. Abdi believes "cooperation" with these agents is his only way out.  To Mr. Abdi "cooperation" meant talking to these agents.  This questioning on day two took place without the provision of any Miranda warnings[113] and thus further created a coercive situation.  Miranda warning are to be given due to the "inherently compelling pressures which works to undermine the individual's will to resist and to compel him to speak where he does not otherwise do so freely".  Miranda at 467.  The officers' failure to give these warnings at this point thus exacerbates those inherently compelling pressures.  In this case, it exacerbates the overtly stated and circumstantially created pressures the defendant was under.  This lack of Miranda warnings at this pivotal point in the agents questioning and psychological tactics being employed create the utmost psychological coercion and oppression.  No statement by Mr. Abdi at this point nor any point thereafter, nor any waiver of his rights thereafter can rightfully be deemed voluntary.

---

[112] Exhibit A, P3-L25-28.

[113] Exhibit A, P4-L1-4.

After this questioning on day two which violated <u>Miranda</u>, Mr. Abdi was again placed in the cell to wait for approximately another three hours.[114]  At this time an agent came to the cell and told Mr. Abdi that "they had a lot of information about him" and he was not "telling them what they wanted to hear".[115]  Thus, he was not "cooperating" as he had been instructed to do so many times already.  Now, the agents are attempting to demonstrate to the defendant what "cooperation" they actually wanted.  They are telling him, look you are talking to us, but this isn't good enough.  They are also using authoritative language "you aren't telling me what I want to hear" sounds as though they are a parent about to punish, or a ruler about to tirade.  Again, forcing Mr. Abdi to either realize what it is these agents want and cough it up, or choose to not cooperate further and have "no way out".  This is not any option at all, but it is the option that Mr. Abdi was repeatedly presented with.

Mr. Abdi was then specifically told that the agents wanted to know about Iyman Faris.[116]  While on one hand it most likely was a relief for Mr. Abdi to know[117] what the agents were after, he still had no option but to "cooperate" if he wanted "out".  However, this statement by the agents regarding what they wanted to "hear" from the defendant also created a misconception.  The misconception that this is the only thing they were looking for from Mr. Abdi.  Conveniently, this fails to inform Mr. Abdi of the fact that they were also looking for Mr. Abdi's own potential criminal activity.  This misconception if believed by the defendant, creates a situation where his cooperation in fact does carry with it the power they have told him it does – that it is his way "out".  For if you are told by officers that they are looking for information on another individual, it implies they are not after you.  Therefore, if you do give

---

[114] Exhibit A, P4-L5.

[115] Exhibit A, P4-L7-8.

[116] Exhibit A, P4-L12.

[117] The word know is used in the sense that defendant "knew" according to what the agents were stating. Not that the defendant conclusively or correctly "knew" what the agents were seeking.

them what they want, they should let you "out", because they aren't interested in you.  At this point, Mr. Abdi had been told the only concern with him was immigration violations.  Nothing criminal was mentioned.  Now he is being told what they want is information about someone else.  Thus, Mr. Abdi feeling the truth of what they are after is finally revealed is fooled by these agents into believing that they are not searching for criminal activity that the defendant himself has engaged in.  This type of trickery is clever and it worked, as Mr. Abdi never had any idea that these agents were actually looking to incriminate him.  Thus, at this point the psychological coercion and pressure transitioned into trickery.  Pursuant to the Fifth Amendment jurisprudence this is a violation of the defendant's right to be free from self-incrimination.  Miranda at 476.  As any evidence that "the accused was threatened, tricked or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." Id.

At this point on day two, Mr. Abdi is then taken and questioned about Iyman Faris.[118] Here again, Mr. Abdi is not read his rights or given any Miranda warnings.  Mr. Abdi answers the questions of the officers, again because he was now tricked, in addition to the psychological pressure and coercion.  Here again though the officer's apparently were not satisfied with what they were hearing.  Mr. Abdi is told that he is not cooperating, and that if he wanted to go home, he needed to cooperate.[119]  This statement now adding to the same trickery, as the ploy is now that they are after someone else, not him.  All he needs to do is "cooperate", and he will get to go home.  Mr. Abdi for the first time tells the officers to stop this questioning.[120]  He specifically tells them, "I am not here for that."  As he had been told, he was there for immigration violations initially.  The officer's disregard Mr. Abdi's assertion

---

[118] Exhibit A, P4-L13-14.

[119] Exhibit A, P4-16-17.

[120] Exhibit A, P4-L24-25.

that he does not want to talk, that is, that he wants to remain silent.  Instead they tell him specifically "you need to talk to us about what you know about Faris".[121]  This is a blatant violation of <u>Miranda</u> and the defendant's assertion that he does not wish to talk.  The officers completely ignore Mr. Abdi's assertion of his own right.  A right which on this day, they failed to offer, and now continue to ignore.  Mr. Abdi then asks to telephone his family and the officers deny him this request.[122]  The questioning then continues by the officers.  It lasted until approximately 12:00 a.m. and Mr. Abdi was transported back to the jail and returned to isolation.[123]

Now on day three, Mr. Abdi is retrieved from the jail by the ICE agents and taken for questioning.[124]  On this day, four agents, two FBI agents and two ICE agents are present in the room.[125]  The FBI agents now conduct the interrogation.  The ICE agents observe.  Mr. Abdi is asked by the FBI agents to sign a waiver of his <u>Miranda</u> rights.[126]  He is told by the officers generally that they wanted to ask him more questions.[127]  No specifics are told to Mr. Abdi.[128]  The officers did not advise him that they were questioning him regarding his own potential criminal activity.[129]  Thus, Mr. Abdi could only assume they were continuing the same questioning that had occurred the two days prior. At this point Mr. Abdi was on day three of isolation, he had not spoken to his family and saw no future opportunity to speak with them.  He had been told by these agents that communication with his family was not an option.  He

---

[121] Exhibit A, P4-L23.

[122] Exhibit A, P4-L26-27.

[123] Exhibit A, P4-L28 – P5-L1.

[124] Exhibit A, P5-L2-4.

[125] Exhibit A, P5-L5-6.

[126] Exhibit A, P5-L7-8.

[127] Exhibit A, P5-L8-9.

[128] Exhibit A, P5-L9-10, P5-L28 – P6-L1-3.

[129] Exhibit A, P6-L1-2.

had now been through two days of lengthy interrogations, a total of fourteen hours on day one and eleven hours on day two.  He had been told by the agents that he needed to cooperate or face deportation.[130]  That if he cooperated, this would go faster.[131]  Told that he needed to give them what they wanted, if he wanted to go home to his family.[132]  Mr. Abdi understood "cooperate" to mean sign the waiver and talk.[133]  He did so; he signed the waiver, because he was psychologically coerced, he was under oppressive incommunicado conditions, he was told this was his only way out, and he was also tricked into believing they were not seeking criminal information on him.[134]  This waiver by Mr. Abdi was not voluntarily or knowingly made.

In conclusion, Mr. Abdi's waiver of his rights at 2:00 p.m. on day three after such pervasive oppression, coercion, psychological pressure created by circumstances and by the agents' specific statements was not voluntary.  It was not the product of a **deliberate and free choice**.  Mr. Abdi was presented with a situation and with statements from these officers that gave him no freedom of choice.  When your choice is to cooperate and "get out" or not cooperate and continue in isolation from the world and from your family, there is no choice at all.  The officers had also made false promises of leniency with immigration laws to Mr. Abdi if he cooperated,[135] and promises that this would "get over faster'.[136]  In addition, Mr. Abdi's decision was not made with **full awareness**, neither of the <u>nature</u> of the right he was abandoning nor of the <u>consequences</u> of the decision to abandon it.  Mr. Abdi had been tricked

---

[130] Exhibit A, P2-L9.

[131] Exhibit A, P3-L10.

[132] Exhibit A, P2-L23-28.

[133] Exhibit A, P5-L11, L21-22.

[134] Exhibit A, P5-L11-20.

[135] Exhibit A, P2-L8-12.

[136] Exhibit A, P3-L10.

into believing he was about to be questioned regarding another individual.[137]  He was completely unaware that the officers suspected Mr. Abdi himself of criminal activity[138] and were about to solicit self-incriminating statements from him.  The officers created this misconception purposefully and deceived him into waiving his rights "to talk" about someone else, when in fact they were soliciting statements regarding the defendants own alleged criminal activity.  Because Mr. Abdi's waiver of his rights was not voluntary his statements on day three (November 30, 2003) must be suppressed.  The officer's violated the Fifth Amendment and the requirements of <u>Miranda</u> by creating a situation where the defendant had no choice and was forced to cooperate.

Moreover, this psychological coercion, the incommunicado oppression, and the trickery continued to permeate each and every subsequent waiver request the agents obtained from Mr. Abdi.[139]  At no time on any subsequent date when waivers were submitted was any statement by the officers made to remedy the effects of the initial coercion and pressure.[140]  To the contrary the defendant remained in complete isolation with no contact with any one but for these agents until December 7, 2003 when he was finally visited by an attorney.  Defendant thus, moves to suppress all statements on or after November 30, 2003 as none are the product of voluntary waiver's of his <u>Miranda</u>  rights, due to the trickery, oppression, and coercion of the agents.

///

///

///

---

[137] Exhibit A, P4-L12.

[138] Exhibit A, P5-L10, P6-L1-2.

[139] Exhibit A, P6-L17-18.

[140] Exhibit A, P6-L15-16.

**3. The Officers Cajoled and Tricked Mr. Abdi by Guising Their Interrogations Under the Veil of Immigration and Secondly by Making Him Believe Their Questioning Was Not Regarding His Own Activity, but Their Concern with Another Individual**

While the rule is clear that a waiver must also be made with **a full awareness**, both of the nature of the right to be abandoned and consequences of the decision to abandon it. . Moran v. Burbine, 475 U.S. 412, 421 (1986).  In Colorado v. Spring, the Supreme Court held a suspect's awareness of all the possible subjects of questioning in advance of custodial interrogation by law enforcement officials is not relevant in determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege against self-incrimination. Id.  Specifically the Court held that failure of law enforcement officials to inform an individual, when they seek to interrogate him following his arrest for violations of federal firearms laws, that he will also be questioned with regard to his involvement in a murder, does not invalidate that individual's waiver of his privilege against self-incrimination where the individual has been properly advised of his rights in accordance with the Miranda. Id.

First, defendant distinguishes the case before this Court from Spring.  In Spring, the suspect was being questioned about criminal activity dealing with firearms.  The question was did the officers' failure to inform him that he would also be questioned about a murder violate his privilege against self-incrimination.  Again, the Supreme Court found that it did not.  The case at bar, is not dealing with a questioning of two different sets of criminal activity.  The case at bar deals with two different realms of possible misconduct.  One realm is the possible immigration misconduct, and the other is possible criminal misconduct.  The two carry extremely different consequences for a suspect.  The severest immigration penalty for the defendant in this case would be his inability to gain U.S. citizenship.  While this is sometimes a priceless treasure, it is certainly no comparison to the severest penalty for criminal misconduct which is complete loss of liberty and possibly life.  Thus, defendant contends that

the officer's failure to inform him that he was being questioned regarding criminal activity, and their insistence that what he was arrested for, held for and being questioned was only for potential immigration violations violated defendant's privilege against self-incrimination.

Other cases have attempted to distinguish Spring.  In one such case, the Sixth circuit was not convinced with the facts of the case before it, but did state that "absent an actual misrepresentation as to the scope of the questioning, a waiver is unquestionably valid." United States v Napior, 900 F.2d 260 (6th Cir. 1990).  Obviously, the inverse of this statement holds that where an actual misrepresentation as to the scope of the questioning is made a waiver would not be valid.  Defendant contends that this is the exact case before this Court.  The officers here stressed that defendant was being arrested, held and questioned for immigration violations.[141]  There was never any mention or even an illusion by them to the possibility that they were questioning the defendant regarding his own potentially criminal activity.  The interrogation tactics utilized in this case demonstrate the relevance of the information the officers did not reveal.  The officers new that had they revealed to Mr. Abdi that they were investigating him for possible charges surrounding international terrorism and terrorist organizations or even to determine what his connection to any terrorist organization was, that Mr. Abdi would have immediately recognized the **seriousness** of such potential allegations and would **not** have waived any of his rights.  Thus, the tactic here employed was to tell Mr. Abdi that their only concern with him was regarding his immigration status, and if he would "help them" by giving them information on other individuals then they would help Mr. Abdi with his immigration status.  Mr. Abdi was never advised that there were any potential criminal charges against him.[142]  Instead when he asked, he was repeatedly told that he was

---

[141] Exhibit A, P2-L2-3; P2-L8; P2-L25; P3-L21-24.

[142] Exhibit A, P6-L1-2.

arrested and held for immigration violations.  Mr. Abdi's arrest warrant was issued by immigration,[143] he was held by immigration at an immigration facility,[144] he was transported to and from this facility for questioning by the ICE agents (not the FBI agents),[145] and he was questioned at the ICE office.[146]  Thus, everything to the defendant represented immigration violations.  All of these facts, and especially the officer's own statements that this is why he was arrested, held and being questioned demonstrates a pervasive misrepresentation by the officers.  This misrepresentation was calculated and violates the defendant's privilege against self-incrimination.

Secondly, when it was obvious to Mr. Abdi that the officers wanted him to talk about something other than possible immigration violations, the questioning was presented to him as "he needed to talk about Iyman Faris".[147]  This again, demonstrates to the defendant two things: 1) that he is still only being held for immigration violations and 2) that he himself is not under any investigation; Iyman Faris is.  Thus, when further information was revealed the interrogation and questioning was now even more misrepresented to the defendant.  At no time was the defendant advised that he was under investigation for his own potential involvement in criminal activity.[148]

In conclusion, defendant would not have waived his right to remain silent and his right to an attorney had he been apprised of the fact that the officers were questioning him regarding his own potential criminal activity.  Criminal activity that carries with it a penalty of up to life in prison. 18 U.S.C. 2339A.  Defendant was deceived by the officers who misrepresented their

---

[143] Warrant for Arrest of **Alien** is attached as Exhibit D.

[144] Order to Detain or Release **Alien** is attached as Exhibit E.

[145] Exhibit A, P3-L16-17.

[146] Exhibit A, P2-L19, P3-L18, P5-L3, P6-L5.

[147] Exhibit A, P4-L12.

[148] Exhibit A, P5-L27-28, P6-L1-3.

purpose as that being for immigration purposes. This statement was made to the defendant at the very beginning, on day one just before questioning began.[149] This is a violation of the defendant's privilege against self-incrimination. In addition, it demonstrates that the waivers the defendant signed were not signed knowingly. When a waiver is not made knowingly, then it cannot be deemed to be voluntary or in compliance with Miranda. Had defendant known the real consequences and scope of the questioning he would not have waived his rights. Where a waiver is not knowingly and voluntarily made the statements that result there from must be suppressed. Again, defendant requests this Court suppress all statements resulting from such invalidly obtained waivers of his Miranda rights.

**B. Mr. Abdi's Statements Made On and After November 29, 2003 Were Not Voluntarily Made, They Are the Product of Coercion, Oppression and False Promises of Leniency and Benefits Offered from the Government Amidst Incommunicado Interrogations**

In addition to proving compliance with Miranda and its progeny, the government must establish that the challenged statements were made voluntarily. Arizona v. Fulimante, 499 U.S. 279, 288 (1991). Involuntary statements must be suppressed as they are inherently untrustworthy, and their use violates our fundamental sense of decency. Spano v. New York, 360 U.S. 315, 320-21 (1959). A statement is involuntary if "the will of the defendant was overborne in such a way as to render his confession a product of coercion". Id. *See also* United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993) (declaring a statement is involuntary if it is obtained by any direct or implied promises, however slight, or by the exertion of improper influence). On the other hand, a voluntary statement is "the product of an essentially free and unconstrained choice by its maker". Culombe v. Connecticut, 367 U.S. 568, 602 (1961). In determining whether Mr. Abdi's statements were voluntary, this Court must determine whether under the totality of the circumstances, examining both the

---

[149] Exhibit A, P2-L8-12.

"characteristics of the accused and the details of the interrogation," Mr. Abdi's will was overborne. Dickerson v. United States, 530 U.S. 428, 434 (2000).  Statements determined to be involuntary are inadmissible for any purpose. Mincey v. Arizona, 437 U.S. 385 (1978).

The same analysis applied to determine if a waiver of Miranda rights is valid is applied to determine if the defendant's will was overborne and statements were not voluntary. Spring at 573.  Thus, the facts as detailed above under Section III, subsection A, iii, including subsections 1, 2, 3 describe the totality of the circumstances relevant to make a determination as to whether defendant's statements were voluntary.

> **i. Where a Suspect Is Held Incommunicado, Is Told His Only Way Out Is Through Cooperation, Is Subjected to Lengthy Questioning Over a Prolonged Time Period, and Is Made False Promises His Will Is Overborne and His Statements Are Not Voluntary**

Defendant has detailed the facts under which the defendant was held and questioned above.[150]  In summary these facts demonstrate the following.  Mr. Abdi was held incommunicado. He was arrested at 5:00 a.m. on November 28, 2003 and from this point forward he was held in isolation.  He was not permitted contact with his family, by phone, by mail or by visitation.  This fact was used by the agents, as they made false promises to him that "if he cooperated, he would get to go home to his family".  Mr. Abdi was repeatedly cajoled and coerced by the agents "to cooperate". He was specifically told on several different occasions "he needed to cooperate".  He was told "cooperation" was his only way out, that it would get this over faster, that it would allow him to see his family.  He was made false promises of leniency.  The fact that he was held in isolation was used to taunt him and to pressure him to "tell them what they wanted to hear".  When Mr. Abdi stated that he did not want to talk, "that he was not there" for what the officer's were asking him about, the officer's ignored that he had invoked his right to remain silent and continued to pressure him.  All of

---

[150] Section III, subsection A, iii, including subsections 1, 2, 3

the behavior of the officers which is detailed in this motion demonstrates psychological coercion, oppression, trickery and false promises that were used to force statements from the defendant.  All the statements the defendant made were a result of this psychological pressure and coercion and all were involuntary.  Thus, defendant moves this Court to suppress all statements made by the defendant.  Defendant's contends that beginning on day one at the start of the questioning the agents coerced Mr. Abdi, made false promises and none of his statements thereafter were voluntarily made.

### C. On November 29, 2003 ICE Agents Violated Mr. Abdi's Right to <u>Miranda</u> Warnings as None Were Presented to the Defendant and He Was Subject to a Custodial Interrogation

When the government fails to issue <u>Miranda</u> warnings to a suspect prior to questioning, statements made by the suspect thereafter may not be used as evidence in the prosecution's case-in-chief.  <u>Dickerson</u> at 444.  <u>Miranda</u> requirements are triggered when a suspect is in custody and being interrogated.  The ultimate inquiry is whether there is a "formal arrest or restraint on freedom of movement" that would be associated with a formal arrest. <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983).  In the case at bar, Mr. Abdi was arrested on November 28, 2003.[151]  Although the warrant for the arrest was not served on him until December 1,[152] he was told he was under arrest, he was handcuffed, he was housed in a jail and kept in isolation at the jail.[153]  At this time, the isolation was such that Mr. Abdi was fed through a small window.  He saw guards only when they came to bring the food.  He had to wait for a special guard to take him to shower, at which time he was taken in shackles to the shower and then returned to isolation.  Thus, there is no doubt that Mr. Abdi was in custody.

---

[151] Exhibit A, P2-L1-3.

[152] Defendant's *Memorandum of Points and Authorities in Support of Motion to Suppress All Statements Allegedly Made by Defendant and All Evidence Seized* details the timing of his arrest and the serving of the warrant.

[153] Exhibit E (Dated November 28, 2003).

There can be no doubt that Mr. Abdi was also being interrogated within the meaning proscribed under Miranda.  The Supreme Court defined "interrogation" as any questioning "reasonably likely to elicit an incriminating response". Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  On the date in question, the officers retrieved Mr. Abdi from the jail he was housed in and transported him to the ICE office for questioning.  The initial questioning on this date was regarding his legal status in the United States, his asylum application and about his wife.[154]  Later this same day, the questioning transitioned into asking Mr. Abdi what information he knew about Iyman Faris.[155]  Both of these areas of questioning were likely to lead to Mr. Abdi providing incriminating statements. As well, the indictment references Mr. Abdi's immigration documents, items he was being questioned about on this date.  As well, the indictment references several "conspiracies" presumably ones with Iyman Faris, again a topic of questioning on this date.

**i.   Miranda Warnings Are Required To Be Given Any Time There Is a  Custodial Interrogation**

As discussed supra, Miranda requires that officers provide a suspect with the specific warnings proscribed by Miranda any time there is a custodial interrogation.  In this case, ICE agents interrogated Mr. Abdi on November 29, 2003 and did not read the defendant his rights.[156]  At this time, they did not explain to Mr. Abdi his right to remain silent, his right to an attorney or that anything he said could be used against him.  This failure to advise Mr. Abdi of his rights or to procure a waiver of his rights on this date was in violation of Mr. Abdi's Fifth Amendment right to be free from self-incrimination.

---

[154] Exhibit A, P3-L21-24.

[155] Exhibit A, P4-L13-14.

[156] Exhibit A, P4-L1-4.

In conclusion, the agents violated Mr. Abdi's Fifth Amendment rights on November 29, 2003 by interrogating him without advising him of his rights or procuring a waiver of his rights.  This is a specific violation of procedures required by <u>Miranda</u> and the Fifth Amendment.  As a result of this violation, all statements made by the defendant on this day must be suppressed.

Dated:   May 20, 2005                    Respectfully Submitted,


                                      By:     s/ Mahir T. Sherif, Esq.
                                              MAHIR T. SHERIF (CA Bar No. 135021)
                                              3376 30th Street
                                              San Diego, CA  92104
                                              (619) 297-4444
                                              Fax: (619) 297-4115
                                              sheriflaw@sbcglobal.net

                                              Attorney for Defendant