**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 2:04-cr-88 |
| | : | |
| v. | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| NURADIN ABDI, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S RESPONSE TO MOTION OF DEFENDANT
TO SUPPRESS ALL STATEMENTS ALLEGEDLY MADE BY THE DEFENDANT AND
<u>ALL EVIDENCE SEIZED IN VIOLATION OF THE FOURTH AMENDMENT (Doc.46)</u>**

On May 18, 2005, defendant Nuradin Abdi (defendant or Mr. Abdi), through counsel, filed the instant Motion to Suppress All Statements Allegedly Made by the Defendant and All Evidence Seized in Violation of the Fourth Amendment(<u>Mot</u>.).

The gist of the defendant's argument is that all statements and evidence must be suppressed as tainted by an illegal immigration arrest in violation of the Fourth Amendment. The defendant is wrong and his motion should be denied.

On November 28, 2003, the day after Thanksgiving, the single-largest shopping day in the United States, agents of Immigration and Customs Enforcement (ICE), accompanied by members of the Federal Bureau of Investigation (FBI)'s Joint Terrorism Task Force (JTTF), arrested the defendant on national security grounds.  This civil immigration arrest was authorized by federal

statute and was for the purpose of deporting Mr. Abdi on national security grounds.

For the sake of argument, even if the arrest, in hindsight, is found to be technically flawed, the defendant's statements should not be suppressed.  ICE made an objectively reasonable, good faith, arrest of the defendant on national security grounds.  Furthermore, any taint of an alleged unlawful arrest was purged by intervening events: law enforcement agents gave Miranda warnings to the defendant before each interview, which he memorialized by signing a written waiver and the defendant then later repeated all incriminating information with defense counsel present.  Therefore, the defendant's statements after his arrest should not be suppressed.

Based on the foregoing, and as more fully set out below, there are plainly reasonable grounds and probable cause for defendant Abdi's arrest and the government requests that the defendant's motion be denied.

I.   **STATEMENT OF FACTS AND OF THE CASE**[1]

A.   **Facts Leading to Mr. Abdi's Arrest on National Security Grounds on November 28, 2003**

---

[1]The government has only included the facts necessary to respond to the instant Motion to Suppress and establish the basis for a reasonable belief and probable cause to arrest the defendant.  The government is in possession of classified information, considered at the time of arrest, that could further buttress its grounds to arrest.  However, such information is not necessary to establish reasonable grounds and probable cause to arrest the defendant.

2

In March 2003, FBI learned of a long-standing relationship between defendant and Iyman Faris, a now-convicted Al Qaeda operative.  FBI learned that Mr. Abdi had met with Faris who was then actively engaged in material support of Al Qaeda against U.S. interests.  Faris was seeking to acquire targets of opportunity inside the United States for Al Qaeda.  According to Faris, Mr. Abdi told Faris that "things were heating up[2] and we need to do something."  When asked what Mr. Abdi believed should be done, Mr. Abdi replied, "take an AK-47 to a mall and start shooting."  Faris told the FBI that he thought he had talked Mr. Abdi out of it, but had not had recent contact with Mr. Abdi. The FBI immediately opened up a terrorism investigation on defendant Abdi to assess the threat the defendant Abdi posed and who else was involved with him.

The FBI, working with ICE, believed that Mr. Abdi had entered the United States illegally from Mexico on October 10, 1998.  Nevertheless, the defendant was granted asylum in the U.S. on January 28, 1999.  He was issued a work permit which expired in 2000.  The investigation revealed that defendant Abdi had attempted to enter Canada on several occasions and was refused entry.

On April 3, 2003, the FBI interviewed Mr. Abdi about

---

[2]At that time the U.S. had troops in Afghanistan searching for Usama bin Laden and was close to war with Iraq.

his statement that he intended to shoot up a mall with an AK-47. Defendant Abdi denied making the statement, but admitted to knowing Iyman Faris.  Mr. Abdi also admitted knowing another person of interest to the FBI as a terrorism subject.  A consent search of Mr. Abdi's residence yielded no weapons.  The investigation of defendant Abdi continued.

In May 2003, Faris pled guilty to materially supporting Al Qaeda.  Faris was ultimately sentenced to 20 years incarceration for conspiracy and materially supporting Al Qaeda. Faris admitted being a member of Al Qaeda and taking steps to determine whether the Brooklyn Bridge in New York City was a viable target for Al Qaeda.  According to Faris, he had been tasked to do so by Khalid Sheik Mohammed (KSM), alleged mastermind of the Sept 11 attacks.

During the same time period that Faris was selecting U.S. targets for KSM and Al Qaeda, Faris was meeting with defendant Abdi at a Columbus, Ohio coffee shop and the defendant was expressing his interest in "shooting up a mall."

In June of 2003, another Faris associate began cooperating with the FBI.  This source confirmed that Mr. Abdi was an associate of Faris and had had numerous contacts with him. According to this source, defendant Abdi met numerous times with Faris after mosque prayer services.  This source was a national security concern in his own right.  The source was ultimately

4

deported by immigration authorities.

The Abdi investigation continued.  The FBI, at times, engaged in physical surveillance of Mr. Abdi.  While under surveillance, defendant Abdi was observed engaging in counter-surveillance measures.  Mr. Abdi would drive in an unsafe and erratic manner in order to escape surveillance.

The FBI and ICE investigation revealed more disturbing information about Mr. Abdi.  The FBI learned that on July 31, 2001, Mr. Abdi had sent email to Faris.  The email contained a list of web sites dealing in spyware equipment, that is, electronic surveillance equipment and other items of interest. FBI terrorism investigations show that terrorist organizations make frequent use of email as a tool.  Email is used for conveying operational planning and direction, advice, fund raising, logistical, and other forms of support for terrorist acts.

From June 15, 2003 almost to the date of his arrest, the FBI learned that Mr. Abdi had been in contact with more than 40 separate phone numbers associated with FBI terrorism cases inside the United States.

Based on the foregoing, ICE concluded that defendant Abdi was deportable on national security grounds based on (1) his associations with terrorists and (2) his plan, threat, solicitation, and incitement to "shoot up a shopping mall."  As

the single-largest shopping day in the United States loomed closer, investigation and intelligence-gathering gave way to concern for public safety.  Rather than risk that the defendant would carry out a plan to shoot up a mall or disappear and commit some other violent act, ICE, accompanied by FBI, arrested defendant Abdi on immigration violations, based on national security grounds, at 6:00am on November 28, 2003, the day after Thanksgiving and the single largest shopping day in the United States.

At his arrest on November 28, 2003, defendant Abdi was given full oral Miranda warnings by ICE.  After his transport to the FBI office, Mr. Abdi was Mirandized again whereupon he waived his rights, signed a written rights waiver, and began making statements to ICE and FBI agents.  Defendant Abdi was transferred to a detention facility near Cincinnati to await the filing of formal immigration charges by ICE.

While Mr. Abdi was being held as a national security risk by ICE, on 11/30/03, defendant Abdi admitted that he had falsified his U.S. asylum application in its entirety.  This information was not known to ICE before his arrest, and gave ICE an entirely new basis upon which to file formal written immigration charges.  Mr. Abdi also began giving information concerning threats to U.S. interests which had to be immediately vetted.  Mr. Abdi also provided information about his knowledge

6

and involvement in conduct that formed the basis of the criminal terrorism charges upon which he was later indicted.  Mr. Abdi signed a written confession on November 30, 2003.

Based on his 11/30/03 confession, on 12/01/03, ICE charged Mr. Abdi with immigration violations relating to his falsification of his asylum application, rather than the original national security grounds.  The charging decision, later memorialized in the Notice to Appear (NTA), came more than 48-hours after defendant's arrest, because of discussions between ICE agents in the field and their headquarters in Washington, D.C. as to the charging language to be used in the NTA, resolution of issues of classified information which could affect the charging language, and the unexpected turn of events, namely the admissions by defendant Abdi.  Such a delay for extraordinary circumstances is provided for by ICE regulation.

After his confession on 11/30/03, on 12/01, 12/02, 12/03, 12/05, 12/06, and 12/07/03, defendant Abdi continued providing detailed information related to conduct for which he was eventually indicted.  Before each interview defendant was Mirandized and, on each occasion, Mr. Abdi waived his Miranda rights and signed a written waiver.

During the interviews between 11/28/03 and 12/07/03, three lawyers, claiming to have been hired by family or friends to represent defendant Abdi, notified ICE that they represented

Mr. Abdi.  At each juncture, before the interview began, defendant Abdi would be advised that the agents had been contacted by a lawyer, claiming to represent him and to have been hired by family or friends.  Mr. Abdi would be asked if he wished to speak to the lawyer.  Mr. Abdi responded "no" each time and the lawyer would be so advised.  On at least two occasions, defendant Abdi actually indicated his refusal to see these lawyers in writing.

On December 7, 2003, defendant decided to accept defense counsel, Douglas Weigle.  Mr. Weigle was hired by defendant's family to represent him.  Mr. Abdi specified he would only speak with Mr. Weigle after he had concluded a polygraph with the FBI.  On December 7, 2003, once the polygraph was concluded, Mr. Weigle spoke with Mr. Abdi.

Thereafter, on 12/10/03, 1/06/04, 1/15/04, and 2/17/04, with defense counsel Weigle present, the interviews continued. Before each interview, with counsel present, the FBI still Mirandized defendant Abdi and defendant still signed a Miranda waiver.  With counsel present, defendant repeated substantially the same information he had given in preceding interviews without counsel.

Meanwhile, the immigration deportation case based on defendant's false asylum application continued.  On January 28, 2004, with counsel Doug Weigle present, the immigration judge

continued defendant Abdi's ICE detention based on defendant's threat to national security.

On March 9, 2004, the defendant again appeared with counsel Douglas Weigle before an immigration judge in Detroit and, as he had done during the FBI/ICE interviews, freely and voluntarily admitted that he had falsified all information in his U.S. asylum application.  The immigration judge, observing the appearance and demeanor of defendant Abdi, accepted his admissions and terminated his asylum status and ordered defendant removed from the United States.

The criminal investigation of defendant Abdi's terrorism activities continued during this time, seeking corroboration of the defendant's statements.[3]  On June 10, 2004, the defendant was indicted in a four-count indictment.  Count one charged the defendant with conspiracy to provide material support to terrorists in violation of 18 U.S.C. §371 and §2339A; count two charged conspiracy to provide material support to a designated foreign terrorist organization, Al Qaeda, in violation of 18 U.S.C. §2339B; counts three and four charged fraud and misuse of immigration documents to facilitate an act of international terrorism in violation of 18 U.S.C. §1546(a).

---

[3]The information provided by Mr. Abdi continues to be vetted and investigated to the present day.

II.   **LAW AND ARGUMENT**

The government believes the above facts are more than sufficient to establish reasonable grounds and probable cause for ICE to arrest the defendant on national security grounds on November 28, 2003.  See United States v. Murrie, 534 F.2d 695, 697 (6th Cir. 1976)(citing United States v. Thompson, 409 F.2d 113 (6th Cir. 1969)(at suppression hearing, government has burden of establishing grounds to arrest to a preponderance of the evidence); See also Nix v. Williams, 467 U.S. 431, 444 n.5 (1984)(quoting United States v. Matlock, 415 U.S. 164 (1974)(preponderance standard).

**A.   Defendant Was Lawfully Arrested Without a Warrant on November 28, 2003**

On November 28, 2003, the defendant was arrested, without a warrant, pursuant to federal statutes, based on national security grounds.  The power of ICE to arrest without a warrant is established by Congress and set out by federal statute.

Title 8 U.S.C. § 1357(a)(2)states:

> **(a) Powers without warrant**
> Any officer or employee of the
> Service authorized under
> regulations prescribed by the
> Attorney General shall have power
> without a warrant-
> *          *          *
>     (2) to arrest any alien in the
> United States if he has **reason to
> believe** that the alien so arrested

10

> is in the United States in violation of. . .any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens . . .and [the person so arrested] is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States. (emphasis added)(attached as Exhibit 2).[4]

The plain language in the above statute is that to make a warrantless arrest there must be a "reasonable belief" on the part of the arresting officer that the alien is in violation of law.

Some courts have held that arrests under federal statutes can be based on less than probable cause, that is, a "reasonable suspicion." See United States v. Cortez, 449 U.S. 411 (1981)(cited by defendant, Mot. at 10)(reasonable suspicion); See also United States v. Khan, 224 F. Supp. 2d 1177, 1187 (D.C. Colo 2004); United States v. Rodriguez Rosario, 641 F. Supp. 560, 561 (D. Puerto Rico 1986)(arrest can be based on mere reasonable

---

[4]Citations to Title 8 U.S.C. herein correspond to sections of the Immigration and Nationality Act (INA) as amended prior to the enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B. 119 Stat. 231, 302 (2005)(attached as Exhibits 1-5). Copies of the provisions of INA Code of Federal Regulations (C.F.R.) cited herein are attached as Exhibits 6-9.

suspicion).  Other courts have held that the standard for arrests under a federal statute is probable cause.  United States v. Fachini, 466 F.2d 53, 56 (6th Cir. 1972)(probable cause); accord Tejeda-Mata-v. INS, 626 F.2d 721, 724 (9th Cir. 1980)(citing cases); United States v. Cantu, 519 F.2d 494, 496 (7th Cir.), cert. denied, 423 U.S. 1035 (1975).

Where there is probable cause, there is no need to establish exigent circumstances for a warrantless arrest where it is authorized by federal statute.  United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990), (citing United States v. Watson, 423 U.S. 411 (1976)(holding that warrantless arrest does not violate 4th Amendment even if there were no exigent circumstances and even if there was ample time to obtain and serve a warrant); See also United States v. Forest, 355 F.3d 942, 951 (6th Cir. 2004).

The government submits that under either the "reasonable belief" or the "probable cause" standards, based on the totality of the circumstances approach as outlined in Fachini, supra, Cortez, supra; Illinois v. Gates, 462 U.S. 128, 137 (1978), there are reasonable grounds and probable cause to believe that the defendant was in violation of the laws governing the "exclusion, expulsion, or removal of aliens" related to "national security" on November 28, 2003.

> ### 1.  Arrest Based on National Security Grounds

As described below, at the time of the defendant's arrest, ICE had reason and probable cause to believe that the defendant Abdi was in violation of at least three, separate, inadmissibility grounds of removal:

**1.  Member of Foreign Terrorist Organization**
8 U.S.C. §1182(a)(3)(B)(i)(V)(is a member of a foreign terrorist organization)(See Exhibit 3);

**2.  Threatening Use of Firearm**
8 U.S.C. §1182(a)(3)(B)(i)(I)(has engaged in terrorist activity)(See Exhibit 3) by means of threatening the use of a firearm with intent to endanger individuals or do substantial property damage 8 U.S.C. §1182(a)(3)(B)(iii)(V)and(VI)(See Exhibit 4);

**3.  Planning, Inciting, and Soliciting Terrorist Activity**
(planning, inciting, and soliciting terrorist activity with intent to cause death or serious bodily harm)or soliciting same. (8 U.S.C. §1182(a)(3)(B)(iv)(I)(II) and (V))(See Exhibit 4)

**1.  Defendant's Membership in Foreign Terrorist Organization**

Title 8 U.S.C. §1182(a)(3)(B)(i)(V), in relevant part, defines "terrorist activity" as an alien who–

> is a member of a foreign terrorist organization as designated by the Secretary under section 1189 of this title, which the alien knows or should have known is a terrorist organization. (See Exhibit 3).

Applied to the facts, ICE knew that defendant Abdi was a longtime associate of Iyman Faris, a self-confessed Al Qaeda

operative.  ICE was made aware that Mr. Abdi's contacts with Faris were on a regular basis, numerous, and suggested a meaningful association.  For example, Mr. Abdi had sent email to Faris suggesting websites where Mr. Faris could find "spyware." The "spyware" consisted of electronic surveillance and anti-surveillance equipment and other items of interest.  Email was a known tool used by members of terrorist organizations to communicate with each other.

Significantly, Mr. Abdi was suggesting "shooting up a mall" at the same time Faris was casing targets inside the U.S. for KSM and Al Qaeda.  Mr. Abdi had continued associations with another subject, a national security concern in his own right, who was ultimately deported in June 2003.  Moreover, from June 2003 leading up to his arrest, Mr. Abdi was in contact with more than 40 phone numbers associated with ongoing FBI terrorism investigations.

Based on the foregoing, on November 28, 2003, ICE had reason and probable cause to believe Mr. Abdi was in violation of 8 U.S.C. §1182(a)(3)(B)(i)(V) and deportable on security grounds as a member of a foreign terrorist organization, namely, Al Qaeda.[5]

**2.  Defendant's Threat to Shoot Up a Mall**

---

[5]Al Qaeda was designated a foreign terrorist organization on October 8, 1999.  64 Federal Register 112 (1999).

14

Any alien who has engaged in "terrorist activity" has also violated immigration law.  <u>See</u> 8 U.S.C. §1182(a)(3)(B)(i)(I) (Exhibit 4).  "Terrorist activity" is defined, in relevant part, as

> any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which **involves**, in relevant part, any of the following–
>
> (V) The **use** of any -(b) explosive, **firearm**, or other weapon or dangerous device...with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.
>
> (VI) A **threat**, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. §1182(a)(3)(B)(iii)(V) and (VI)(emphasis added) (<u>See</u> Exhibit 4).

By threatening to shoot up a mall with an AK-47, in the presence of now-convicted and imprisoned Al Qaeda cohort, Iyman Faris, defendant Abdi violated 8 U.S.C. §1182(a)(3)(B)(iii)(V) and (VI)(Exhibit 4).

Although in April 2003, the defendant denied making the threat, defendant's conduct and the circumstances in which he made the threat suggest that ICE and FBI were justified in taking this information seriously.  Defendant Abdi's threat was made during a volatile political situation when our troops were hunting Al Qaeda in Afghanistan and war was imminent with Iraq.

15

His threat was made in the presence of a now-admitted Al Qaeda operative who, at the very time Abdi made the threat, was conducting ongoing Al Qaeda target selection in the U.S. for Khalid Sheik Mohammed (KSM), supposed mastermind of the 9/11 terror attacks.

Even in his denial on April 3, Mr. Abdi admitted that he knew Faris.  Of course, at that time, Mr. Abdi did not know Faris had already confessed to being an active Al Qaeda operative inside the U.S., targeting U.S. interests for attack, and taking direction from KSM.  At that time, Faris' eventual guilty plea was not public and Abdi had not had recent contact with Faris.

After Mr. Abdi's April 3, 2003 denials, FBI and ICE learned that Mr. Abdi had previously sent email to Faris showing Faris where he could find "spyware," that is, electronic surveillance equipment and other items of interest.  There were other clear indications that Mr. Abdi was serious about his intentions to shoot up a mall or engage in violent conduct and had not abandoned those intentions.

Mr. Abdi stayed in contact with suspected terrorists inside the U.S.  He kept in contact with other Faris associates, one of whom was also a national security concern.  One of these former Faris associates was deported in June 2003.

During this time, Mr. Abdi engaged in counter surveillance activity by driving recklessly to escape physical

16

surveillance.  Almost up to the time of his arrest, Mr. Abdi was in contact with more than 40 phone numbers associated with ongoing FBI terrorism investigations.

Finally, Faris' remark that he [Faris] *thought* he had talked "him [Abdi] out of it [shooting up a mall]" was troubling. Faris' statement, in itself, showed Faris believed Abdi had been serious in his threat to "shoot up the mall."  Coupled with Abdi's continued associations with terrorism subjects and his attempts to elude surveillance there was reason and probable cause to take Abdi's threats very seriously.

Thus, on November 28, 2003, there was reasonable and probable cause to believe that defendant Abdi had threatened to use a firearm with intent to endanger persons in violation of 8 U.S.C. §1182(a)(3)(B)(iii)(V) and (VI)(Exhibit 4).

### 3.  Planning, Inciting, and Soliciting Terrorist Activity[6]

The term "engage in terrorist activity" is defined, in relevant part, as:

> ...in an individual capacity or as a member of an organization–(I) to commit or **to incite** to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity; (II) to prepare or **plan** a terrorist activity; ...(V) to **solicit** any individual to engage in (a terrorist activity).

---

[6]Actually this section, alone, supports three, distinct, national security grounds: planning, inciting, and solicitation of terrorist activity.

8 U.S.C. §1182(a)(3)(B)(iv)(I), (II), and (V)(See Exhibit 4). Thus, one who "incites" another to commit a terrorist activity; "plans" a terrorist activity; or "solicits" any individual to engage in terrorist activity has violated immigration law.

Mr. Abdi suggested to Faris, an active Al Qaeda operative that, because things were "heating up," they needed "to do something." This is incitement or solicitation, plain and simple. When Faris asked "what?" and Abdi replies, "take an AK-47 to a mall and start shooting," this is planning.

Under the circumstances of this case, it is reasonable to assume that Abdi knew full well that Faris was an Al Qaeda operative. They were close and saw each other numerous times and engaged in after-mosque discussions. Mr. Abdi had shown his email support by sending Faris emails of places Faris could buy "spyware," that is, electronic surveillance equipment and other items of interest. It was reasonable, therefore, for ICE and FBI to believe that Mr. Abdi's comment that "we need to do something [like] take an AK-47 to a mall and start shooting" was incitement or solicitation to Faris. It was also reasonable to believe Abdi's words were the beginning of a plan by Abdi to carry out violent acts in response to U.S. foreign policy that defendant Abdi found disagreeable. A reasonably prudent person would be warranted in believing Mr. Abdi was soliciting and inciting Faris and planning with him, to shoot up a mall.

Accordingly, there was reason and probable cause to believe the defendant planned, incited, or solicited another to commit a terrorist activity in violation of 8 U.S.C. §1182(a)(3)(B)(iv)(I)(V) and (II)(See Exhibit 4).

Based on all the foregoing, there was reason and probable cause to believe that on November 28, 2003, defendant Abdi was 1) a member of a foreign terrorist organization; (2) had threatened to use a firearm with intent to injure others; and (3) had incited, planned, or solicited terrorist activity.  Thus, ICE had reason to believe defendant Abdi had violated immigration law and was deportable on national security grounds.

### 2.  Likelihood of Escape

8 U.S.C. §1357(a)(2) also requires a showing that the person arrested without a warrant "is likely to escape before a warrant can be obtained for his arrest." (See Exhibit 2).

As the United States Supreme Court pointed out in United States v. Watson, 423 U.S. 411, 423-24 (1976)(cited with authority in United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990); United States v. Forest, 355 F.3d 942, 951 (6th Cir. 2004), however, where the warrantless arrest is by a federal officer under a statute authorizing such, the relevant inquiry is *not whether there was a warrant, or time to get one, but whether there was probable cause for the arrest.*   Watson, 423 U.S. at 417 (emphasis added).  After noting that Congress had explicitly

19

decided against conditioning warrantless arrest power on proof of exigent circumstances, the Supreme Court stated:

> But we decline to transform a judicial preference into a constitutional rule when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like.

Id. at 423-24.

Moreover, the warrant requirement within the administrative immigration system is different from the usual criminal context. In the immigration system, the ICE agent in the field determines probable cause to arrest an alien and the ICE Resident-Agent-in-Charge (RAC) issues the Notice to Appear (NTA) and the arrest warrant. The service of an NTA, usually by an ICE agent, commences removal (deportation) proceedings. See 8 C.F.R. §236.1(b)(1)(Exhibit 7). The arrest warrant, itself, is not executed until the NTA issues or thereafter. See id. Thus, in this case, the same official who proceeded with the warrantless arrest made the charging decision, in consultation with ICE Headquarters.

Unlike arrests made in the criminal judicial context, civil immigration arrests[7] are executed when an ICE RAC (not a

---

[7]Here, while the ICE arrest may have been civil in nature, defendant was given full Miranda rights.

20

magistrate) determines probable cause to exist and issues the NTA and arrest warrant.  This differs fundamentally from the criminal judicial system in which a federal magistrate or judge determines probable cause and issues the complaint and arrest warrant to be served by the federal law enforcement officer.

Applied to Mr. Abdi's case, in the early morning hours of November 28, 2003, the biggest shopping day of the year, when ICE made the warrantless arrest of defendant Abdi outside his apartment building, ICE had reason and probable cause to believe that the defendant was planning to commit a violent attack on a shopping mall.  They had reason and probable cause to believe Mr. Abdi was a member of Al Qaeda.  ICE knew that defendant had previously attempted to leave the U.S. and gain entry into Canada.  Mr. Abdi was arrested outside his residence with car keys in his hand and his automobile nearby.

Based on this evidence, there was ample reason for ICE to believe that defendant was a flight risk and danger to the public.  Although ICE did not have a warrant in hand, as the exact charging language was being discussed at ICE Headquarters in Washington, D.C. (HQ), the local ICE agent and RAC had been in consultation with their HQ and had been given approval to lodge the charges against defendant Abdi on national security grounds, seeking Mr. Abdi's deportation.

Accordingly ICE, accompanied by FBI, arrested the

defendant in the early morning hours of November 28, 2003, the day after Thanksgiving.

Plainly, none of the ICE statutes involved in this case require a warrant in hand to make an arrest and seek the deportation of a national security threat.  Nor does the Watson Court require hyper-technical analysis of a warrantless arrest or proof of exigent circumstances where an arrest, like this one, is authorized by federal immigration statute.

In cases of national security, the likelihood of escape should be self-evident.  By definition, persons who are national security threats *are flight risks* and dangers to the public.  Mr. Abdi was not a citizen and had not pursued permanent residency at that time.  It was reasonable for ICE to assume that defendant Abdi would attempt to escape.  He had already attempted to escape surveillance.  He stood there with keys in hand and his automobile nearby.  It would also be reasonable to believe Mr. Abdi would be likely to escape after attacking a mall. Individuals arrested on national security grounds can and should be held pending disposition of their immigration cases.[8]  ICE was not required to issue a citation and release, on the largest shopping day of the year, a suspected Al Qaeda terrorist who had

---

[8]On January 28, 2004, an immigration judge ordered Mr. Abdi detained on national security grounds and on March 9, 2004, found the defendant to have falsified his asylum application, revoked his asylee status, and ordered him deported.

22

threatened to shoot up a mall simply because the exact charging language had not been decided on at the time of arrest. Nevertheless, the arrest was supported by probable cause.

Alternatively, even if the court finds there were insufficient reasons for not obtaining a warrant, the basis for the arrest, reasonable belief and probable cause that defendant was a threat to national security, is still present.  Obtaining a warrant would not have changed the outcome.  The result would have been the same.  The same evidence would have been used to authorize the warrant.  The warrant, itself, would have been authorized and *issued by the ICE RAC himself*, who was then on the scene of the civil arrest.[9]  Unlike the warrant requirement in the usual criminal arrest, in this case, the warrant would have offered no further constitutional protection to the defendant. The lack of a warrant in this case, if it is error (which we say it is not), is harmless.

### Delay in Issuing Notice to Appear and Arrest Warrant

Defendant attaches great significance to the delay in ICE issuing an arrest warrant to Mr. Abdi.  (See Mot. at 3,4, and

---

[9]See 8 U.S.C. §1357(a)(2)..."and [the person so arrested] is likely to escape before a warrant can be obtained for his arrest, *but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States*. (emphasis added).

23

7)(noting that the warrant was served 56 hours after arrest).[10] The government submits that delay in issuing an arrest warrant in this case is justified by the circumstances and is essentially immaterial as discussed above.  In extraordinary circumstances, delay in making the charging determination is provided for by ICE regulation.

In this case, the ICE RAC and agent did not obtain an arrest warrant, prior to defendant Abdi's arrest in the early morning hours on November 28, 2003.  This was because the ICE RAC, ICE agent, and ICE headquarters (HQ) in Washington, D.C. were discussing charging options to be set forth in the NTA. The ICE RAC was awaiting the drafting of the language of the NTA by ICE attorneys at HQ.  There was, however, no question as to a reasonable ground and probable cause to arrest Mr. Abdi.  Both the ICE RAC, agent, and ICE HQ had been in consultation and agreed on that.

ICE regulations require that the charging and custody determinations be made within 48 hours of an arrest.  See 8 C.F.R. §287.3(d)(See Exhibit 8).  However, this time period may be extended for an additional, reasonable, period of time in the event of an emergency or other extraordinary circumstance.  Id. Moreover, it is important to keep in mind that the "48-hour rule"

---

[10]Actually, by the government's calculation, the warrant was served almost 84 hours after defendant's arrest on 11/28/03 at 6:00am, at 5:38pm on 12/01/03.

applies only with regard to a "determination" of charging and custody decisions, *not* to presentation and service of an NTA and warrant upon the alien, himself.

In this case the delay is justified.  The case involved the consideration of information, some of which was classified, and the need to find declassification officials and resolve those issues.  Such a resolution could have direct bearing on what charges were ultimately set out in the NTA.  While these issues were being sorted out, the defendant was being Mirandized and interviewed.

On November 30, 2003, after being Mirandized, defendant Abdi admitted that he had falsified his entire asylum application and started providing startling and disturbing information related to national security which had to be vetted immediately.[11]  Later on November 30, 2003, defendant was re-Mirandized and signed a written confession based on his statements.

Thus, now with the need to immediately vet any current threat information, coupled with sorting out issues related to classified information and the unexpected admission by Abdi of falsifying his asylum application, the circumstances were fluid, intense, and extraordinary.  While the charging determination was

---

[11]Some of Mr. Abdi's information now forms the basis of the criminal charges he is facing.

made beyond the usual 48-hour rule, this was a beyond-the-usual case.  Extension of the 48 hours was justified.

Based on all the foregoing, the ICE civil immigration arrest of defendant Abdi on November 28, 2003 was lawful and defendant's motion to suppress should be denied.

### B.    Good faith Reliance on Authority to Arrest

Alternatively, for the sake of argument, even if the legal or factual grounds for the arrest were technically deficient (which they are not), the arresting officers were justified in their objectively reasonable, good faith, reliance on their statutory authority and factual bases to arrest the defendant on national security grounds.

Where evidence is obtained as a result of a mistaken, but objective, good-faith, belief on authority to arrest, the evidence should not be suppressed.  See generally United States v. Leon, 468 U.S. 897 (1984).

The Leon "good faith" exception to the exclusionary rule has been applied to good faith mistakes of law or facts in warrantless arrest scenarios.  The policy behind the "good faith" exception to the exclusionary rule is that:

> Evidence is not to be suppressed where it is
> discovered by officers in the course of
> actions that are taken in good faith and in
> the reasonable, though mistaken belief that
> they are authorized.  We do so because the
> exclusionary rule exists to deter willful or
> flagrant actions by police, not reasonable,
> good-faith ones.  Where the reason for the

26

rule ceases, its application must cease also. United States v. Williams, 622 F.2d 830, 840 (5th Cir. 1980)(en banc), cert. denied, 449 U.S. 1127 (1981)(applying good faith exception to warrantless arrest).

Williams involved a DEA agent's erroneous belief that a violation of bond authorized the defendant's arrest.  Incident to the arrest, the DEA agent found heroin on the defendant.  The Fifth Circuit applied the good-faith exception refusing to suppress the fruit of a technically illegal arrest.[12]

The Sixth Circuit has, for reasons similar to Williams, supra, applied the good-faith exception to the technically deficient arrest fact pattern.  See United States v. Gordon, 50 F.3d 11, 1995 WL 108988 (6th Cir. Mar. 14, 1995)(attached hereto as Exhibit 9)(erroneous, but good faith, reliance on authority to arrest under bench warrant did not trigger exclusionary rule).[13]

Applied to the instant case, even if the officers arresting defendant Abdi on 11/28/03 are found to have made a technically unlawful arrest, based on the facts in this case, the officers were objectively reasonable and in good faith on their

_____

[12]  But see United States v. Chanthasouxat, 342 F.3d 1271, 1276, 1280 (11th Cir. 2003)(applying Leon to warrantless arrests based on good faith mistake of fact, but not to mistake of law).

[13]But see earlier case of United States v. Boffman,747 F. Supp. 1251, 1254 (S.D. Ohio 1990)(Leon does not apply in cases in which police have acted without a warrant).

27

authority to arrest defendant Abdi on national security grounds. Accordingly, the evidence should not be suppressed.

The "good faith" exception has also been applied to "good faith," but erroneous beliefs as to the facts in a given case.  In United States v. De Leon-Renya, 930 F.2d 396 (5th Cir. 1991), the good faith exception was applied to the warrantless immigration arrest based on a mistake of fact.  In De Leon-Renya, the Fifth Circuit held that erroneous factual information received by an agent over the radio indicating that a license on a welding truck had not been issued to a truck which was stopped by the officer could be considered in determining whether good-faith exception to the exclusionary rule applied.  If it was objectively reasonable for the officer to conclude that the stop was lawful, the good-faith exception to the exclusionary rule applied and the evidence obtained flowing from the arrest would not be suppressed.  See also United States v. Garcia, 942 F.2d 873, 875-76 (5th Cir. 1991)(even though stop based on erroneous dispatcher information, good faith exception applied and evidence not suppressed where defendant's actions and inaction supplied probable cause to further search and arrest him).

Thus, if there were reasonable, good faith, mistakes of fact made in defendant Abdi's case, the good-faith exception should not result in application of the exclusionary rule.

Here, the arresting officers were entirely reasonable

28

in believing that they had both the authority and necessary facts to make a valid warrantless arrest of defendant Abdi based on national security.  Defendant Abdi, who had threatened to shoot up a mall, was an associate of an admitted Al Qaeda operative. There was no evidence that the defendant had abandoned his purpose.  In fact, the evidence developed during the investigation of defendant Abdi only confirmed ICE and FBI's reasonable belief that he was a serious threat to national security.

Thus, the policy behind the exclusionary rule in this case, does not apply and the evidence obtained following defendant Abdi's arrest should not be suppressed.  The officers were objectively reasonable in their good faith belief in their authority to arrest the defendant and the facts underlying that arrest.

### C.  Defendant's Statements were Sufficiently Attenuated from the Alleged Illegal Arrest to be Admissible

Assuming, for the sake of argument, that the defendant's arrest was illegal(which it is not), there are other reasons not to suppress the evidence obtained after his arrest. On November 28, 2003, at his arrest, Defendant Abdi was Mirandized and signed a written waiver.  At every interview thereafter, he was Mirandized and signed written waivers.  Thus, there is strong proof of the validity of that waiver.  United

<u>States v. Bentley</u>, 726 F.2d 1124, 1128 (6th Cir. 1984)(<u>citing</u>

<u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979)).

On December 7, 2003, ten days after his arrest,

defendant Abdi accepted defense counsel, Doug Weigle, to

represent him.  Defendant Abdi was represented by counsel from

this time on.  Three days later, on December 10, 2003, with

counsel present, defendant was interviewed.  Again, defendant was

Mirandized and signed a written waiver, and continued making

statements and providing information.  With counsel present,

defendant was interviewed on January 6, January 15, and February

17, 2004.  At each interview, with counsel present, defendant was

Mirandized and signed written waivers of his rights.

In the interviews, *with counsel present*, defendant Abdi

repeated substantially the same incriminating information he had

provided in interviews without counsel.  It is clear why this is

so.  Defendant Abdi freely, voluntarily, and without coercion,

made statements and provided the same information both before and

after he had defense counsel.

As the U.S. Supreme Court has said, not all evidence is

"fruit of the poisonous tree" simply because it would not have

come to light but for an unlawful arrest.  Where the connection

between an unlawful arrest and statements made by the defendant

becomes so attenuated as to dissipate the taint, the statement is

admissible, despite the unlawful arrest.  <u>Wong Sun v. United</u>

30

States, 371 U.S. 471 (1963)(where defendant unlawfully arrested, released, and two-days later confessed taint of illegal arrest attenuated by passage of time).

While the giving of Miranda rights is an important factor to consider in determining whether an alleged unlawful arrest has been sufficiently attenuated to allow the statements to be admissible, it is not the only factor.  Brown v. Illinois, 422 U.S. 590, 600-02 (1975)(citing Wong Sun, giving of Miranda rights do not per se purge subsequent statements from taint of unlawful arrest, but are a factor).  The Supreme Court in Brown stated:

> The question whether a confession is the product of free will under Wong Sun must be answered on the facts of each case.  No single fact is dispositive.  The workings of the human mind are too complex, and the possibilities of misconduct are too diverse to permit protection of the Fourth Amendment to turn on such a talismanic test.  **The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest.  But they are not the only factor to be considered.**  The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly the purpose and flagrancy of the official misconduct are all relevant.  The voluntariness of the statement is a threshold requirement.  And the burden of showing admissibility rests, of course, on the prosecution.

Brown, 422 U.S. at 603-04 (citing Wong Sun 371 U.S. at 491)

31

(emphasis added).

Incorporating Brown and Wong Sun, the Sixth Circuit has adopted a three-part test for determining whether the taint of an alleged unlawful arrest has been purged or is sufficiently attenuated so as to admit the statements made by the defendant. See United States v. Jackson, 97-2135, unrep. 172 F.3d 874, 1998 WL 964236 (6th Cir. 12/28/98, Sargus, J.)(attached as Exhibit 10)(citing both Brown and Wong Sun with authority).  The Sixth Circuit test is based on a consideration of the following factors:

> (1) the temporal proximity of the arrest and the confession;
>
> (2) the presence of intervening circumstances; and
>
> (3)particularly, the flagrancy of the official misconduct.

Jackson, 1998 WL 964236 at **2 citing Brown 422 U.S. at 603-04.

In Jackson, the police arrested the defendant without probable cause and the defendant was placed in custody.  The defendant's confession came 24 hours after the unlawful arrest while still in custody.  The district court concluded that the confession was freely and voluntarily given.  Nothing in the record suggested that the purpose of arrest was to interrogate the defendant and there was no flagrant misconduct by the police. The Sixth Circuit held that the defendant's confession was sufficiently attenuated from taint of unlawful arrest and

32

therefore admissible.  <u>Jackson</u>, <u>supra</u> at **2-**3.

Strikingly similar to <u>Jackson</u>, defendant Abdi's confession came on Sunday, November 30, while in custody, but with a 24-hour period of no questioning on Saturday November 29. As the facts set forth in our other suppression responses indicate, the confession was freely and voluntarily given.  <u>See Government Responses</u> to defendant's motions to suppress/dismiss based on violations of Fifth Amendment and alleged misconduct.

The purpose of the arrest was not to interrogate defendant Abdi to build a criminal case against him, rather it was to deport him as a national security threat.  Defendant Abdi's confession was simply an unintended consequence of what ICE and FBI believed was a national security immigration arrest.

While not <u>per</u> <u>se</u> purging the taint of an illegal arrest, the fact that defendant Abdi was given his Miranda rights, are, per <u>Brown</u>, <u>supra</u>, important factors.  Here, Miranda rights were given and written waivers were executed by Mr. Abdi at each interview.  As in <u>Jackson</u>, there was no flagrant misconduct by law enforcement.  To the contrary, thoughtful deference to defendant's constitutional rights was paid.

Finally, defendant Abdi had the assistance of counsel at every interview after December 7, 2003.  Defendant being interviewed with counsel at his side can only be considered an intervening, superseding, event.  Thus, the presence of counsel

33

purged and attenuated any taint caused by the alleged unlawful arrest.

As the Sixth Circuit and other courts have said, the presence of counsel sufficiently attenuates any enduring effect of any unlawful coercion. <u>Cochran v. Norvell</u>, 446 F.2d 61 (6th Cir. 1971); <u>United States v. Wellins</u>, 654 F.2d 550, 555 (9th Cir. 1981)(crucial factor in finding attenuation between unlawful arrest and consent was defendant's consultation with his attorney).

Thus, any taint flowing from the alleged unlawful arrest of defendant Abdi on November 28, 2003, if not attenuated by (1) the passage of time (almost two days with no questioning between arrest and confession) and (2) the giving of Miranda rights (before each interview with signed Miranda waivers by defendant)were purged by (3) the assistance of counsel during the last four interviews, during which defendant Abdi repeated most, if not all, of his prior incriminating statements to law enforcement.

**CONCLUSION**

For the foregoing reasons, defendant's motion to suppress based on a violation of the Fourth Amendment should be denied.

34

Respectfully submitted,
GREGORY G. LOCKHART

UNITED STATES ATTORNEY


By:   s/Dana M. Peters
      DANA M. PETERS (0034226)
      Assistant U.S. Attorney
      303 Marconi Blvd., 2nd Floor
      Columbus, Ohio 43215
      (614) 255-1634
      Fax: (614) 469-5653
      Dana.Peters@usdoj.gov


      s/Sylvia T. Kaser
      SYLVIA T. KASER
      (D.C. Bar No. 360918)
      Trial Attorney
      U.S. Department of Justice
      Criminal Division
      Counterterrorism Section
      10th St. and Pennsylvania Ave.,N.W.
      Suite 1539
      Washington, D.C.  20530
      (202) 305-9148
      Fax: (202) 353-0778
      Sylvia.Kaser@usdoj.gov

      Attorneys for the United States


## CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing was served this 1st day of July, 2005 electronically on Mahir T. Sherif, Esq., counsel for Nuradin Abdi.

                      s/Dana M. Peters
                      Dana M. Peters (0034226)
                      Assistant U.S. Attorney