IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| V. | ) | No. 2:04cr88 |
| | ) | |
| | ) | JUDGE ALGENON L. MARBLEY |
| NURADIN M. ABDI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S
MOTIONS  TO SUPPRESS STATEMENTS  FOR VIOLATIONS
OF DEFENDANT'S FIFTH AMENDMENT RIGHTS AND TO DISMISS
FOR  OUTRAGEOUS GOVERNMENT MISCONDUCT (Docs 62 and 56)**

Defendant has filed two motions relying on essentially the same body of facts.  In his Motion to Suppress Statements for Violations of Defendant's Fifth Amendment Rights, defendant argues that, during the first three days of questioning, he did not make a voluntary, knowing and intelligent waiver of his Fifth Amendment rights after he was Mirandized, variously due to "psychological coercion and oppression," "forced cooperation," trickery, false promises and "presentment," "incommunicado interrogation," and psychological pressure.  He also mistakenly claims that he was questioned without being *Mirandized* on "day two."  The defendant seeks suppression of all of his statements – including those made on the remaining ten days of questioning – on the basis that they are all tainted or infected by the deficiencies of the first three days.

In his "Motion to Dismiss for Outrageous Government Misconduct," the defendant makes roughly the same allegations as to his entire period of immigration detention and argues that this amounts to "outrageous government misconduct" requiring dismissal of the indictment.

As will be shown at the suppression hearing, the defendant was advised of his rights on each of the twelve days of questioning and knowingly, intelligently, and voluntarily waived those rights on each occasion.  The defendant was represented by counsel during four of the interviews, before which he nevertheless chose to waive his *Miranda* rights in the presence, and with the advice, of counsel.  The defendant was not coerced, tricked, or made false promises by the agents during the course of any interview.  Moreover, defendant's conditions of custody were a necessary prophylactic measure in light of the charges against him and his conduct and grave admissions thereafter.  Accordingly, this Court should deny defendant's request to suppress his statements and to dismiss the indictment.

## STATEMENT OF FACTS

The United States respectfully refers the Court to the Statement of Facts in its Response to Defendant's Motion to Suppress all Statements Made by the Defendant and all Evidence Seized in Violation of the Fourth Amendment.  The United States will also present facts in support of its response at the suppression hearing scheduled for July 21-22, 2005.

## ARGUMENT

### I.

### THE DEFENDANT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY WAIVED HIS FIFTH AMENDMENT RIGHTS

**A.  A Waiver of *Miranda* Rights Must be Knowing, Intelligent, and Voluntary.**

The Fifth Amendment states that no person shall be compelled to be a witness against himself in a criminal case.  U.S. Const. Amend. V.  It does not state or infer that a suspect shall not be permitted to confess.  In *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), the Supreme Court concluded that custodial interrogation by law enforcement officers generates "pressures which

-2-

work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."   "To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain [now well-known] procedures in dealing with the accused." *Moran v. Burbine,* 475 U.S. 412, 420 (1986).

The Supreme Court held that, prior to any questioning of a suspect, a law enforcement officer must inform the suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.  *Miranda* further provided that a suspect may waive his right to remain silent and agree to submit to questioning by law enforcement officers "provided the waiver is made voluntarily, knowingly and intelligently."  384 U.S. at 444, 468-70;  *Burbine*, 475 U.S. at 421.

The Supreme Court has articulated the test for determining the legality of a *Miranda* waiver as follows:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. at 421 (citing *Fare v. Michael C.,* 442 U.S.707, 725 (1979); *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979)).  Following this precedent, this Court as well as others, has used the "totality of the circumstances" test to aid the determination whether a waiver has been voluntarily, knowingly and intelligently made.  *E.g. Seymour v. Walker*, 224 F.3d 542,

553-54 (6th Cir. 2000).

In doing so, the courts typically look to various factors such as (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights. *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir.2004) (citing *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993)). Coercive police activity is a necessary element for finding that a confession was involuntary. *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157,167 (1986)); *Seymour v. Walker*, 224 F.3d at 554 (citing *Connelly*).[1]

The government must prove by a preponderance of the evidence that the defendant waived his *Miranda* rights. *See Connelly*, 479 U.S. at 168.

**B. Defendant Knowingly and Intelligently Waived his *Miranda* Rights.**

**1.** The Supreme Court stated in *North Carolina v. Butler,* 441 U.S. 369, 372 (1979), that "[a]n express written or oral statement of waiver of the right to remain silent or of the right to

---

[1] The standard for determining the voluntariness of a *Miranda* waiver is the same as the standard for voluntariness of a confession. *Connelly*, 479 U.S. at 169-70 (there is no reason to require more in the way of a "voluntariness" inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion.) Thus, in determining whether a confession was voluntarily made, the courts "look[] to whether a defendant's will was overborne in a particular case." *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Mahan,* 190 F.3d 416, 422 (6th Cir. 1999)). When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary. *Johnson*, 351 F.3d at 260; *see also* Part I.C., *infra,* for an additional discussion of the standards of voluntariness.

counsel is usually strong proof of the validity of that waiver[.]"[2]  The evidence here will show that the defendant was immediately *Mirandized* after his arrest on November 28, 2003.   His rights were explained to him by the agent who read him the full *Miranda* warning.  The defendant was asked if he understood the warning or had questions.  The defendant stated that he understood and he waived his rights.  Later, when he was taken to the FBI for initial questioning, agents *Mirandized* him again, asked him if he understood his rights, to which he responded in the affirmative, and he signed a written waiver.

He was not questioned again until November 30, 2003.  Before any questioning began, he was again informed of his rights and waived them.  Mr. Abdi was advised of his Fifth Amendment rights every day he was interviewed, beginning with the day of his arrest and continuing until the conclusion of the last of the twelve interviews on February 17, 2004.  His rights were also explained to him and he was asked if he understood them.  On every occasion, he answered that he understood them, and he signed a written waiver of those rights.

Three times – once on November 30 and twice on December 5 -- Mr. Abdi was informed by agents that ICE had been contacted by attorneys who wanted to represent him and on every occasion he expressly rejected representation, twice in writing.  Specifically, three different lawyers, claiming to have been hired by family or friends to represent defendant, notified ICE.  Each time, the defendant was advised that ICE had been contacted by a lawyer claiming to represent him and to have been hired by family or friends.  Mr. Abdi was asked if he wished to speak to the lawyer.  Mr. Abdi responded "no" and the lawyer would be so advised.  Twice,

---

[2]  It also held that an *implicit* waiver may suffice, depending upon the background, experience, and conduct of the accused.  *Id.*

defendant actually indicated his refusal to see these lawyers in writing.

The agents had no obligation to inform Mr. Abdi of the existence of these attorneys, but did so out of an abundance of caution.  *See Moran v. Burbine*, 475 U.S. 412, 421-28 (1986) (confession was not suppressed where police failed to inform defendant of an attorney's efforts to reach him).  Moreover, at any point in time, Mr. Abdi could have told agents to stop questioning him and that he wanted an attorney or one of *these* attorneys, for that matter.  The evidence will show that on no occasion did Mr. Abdi do so.[3]

Even if he had invoked the right to remain silent or the right to counsel – which he did not – defendant specifically summoned the agents on December 5 and 7, 2003, because he wanted to talk to them further.  *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (once an accused "expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further conversations with the police"); *United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998) (By repeatedly asking "what's this all about?" after he had requested a lawyer, "the

---

[3] Defendant claims he made the statement, "I am not here for that," in answer to inquiries about his association with Iyman Faris, and that, in so doing, he invoked his right to remain silent.  The evidence will show that he did not make such a statement to officers.  However, even if he did, this statement does not nearly amount to an invocation of the right to remain silent.  The suspect's invocation of the right to remain silent, as with the right to counsel, must be clear and unambiguous.  *United States v. Hurst*, 228 F.3d 751, 760 (6th Cir. 2000) (suspect did not unambiguously invoke his right to remain silent in response to questions about firearms where he had earlier waived his rights and answered questions regarding some burglaries); *see also Abela v. Martin*, 380 F.3d 915, 925 (6th Cir. 2004) (citing *Davis v. United States,* 512 U.S. 452, 459 (1994)) (invocation of right to counsel determined by objective standard).  This statement would not have caused "'a reasonable officer in light of the circumstances'" to have understood that the defendant was invoking the right to remain silent.  *Id.*  (quoting *Davis,* 512 U.S. at 459); *see also Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) (defendant's statement that "it would be nice" to have an attorney was not a clear and unambiguous request for counsel).

defendant expressed an insatiable desire to reignite the dialogue . . . having himself initiated the resumed discussion, [the suspect] cannot later be heard to claim that the officers, by doing his bidding, abridged his rights"); *Owens v. Bowersox*, 290 F.3d 960, 963-64 (8th Cir. 2001) (valid waiver where defendant who was represented by counsel initiated interview with police).

On December 7, 2003, agents informed Mr. Abdi that a fourth attorney, Douglas Weigle, had presented himself as a representative of Mr. Abdi.  The defendant accepted this representation, only after he told agents to tell Mr. Weigle to wait until he had completed a polygraph examination.  Thereafter, in the remaining four interviews *and in the presence of Mr. Weigle*, Mr. Abdi waived his Fifth Amendment rights and continued to speak to the agents.

Although Mr. Abdi claims he "had no understanding of American laws," he has not even alleged that he failed to understand the *Miranda* warnings themselves.  He clearly understood that he had the right to remain silent, that he had the right to a lawyer, and that anything he said could be used as evidence against him.  Despite this clear comprehension, he continued to speak with ICE and FBI agents, making statements in which he incriminated himself.

**2.**  Mr. Abdi was also a mature, educated man at the time of his arrest.  He was 31 years old and claimed he had been in the United States for five years.  He speaks English fluently and does not claim that he was in need of a translator.  By his own admission, he graduated from high school and had two years of college.  *See* Declaration of Nuradin Abdi in Support of Motion to Suppress Statements for Violation of Defendant's Fifth Amendment Rights, "5th Am. Decl.," ¶ 2. He owned a business in Columbus at the time of his arrest and he portrayed himself to agents as a respected member of the Somali community.  He also told agents that his father, now deceased, had been a Somali ambassador and that his mother owns a restaurant business in the Columbus

area.  According to Abdi himself, after his family's departure from Somalia, they lived in several countries around the world and Abdi traveled extensively.

Although Mr. Abdi claims he had a mental breakdown months after agents had finished questioning him, *see* Part II., below, at the time of his arrest and the first three days of his incarceration, there is not even a suggestion that he was suffering from any physical or mental condition or illness.  *See, e.g., Seymour v. Walker,* 224 F.3d 542, 544 (6th Cir. 2000) (waiver valid even though defendant was questioned in intensive care unit following suicide attempt).

And, although knowledge of the U.S. legal system is not explicitly a factor considered by the courts in determining the propriety of *Miranda* waivers, Mr. Abdi is not a novice with respect to the U.S. legal system, and immigration law, as he claims.   Indeed, he admitted his knowledge of and ability to manipulate that system in the March 9, 2004 immigration hearing.  Specifically, Mr. Abdi admitted a scheme to go to San Diego to falsify his asylum application and repeated efforts – by trickery – to enter Canada to obtain government benefits, as a comparison had led him to believe they were better than those offered by the U.S. Government.  Gov't Ex. 1 (March 9, 2004, Hearing Transcript at 30-33, 63-64) (disclosure authorized by 8 C.F.R. § 1208.6).

Moreover, Mr. Abdi had had prior experience with law enforcement.  In his initial encounter with the FBI in March of 2003, he, without hesitation, lied to the FBI in response to questioning about allegations Iyman Faris had made against him.  In his brief, he states that when he was arrested, "naturally he remembered his first encounter with the FBI and he recalled that his answering their questions [falsely] was quickly concluded and enabled their investigation to come to an end."  Def's Mem. at 16.   Rather than an innocent novice, Mr. Abdi has demonstrated himself to be a manipulator of the legal system.  The fact that he has not familiarized himself with

the criminal justice system through repeated arrests can hardly vitiate his knowing and intelligent decision to waive his rights. *See United States v. Burrous,* 147 F.3d 111, 116-17 (2d Cir. 1998) (waiver by 16-year old Spanish/English speaking defendant who had one prior experience with the law a month earlier upheld).

**3.** The defendant also suggests that he was interrogated for long hours in the three days following his arrest, *e.g.* Def's Mem. at 24-25. However, in reality, on November 28, Abdi was questioned by ICE and FBI agents, in turn, for a total of approximately 45 minutes. He was in an FBI conference room in Columbus. Contrary to his allegations, *e.g.,* Def's Mem. at 5, the defendant was not questioned at all on November 29 and, hence, no *Miranda* warning was needed or provided.

On November 30, Abdi was questioned by ICE agents in ICE offices for several hours during the middle of the day, from approximately 11:00am until 4:00pm, with repeated breaks. During that questioning, he admitted to the ICE agents who were reviewing his immigration history that he had completely falsified his asylum application. He also unexpectedly admitted to most of the terrorist activities with which he was eventually charged criminally. Later that day (around 10pm), after he had had a break of six hours, agents *Mirandized* him again, he waived his rights, and they reviewed with the defendant a draft sworn statement that set forth the admissions he had made earlier in the day. Mr. Abdi signed the statement. He was then questioned about those activities for approximately two hours by FBI agents. Thus, over a three-day span, during which he made admissions of terrorist activity to agents, he was only questioned for about eight hours. At all times, he was provided with food and beverages and he was not deprived of sleep or subjected to any physical punishment. *See, e.g., Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)

(deprivation of food and sleep has bearing on voluntariness of confession); *United States v. Haynes*, 301 F.3d 669, 684 (6th Cir. 2002) (citing *Fulminante* factors); *Ledbetter v. Edwards*, 35 F.3d at 1070 (statements admissible where defendant was, *inter alia,* questioned for a reasonable period of time and not deprived of "necessary creature comforts").

Mr. Abdi was incarcerated during this period under conditions that were reasonable in light of the activities for which he was arrested. On November 28, 2004, the FBI made a written request to ICE to place Mr. Abdi in segregation due to the nature of the evidence against him and the concern that he would attempt to communicate with co-conspirators directly or through messages conveyed wittingly or unwittingly by the family. ICE requested that the facility implement that request. Abdi was separated from other prisoners in the Kenton County Jail and he was permitted communication with counsel, if he chose to do so. He did not choose to do so at any time prior to electing to have Mr. Weigle represent him on December 7. The defendant did not request to see his family.

**4.** Defendant complains that he did not make a knowing and intelligent waiver because he was tricked and misled into believing he was not a terrorism suspect. He asserts that agents misled him because they told him he had been arrested for "immigration violations," they questioned him about Iyman Faris, and they never advised him there were any potential criminal charges against him. Defendant argues that this amounts to an "actual misrepresentation" that requires suppression of his statements under *Colorado v. Spring*, 479 U.S. 564 (1987), and this Circuit's decision in *United States v. Napior*, 900 F.2d 260, 1990 WL 47353 (6th Cir. 1990) (unpublished, copy attached). Def's Mem. at 27-30.

Defendant was informed of the nature of the right being abandoned and the consequences

of the decision to abandon it.  The police need not advise a suspect of every possible *subject* or

*consequence* of questioning.  *Colorado v. Spring*, 479 U.S. 564 (1987).  In *Spring,* the Supreme

Court considered a defendant's argument that his waiver of *Miranda* rights was invalid because

the police failed to inform him of all potential subjects of questioning, *i.e.,* his suspected role in a

homicide, rather than the firearms violation for which he had been arrested.  The Court observed

that it had "never held that mere silence by law enforcement officials as to the subject matter of

an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights" and it

declined to do so in that case.  479 U.S. at 576.

> Moreover, the Court succinctly concluded that:

> [t]his Court's holding in *Miranda* specifically required that the police inform a criminal suspect that he has the right to remain silent and that *anything* he says may be used against him.  There is no qualification of this broad and explicit warning.  *The warning, as formulated in Miranda, conveys to a suspect the nature of his constitutional privilege and the consequences of abandoning it.*  Accordingly, we hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.

479 U.S. at 577 (emphasis added).  In addition, the *Spring* Court stated that "the Constitution

does not require that a criminal suspect know and understand every possible *consequence* of a

waiver of the Fifth Amendment privilege."  *Id.*, 479 U.S. at 574 (citing *Moran v. Burbine*, 475

U.S. at 422, and *Oregon v. Elstad*, 470 U.S. 298, 316-17 (1985)) (emphasis added).

Thus, as *Spring* illustrates, it is not in the sense of shrewdness or wisdom that *Miranda*

speaks of an intelligent waiver, but in the sense of understanding constitutional rights; whether a

waiver is, under the circumstances, wise or foolish is constitutionally irrelevant.   This Circuit has

recognized as much in *U.S. v. Martinez-Rocha*, 337 F.3d 566, 570 (6th Cir. 2003) (Marbley, J.,

sitting by designation on the panel), in a factually different but legally indistinguishable context,

that "a waiver need not be the best choice under the circumstances in order for it to be 'considered and intelligent.'" (citing *United States v. Turner*, 287 F.3d 980, 984 (10th Cir.2002)); *see also Spring*, 479 U.S. at 577 n.9 (recognizing the need to preserve the bright-line rule of *Miranda*, the "virtue" of which is "informing police and prosecutors with specificity as to how a pretrial questioning of a suspect must be conducted," and to avoid hinging constitutional determinations on proof of factors may have led to a particular suspect's decision to waive his rights).

As stated above, after his arrest by ICE, defendant was fully advised of his rights.  As required by *Miranda,* agents informed him of his right to remain silent, his right to counsel, and perhaps most importantly in this context, the fact that anything he did say could be used against him.  Specifically, he was told that, *inter alia,* "*[a]nything* you say can be used against you *in court, or in any immigration or administrative proceeding."*   Abdi agreed to waive this right in the face of that statement and others like it.  As the *Spring* Court observed, "it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled."  *Spring,* 479 U.S. at 576 (quoting *United States v. Washington,* 431 U.S. 181, 188 (1977)).

The defendant complains that he did not know that he was going to be prosecuted criminally – only that he was arrested for "immigration violations" – and that if he had understood that properly, he would have remained silent, because, in his estimation, the criminal offense was different and more serious.  There is simply no question that, even if true, this is insufficient to establish an invalid *Miranda* waiver in the face of repeated, full *Miranda* warnings. "[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is

-12-

not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Spring*, 479 U.S. at 577.  Indeed, in *Spring*, the defendant had *no knowledge* that the police considered him to be a suspect in a murder, a much more serious offense than the firearms violations for which he had been arrested, yet the Supreme Court, without hesitation, upheld the waiver and the admissibility of his statements about the murder. The Supreme Court stated in *Moran v. Burbine,* 475 U.S. at 422, that "we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." (citing authorities); *see also Keene v. Mitchell*, 2004 WL 3325797, *41 (S.D.Oh. 2004) (Beckwith, C.J.) (defendant "may waive his right to remain silent . . . even if the defendant does not know the specific questions the authorities intend to ask").[4]

Finally, even if an "affirmative misrepresentation by law enforcement officials as to the scope of the interrogation" could form the basis for suppression on Fifth Amendment grounds – and the *Spring* court merely left open this question, 479 U.S. at 576 n. 8 -- there was no such misrepresentation here.  Indeed, the agents' questioning here was *directly* related to Abdi's arrest. During his very first interview on November 28, Abdi was questioned about his immigration

---

[4] Defendant's arguments are internally inconsistent.  Despite his professed assessment that immigration violations do not result in penalties as harsh as those in the criminal context, defendant admits in his brief that the "the threat of being deported could be as harsh to an immigrant as criminal penalties."  Def's Mem. at 18.  This statement would suggest that defendant was fully aware of the gravity of his situation and consequences of his waiver. Similarly, defendant repeatedly relies upon his purported statement, "I am not here for that," in response to agents' questioning about Faris.  As will be shown at the suppression hearing, Abdi never made such a statement to agents.  Even if true, however, it merely shows defendant attempted to bury his head in the sand when agents questioned him and that he fully understood the gravity of the situation and believed he could lie his way out of it again, as he had done in the Spring of 2003.

history and his relationship to Iyman Faris, an individual who had been convicted of conspiring to provide material support to al Qaeda only months before.  Faris had previously told the FBI that Abdi said "things were heating up and we need to do something."  According to Faris, when Abdi was asked what should be done, he replied "take an AK-47 to a mall and start shooting."  Abdi had been questioned by the FBI about this on April 3, 2003, and he was questioned about it again as soon as he was arrested.  This was partially the basis for his immigration arrest on national security grounds and the subject of questioning by both ICE and FBI agents on November 28, and 30, 2003 (and thereafter).

Agents had no obligation, and, indeed, no right, to tell Abdi what would or would not be made of his admissions by federal prosecutors later.  In fact, the agents had no way of knowing at the outset that he *would* make damaging admissions of terrorist activity.  Conversely, the evidence will show that at no time did agents represent to him that he would *not* be prosecuted criminally, that he would be granted immunity, or that he would be allowed to "go home."  Accordingly, Abdi could hardly have misapprehended his right to remain silent in these circumstances.  On the basis of these facts, there is simply no doubt that Abdi's waiver of his Fifth Amendment privilege was knowingly and intelligently made.

## C. **Defendant's Statements were Voluntarily Made and not the Product of Coercion.**

The defendant claims his statements were the product of  ICE and FBI coercion.  Specifically, he asserts that ICE and FBI agents made him various promises of leniency in exchange for cooperation and, at the same time, leveled threats against him and his family.  The defendant also asserts that he was psychologically coerced due to the conditions of his detention.  None of these allegations is true.

-14-

A confession cannot be involuntary in the absence of police coercion.  *See Colorado v. Connelly,* 479 U.S. at 167 & 164 n.1 (collecting cases of police overreaching).   There are three requirements for a finding that a confession was involuntary due to police coercion: "(1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear the defendant's will; and (3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

A court must examine these factors in light of the "totality of the circumstances surrounding the confession," including "both the characteristics of the accused and the details of the interrogation, and determine [] their psychological impact on an accused's ability to resist pressures to confess."  *United States v. Melnikas*, 929 F. Supp. 276, 281 (S.D. Oh. 1996) (quoting *United States v. Rigsby,* 943 F.2d 631, 635 (6th Cir. 1991), *cert. denied*, 503 U.S. 908 (1992)). When this Court examines the totality of the circumstances, many of which have already been addressed above, it will find that there was no police coercion in this case.

### 1.        No improper promises of leniency or threats were made.

The testimony in this case will show that no threats or improper promises of leniency were made by the agents to the defendant.  Mr. Abdi was not told that he would be able to go home to his family if he cooperated, or that cooperation was his only "way out," or that he would not be deported if he cooperated, or that he was not telling agents "what they wanted to hear."

To the extent defendant was himself motivated to talk out of the hope of leniency, he has not even remotely established a basis to suppress his statements.  This Circuit has rejected a request for suppression in circumstances where a defendant's statements failed to show that they

were "coerced or motivated by anything other than a knowing and voluntary desire to offer information to the authorities in the hope of receiving leniency." *U.S. v. Doe*, 226 F.3d 672, 680 (6th Cir. 2000); *see also U.S. v. Okafor*, 285 F.3d 842, 847 (9th Cir. 2002) ("common sense may indicate that a suspect's recognition of the potential consequences of his or her crime may create incentives for cooperation. But there is nothing wrong with that.").

Mr. Abdi made two appearances before an Immigration Judge in connection with deportation proceedings while he was in ICE custody. After hearing Mr. Abdi's testimony that he was "cooperating" with the FBI during this time frame, the Immigration Judge who was conducting the deportation hearing held as follows:

> you constitute a danger to the security of the United States based upon your own testimony herein, your discussions with a convicted terrorist to construct a bomb to be placed in shopping malls. By your own admission, you've received instructions to undertake this action. These are all actions which are contrary to the peace and security of the United States. *Your interruption in this continued activity appears to be as a result of your arrest. After your arrest, you appear to have cooperated with authorities, certainly in an attempt to ameliorate the effects of your earlier actions. There's very little doubt in my mind with respect to that.*

Gov't Ex.1 (March 9, 2004 Hearing Transcript at 126, lines 15-25) (emphasis added).[5] There is no reason to reach a different conclusion on those facts here.

Moreover, the courts generally have held that promises of leniency in exchange for cooperation, for example, are insufficiently coercive to constitute a Fifth Amendment violation. Thus, even if agents had told Abdi that he could help himself by cooperating they would have done nothing improper. "A confession is not deemed involuntary merely because a suspect is

---

[5] The Immigration Judge ordered his asylum status terminated, denied his Convention Against Torture claim and ordered him removed, in part based upon these national security grounds. Gov't Ex. 1 (Mar. 9, 2004 Hearing Transcript at 130-131).

promised leniency for cooperating with law enforcement officials." *United States v. Melnikas*, 929 F.Supp. 276, 281 (S.D. Oh. 1996); *see also United States v. Wiley*, 2005 WL 1285712 *4 (6th Cir. May 26, 2005) (citing authorities) (unpublished, copy attached); *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002) (confession admissible despite agent's statement that prosecutor and judge would be made aware of any cooperation, as vague description of the potential benefits of cooperation contained no material misrepresentations or unfulfillable promises).

In *United States v. Dillon*, 150 F.3d 754, 758 (7th Cir. 1998), the Seventh Circuit aptly observed that promises by agents to bring the suspect's cooperation to the attention of prosecutors did not render his statements involuntary, even though the suspect argued that this constituted a psychological inducement that "enticed him into saying exactly what the agents wanted to hear." The *Dillon* court stated "we have repeatedly upheld this tactic as one that allows a defendant to make a rational decision." *Id*. (citations omitted); *see also Simmons v. Bowersox,* 235 F.3d 1124, 1133 (8th Cir. 2001) ( no coercion where police told a suspect he "was facing either the death penalty or life in prison and that it would be in his 'best interest' to tell the truth").

Finally, it is also acceptable to inform a defendant of the possible sentence he is facing. *U.S. v. Okafor,* 285 F.3d at 847 ("[t]hose who do a crime may have to pay in time; and we do not hesitate to say that law enforcement may bring this to the suspect's attention"). Thus, even if agents told Mr. Abdi that he could be deported, there is no basis to exclude his statements as that was an entirely likely consequence of the allegations against him at that time. In fact, on March 9, 2004, the Immigration Judge entered a deportation order against him, in part, based upon the national security grounds for which he was arrested on November 28.

In sum, the evidence offered at the suppression hearing will show that agents made no

threats or improper or false promises of leniency to the defendant, warranting suppression of his statements.

> **2.** **Defendant was not held "incommunicado" and there were valid national security reasons for the conditions of his detention.**

Defendant argues that he was held under oppressive "incommunicado" conditions imposed upon him for the purpose of coercing a confession from him. As explained above, Part B.3., after his arrest on November 28 by ICE, the FBI requested that the defendant be placed under certain restrictions while in ICE custody.

Mr. Abdi was not held "incommunicado," however. In all the cases we surveyed, the courts have referred to "incommunicado" conditions as those where a defendant or suspect was either not offered, or expressly denied, access to counsel or to family who would have hired counsel. *E.g. Davis v. State of North Carolina*, 384 U.S. 737 (1966) (impoverished African-American with third or fourth grade education, who had escaped from state prison camp, was taken into custody by police and interrogated repeatedly over a period of 16 days; police did not advised him of any of his rights until after he had confessed orally on the 16th day to rape-murder); *Haynes v. State of Washington,* 373 U.S. 503, 506 (1963) (suspect's specific requests to call an attorney and to call his wife refused by police, who told him he might make a call if he confessed); *see also Moran v. Burbine,* 475 U.S. 412, 438-39 n.9 (1986) (Stevens, J. dissenting) (collecting "incommunicado" cases).

The FBI prepared a written request that was provided to ICE on the day of the defendant's arrest. The FBI's letter requesting the detention restrictions – cited by the defendant in his papers – explicitly states that Mr. Abdi be permitted communication with his legal counsel. Defendant's Motion to Dismiss for Government Misconduct, Exhibit R. Identically, the "Order

to Detain or Release Alien" prepared by ICE in response to that request – and again cited by the defendant – states that Mr. Abdi would be permitted communication with legal counsel. *Id.,* Exhibit C.

Moreover, Mr. Abdi was advised of his right to counsel every time he was questioned. As early as November 30, he specifically turned away a lawyer who had advised one of the ICE agents that he had been hired by the defendant's family to represent him. He did so again twice on December 5. On December 7, Mr. Abdi decided to accept representation from a fourth attorney who presented himself and thereafter, all interviews were conducted in the presence of his attorney. As will be shown at the suppression hearing, agents did nothing to discourage Mr. Abdi from retaining these or any other lawyers.

Second, Mr. Abdi was kept in segregation from other prisoners and restricted in his communications because of the nature of the evidence against him, recited above. The FBI was concerned that Mr. Abdi might attempt to make contact with other individuals potentially involved in the planning of violence, or who might destroy evidence, or that he might attempt to use family or friends as unwitting communications conduits through the use of codes, for example.

These conditions were based on legitimate national security concerns and were not imposed for purposes of extracting a confession. Indeed, those concerns were borne out on the first two days of the defendant's detention, when he obtained access to a phone and made repeated attempts to call an individual who had been named by Iyman Faris as a participant in the plotting that had gone on amongst this group, raising serious concerns for law enforcement. Mr. Abdi made some of these calls before attempting to reach his wife.

-19-

Second, there have been instances where terrorists have successfully communicated with their confederates from prison.  For example, after El Sayyid Nosair assassinated Rabbi Kahane, he was placed in Rikers Island, where:

> he began to receive a steady stream of visitors, most regularly his cousin El-Gabrowny, and also Abouhalima, Salameh, and Ayyad.  During these visits, as well as subsequent visits once Nosair was at Attica, Nosair suggested numerous terrorist operations including the murders of the judge who sentenced him and of Dov Hikind, a New York City Assemblyman, and chided his visitors for doing nothing to further the *jihad* against the oppressors.  Nosair also tape recorded messages while in custody . . . .

*United States v. Rahman*, 189 F.3d 88, 105-06 (2d Cir. 1999).

The use of codes and other methods to avoid detection of monitored calls from prison is illustrated in *United States v. Salameh*, 152 F.3d 88 (2nd Cir. 1998), by the communications between World Trade Center I co-conspirators:

> During this entire period, although Ajaj remained incarcerated, he kept in telephone contact with Yousef.  By doing so, Ajaj stayed abreast of the conspirators' progress in carrying out the terrorist plot and attempted to get his "terrorist kit" into Yousef's hands.  Because Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot.

152 F.3d at108; *accord United States v. Johnson*, 223 F.3d 665, 673 (7th Cir. 2000) ("we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code"); *United States v. Hammoud*, 381 F.3d 316, 334 (4th Cir. 2004) ("A conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals are talking in code."); *United States v. Moncivais*, 401 F.3d 751, 757 (6th Cir. 2005) (noting police testimony that seemingly nonsensical conversations could be in code and interpreted as indicative of drug dealing activity).  In *Salameh,* the court noted that, to protect Yousef, "Ajaj never contacted Yousef directly but telephoned a friend, Mohammad

Abukhdeir in Texas, who then, as an intermediary, either relayed messages or patched three-way calls to Yousef." *Salameh*, 152 F.3d at 154.

An Al Qaeda training manual, seized in May of 2000 by British authorities, and available on numerous websites, *e.g.,* www.thesmokinggun.com/archive/jihad18chap1.html, contains the following advice regarding communications from prison:

> Take advantage of visits to communicate with brothers outside prison and exchange information that may be helpful to them in their work outside prison [according to what occurred during the investigations]. The importance of mastering the art of hiding messages is self evident here.

Whenever using the telephone, the training manual advises the reader to: "Converse on the telephone using special code so that does not attract attention."[6]

Thus, the restrictions placed on Mr. Abdi were based upon well-founded concerns that he would communicate directly or through his family with other individuals – known and unknown

---

[6] Lesson Eighteen of the manual, *id.,* "Prisons and Detention Centers," also instructs, *inter alia,* as follows:

> IF AN INDICTMENT IS ISSUED AND THE TRIAL BEGINS, THE BROTHER HAS TO PAY ATTENTION TO THE FOLLOWING:
>
> 1.  At the beginning of the trial, once more the brothers must insist on proving that torture was inflicted on them by State Security [investigators] before the judge.
> 2.  Complain [to the court] of mistreatment while in prison.
> 3.  Make arrangements for the brother's defense with the attorney, whether he was retained by the brother's family or court-appointed.
> 4.  The brother has to do his best to know the names of the state security officers, who participated in his torture and mention their names to the judge. . . .
> 6.  During the trial, the court has to be notified of any mistreatment of the brothers inside the prison.
> 7.  It is possible to resort to a hunger strike, but it is a tactic that can either succeed or fail. . . .

-21-

to law enforcement – in furtherance of terrorist activity or destruction of evidence, and not for the purposes of extracting a confession from him.

In sum, as the Supreme Court observed in *Colorado v. Connelly,* 479 U.S. at 170, *Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.  The defendant is a mature 31-year-old man with a college-level education and previous experience with law enforcement and immigration authorities.  He was repeatedly advised of his rights, and expressly refused counsel until his eighth interview.  He was questioned for reasonable amounts of time, and he was not deprived of food or sleep.  He was not physically or psychologically abused or coerced, and he was not threatened, tricked, or made false promises by agents.  Whatever Mr. Abdi's motivation ultimately to confess his deeds to the agents, it was prompted by something other than government coercion.[7]

## II.

### DEFENDANT'S REQUEST FOR DISMISSAL OF THE INDICTMENT ON THE BASIS OF "OUTRAGEOUS GOVERNMENT MISCONDUCT" SHOULD BE DENIED

On the basis of essentially the same facts, defendant alleges that the conduct of ICE and FBI agents was so outrageous that due process principles absolutely bar the government from

---

[7] The defendant also briefly suggests, without much argument, that all statements made on or after November 30, 2003, must be suppressed because they are the product of *Miranda* violations and involuntary.  Def's Mem. at 6.  Under both *Brown v. Illinois*, 422 U.S. 590, 603 (1975), and *Oregon v. Elstad*, 470 U.S. 298, 318 (1985), even if Abdi's waiver of his rights on November 30 is somehow invalid (which it is not) and his confession was involuntary (which it is not), his subsequent statements, made over the course of ten interviews spanning December 1, 2003, to February 17, 2004, should not be suppressed, as he was repeatedly *Mirandized*, he turned down specific attorneys' attempts to represent him and, as to the last four interviews, he gave statements in the presence of his lawyer.

invoking judicial processes to obtain a conviction.  *See* Defendant's Memorandum in Support of Motion to Dismiss for Outrageous Government Misconduct at 9-17.  He therefore asks for dismissal of the indictment.

Defendant's near-exclusive reliance upon *United States v. Russell*, 411 U.S. 423 (1973), an entrapment case, and its progeny, to argue that the Court should dismiss the indictment in this case on the grounds of "outrageous government misconduct," is completely misplaced.   In strongly worded opinions, this Circuit has foreclosed use of the "outrageous government conduct" defense in any entrapment, or "inducement" cases.  *United States v. Tucker*,  28 F.3d 1420 (6th Cir. 1994); *United States v. Warwick,* 167 F.3d 965, 975 (6th Cir. 1999) (same); *United States v. Corrales*, 1999 WL 1485356 (S.D. Oh. 1999) (same).  There is absolutely no legal basis to extend an already-moribund defense to this case, which has nothing to do with entrapment.

Similarly, defendant's appeal to this Court to exercise its "supervisory powers" to dismiss the indictment for "outrageous government conduct" must also be rejected.   The Supreme Court has rejected judicial efforts objectively to rate government conduct under supervisory powers, in the absence of a violation of a specific protected right.  *United States v. Payner*, 447 U.S. 727 (1980).  This Circuit, interpreting *Payner,* stated that the balance between the interest of society in deterring illegal searches and the interest of society in convicting criminals "was not subject to case-by-case second-guessing by the lower courts in the guise of exercising their 'supervisory power.'" *Tucker*, 28 F.3d at 1427 (quoting, in part, *Payner*, 447 U.S. at 735-36).

In any event, as amply shown above, there is no basis to hold that the government engaged in "outrageous conduct," or conduct that "shocks the conscience," essentially a due process violation under *Rochin v. California,* 342 U.S. 165, 172 (1952) ("illegally breaking into the

privacy of the [suspect], the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents"). In the intervening years, when it has cited *Rochin* favorably at all, the Supreme Court has adhered to *Rochin*'s benchmark. *See, e.g., Breithaupt v. Abram*, 352 U.S. 432, 435 (1957) (reiterating that conduct that " 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process); *Whitley v. Albers*, 475 U.S. 312, 327 (1986) (same); *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience.' ") (quoting *Rochin*, 342 U.S. at 172, *Palko v. Connecticut*, 302 U.S. 319, 325-26 (1937)).

As a consequence, there appear to be few cases in which a court has found conduct that shocks the conscience, and the facts are egregious, as distinguished from this case. *E.g. U.S. v. Fernandez-Caro*, 677 F.Supp. 893, 894 (S.D. Tex. 1987) (evidence from search excluded as warrant was based on statements made by defendant to Mexican police, who threatened to kill him, beat him about the face and body, poured water through his nostrils while he was stripped, bound and gagged, and applied electrical shocks to his wet body); *cf. United States v. Toscanino*, 500 F.2d 267, 275 (2d Cir. 1974) (allegation of torture involving beating and attaching electrodes could require court to divest itself of jurisdiction), *on remand*, 398 F. Supp. 916 (E.D.N.Y. 1975) (court refused to dismiss indictment because there was no evidence that U.S. officials participated in or directed torture).[8]

---

[8] The Second Circuit narrowed the reach of *Toscanino* in a subsequent opinion by clarifying that a defendant must prove "torture, brutality, and similar outrageous conduct" by federal officials in order to establish a violation of the due process clause. *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 65 (2d Cir.), *cert. denied*, 421 U.S. 1001 (1975). The narrowing of *Toscanino* was noted by this Circuit in *United States v. Pelaez*, 930 F.2d 520, 525 (6th Cir.

The police conduct here cannot be described as shocking to the conscience or beyond the bounds of civilized behavior, for all of the reasons discussed above.  In addition to that conduct, defendant also focuses on the notion that his attorney, Douglas Weigle, was  "hijacked" by the ICE and FBI agents and that his alleged mental breakdown – after being told that he would be indicted and after viewing news reports of the Abu Graib prison scandal -- was the fault of the government.

There is absolutely no evidence to suggest that Mr. Weigle was somehow in cahoots with the agents, to the defendant's detriment.  The choice to continue talking to agents once he was represented by counsel was that of Mr. Abdi, and it is not the government's burden to establish the wisdom of whatever advice Mr. Weigle may have given him, or Mr. Abdi's regard or disregard of it, for that matter.  Moreover, the government is not responsible for any representations or judgments about the criminal case that may have been conveyed by Mr. Weigle to the defendant.  When agents asked Mr. Weigle whether he represented Mr. Abdi for immigration purposes, he responded that he represented Mr. Abdi for *all* purposes. And, as discussed above, neither Mr. Abdi nor his counsel were told that he would not be prosecuted.

With respect to the defendant's alleged illness in May of 2004, this Court ordered two psychiatric examinations in connection with defendant's request under 18 U.S.C. § 4241.  *See* Order (January 11, 2005).  It is undisputed, *see id., &* Amended Order (June 21, 2005), that the only psychiatric team to have evaluated the defendant *at the time he was purportedly manifesting symptoms* concluded that he was competent to stand trial.  Order (January 11, 2005) at 2.  Similarly, a second psychiatrist concluded, upon an examination conducted after the defendant

1991).

-25-

conceded that he was symptom-free, that Abdi was competent to stand trial.  *Id.* at 3. Accordingly, there is no evidence that defendant suffered from any mental illness at any time, much less that it was caused by any government conduct whatsoever.

Finally, dismissal of the indictment is not an appropriate remedy in any event.  Even if government conduct outside the indictment process interferes with a constitutionally protected right, the Supreme Court has held that a defendant must show actual prejudice to warrant dismissal of an indictment with prejudice.  The Supreme Court observed in *United States v. Morrison*, 449 U.S. 361, 365 (1981), that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests:

> the premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.

*Id.; cf. United States v. Valencia*, 541 F.2d 618, 623 (6th Cir.1976) (where government, at the pre-indictment stage, intruded upon the attorney-client privilege, there must be an intrusion into the privileged relationship and prejudice before dismissal of the indictment is warranted).

In this case, the defendant has established no prejudice whatsoever from any activity of the government.  Had the confessions he made been in violation of *Miranda* or involuntary, the remedy would be suppression of the statements, not dismissal of the indictment.  Moreover, the defendant was never diagnosed as suffering from a mental illness, regardless of cause and there is a finding by this Court that he is competent to assist in his defense.  The fact that the proceedings were delayed was the result of the defense requests for two consecutive evaluations, the second being made after a psychiatric team found that the defendant was competent to stand trial, is a

situation of the defendant's own making.  The second report also found the defendant competent to stand trial.

Defendant also complains that the undersigned prosecutors and an FBI agent visited him in May of 2004, suggesting that they attempted to force him to sign a waiver of the statute of limitations and a plea agreement.  Defendant conveniently omits that this meeting occurred *in the presence and with the full permission of his attorney*.  Neither a waiver of the statute of limitations, which would have allowed the defendant more time to consider the plea, nor the plea agreement, was signed by the defendant.

Accordingly, there is no basis to dismiss the indictment for "outrageous government conduct" or conduct that "shocks the conscience."

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court deny the defendant's Motion to Suppress Statements for Violations of Defendant's Fifth Amendment Rights and defendant's Motion to Dismiss for Outrageous Government Misconduct.

Respectfully submitted,

GREGORY G. LOCKHART.
UNITED STATES ATTORNEY


By:     s/                                                   
        DANA M. PETERS (0034226)
        Assistant U.S. Attorney
        303 Marconi Blvd., 2nd Floor
        Columbus, Ohio 43215
        Phone: (614) 255-1634
        Fax: (614) 469-5653
        Dana.Peters@usdoj.gov


        s/                                                   
        SYLVIA T. KASER (D.C. Bar No. 360918)
        Trial Attorney
        U.S. Department of Justice
        Criminal Division
        Counterterrorism Section
        10th St. and Pennsylvania Ave., N.W.
        Suite 1539
        Washington, D.C.  20530
        Phone: (202) 305-9148
        Fax: (202) 353-0778
        Sylvia.Kaser@usdoj.gov

        Attorneys for the United States

### CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2005, I served the foregoing United States' Response to Defendant's Motions to Suppress Statements for Violations of Defendant's Fifth Amendment Rights and to Dismiss for Outrageous Government Misconduct, by electronic case filing on, Mahir T. Sherif, attorney for defendant Abdi.

        s/                                         
        Sylvia T. Kaser
        Trial Attorney