# GOVERNMENT
# EXHIBIT # 1

U.S. Department of Justice
Executive Office for Immigration Review
Immigration Court

Matter of                                    File A 75 613 050

NURADIN MAHMOUD ABDI,            )           IN REMOVAL PROCEEDINGS
                                 )
        Respondent               )           Transcript of Hearing

Before ELIZABETH A. HACKER, Immigration Judge

Date: March 9, 2004                   Place: Detroit, Michigan

Transcribed by DEPOSITION SERVICES, INC. at Rockville, Maryland

Official Interpreter:

Language:

Appearances:

        For the Department of         For the Respondent:
        Homeland Security:

        Michael B. Dobson, Esquire    Douglas S. Weigle, Esquire

b

JUDGE FOR THE RECORD

This is a continued removal proceeding, in the matter of Nuradin Mahamoud Abdi, file A 75 613 050. Let the record reflect the respondent is present, before Immigration Judge Elizabeth A. Hacker, sitting in Detroit, Michigan.

Government counsel is Michael B. Dobson; counsel for the respondent, Douglas S. Weigle. It's March 9th, 2004. This matter comes before the Court upon the respondent's application for protection under Article 3 of the Convention Against Torture.

Prior to going on the record, we've had a brief pre-trial in this case. I've reaffirmed from the parties that the stipulation entered into by the parties prior to the initiation of these proceedings, whereby the parties agreed and stipulated that the matter be closed, remains effective. We had further discussed the submission of evidence and I've indicated to both sides that since the publication of the 2003 Country Reports has recently occurred, that I intend to incorporate that in the record.

JUDGE TO COUNSEL

Q. I will be providing both of you with a copy of that as it is printed.

JUDGE TO MR. DOBSON

Q. Does that accurately reflect the discussions we've had, Mr. Dobson?

A. Yes, Your Honor.

A 75 613 050                    10                    March 9, 2004

lb

Q. I'm probably looking at close to a half hour.

A. Okay. I'll wait that long. But thank you.

Q. Okay.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

All right. We're back on the record.

JUDGE TO MR. ABDI

Q. We've discussed off the record, Mr. Abdi, before I go to the separate tape, let me tell you what my decision is in this case, sir. For several reasons, I am going to deny your application for relief under the Convention Against Torture. First of all, because as the Government has pointed out, Convention Against Torture protection is barred to you. I do find that you do constitute a danger to the security of the United States based upon your own testimony herein, your discussions with a convicted terrorist to construct a bomb to be placed in shopping malls. By your own admission, you've received instructions to undertake this action. These are all actions which are contrary to the peace and security of the United States. Your interruption in this continued activity appears to be as a result of your arrest. After your arrest, you appear to have cooperated with the authorities, certainly in an attempt to ameliorate the effects of your earlier actions. There's very little doubt in my mind with respect to that. So I don't think

A 75 613 050                    126                    March 9, 2004

b

A.   That's correct, sir.

Q.   What did you do then?

A.   What happened was I received the passport, that it has permanent residence of United States of America.  I had to come to, using that passport, to United Arab Emirates.

Q.   This was not your passport.

A.   No, it wasn't.  It was a passport that had the permanent residence in United Arab Emirates.  What happened was there was a guy who changed the picture of the passport, which is we paid him money.

Q.   What did you do with this passport?

A.   What did I do with the passport was I went to the British consul.  I had to seek a transit visa because I was coming to United States of America and the flight was going through London Heathrow.  I had to had a visa.  They gave me the visa and I went all the way to come to United States, which is I landed on Dulles Airport.

Q.   When was that?

A.   That was in 1995.

Q.   How long did you stay in the United States in 1995 then?

A.   I stayed from September, I will say, until November of 1995.

Q.   Where did you go?

A.   Then I had to go to Canada.

A 75 613 050                      30                      March 9, 2004

Q. Why did you have to go to Canada?

A. The reason was because I have to, I had to study the language, the English language and also, when I came to America, there was no acceptance for the immigration law for the Somali people like it was after '98.

Q. What do you mean by no acceptance?

A. Okay. The ruling, the way they accept people as refugees, it was granted in Canada much easier than United States of America. That's why I had to go to Canada.

Q. Where did you go in Canada?

A. I had to go to London, Ontario.

Q. What did you do in London, Ontario?

A. London, Ontario, I went to Ottawa school, which is called Weeble (phonetic sp.) Ottawa school, to study the language.

Q. This was strictly for language as opposed to any substantive education?

A. Sort of.

Q. What kind of status did you have in Canada?

A. I had something like that work permit, not acceptance, not a denial. They gave me a papers to stay in Canada.

Q. Were your papers still in some sort of process?

A. As a matter of fact, yes, it was back in 1997 or 1996.

A 75 613 050                    31                    March 9, 2004

Q. Did you ever get a decision on --

A. No.

Q. -- your status in Canada?

A. No.

Q. Who did you stay with?

A. I stayed with my uncle. He was a cab driver in London, Ontario.

Q. When did you leave Canada?

A. In 1997.

Q. Where did you go to?

A. United States of America.

Q. Do you have any right or papers to get you back into Canada?

A. No.

Q. Where did you enter the United States from Canada?

A. From Detroit.

Q. Did you file then an application with the Immigration Service in the United States?

A. After, in 1998, I did.

Q. That has already been marked as Exhibit 3-A, an administrative asylum application.

A. That's correct.

MR. DOBSON TO MR. WEIGLE

Q. I think it's 2-A.

A. I stand corrected, 2-A. Thank you.

A 75 613 050      32      March 9, 2004

b

MR. WEIGLE TO MR. ABDI

Q.   How did this document get drawn up?

JUDGE FOR THE RECORD

For the record, counsel is holding up Exhibit 2-A, the administrative asylum application.

MR. WEIGLE TO MR. ABDI

Q.   How did you come to file this with the Immigration Service?

A.   What happened was I went to San Diego because the process of immigration in San Diego was much easier.  When I went to San Diego, there was some guys that were doing applications for people just to pay them money.  I had to make a case in order for me to stay in United States and the case was what you saw in those papers.

Q.   Other than your name and maybe some biographical details, is anything in this document true?

A.   No, unfortunately.

Q.   You've told that to Immigration.  Have you?

A.   Yes, sir.

JUDGE TO MR. ABDI

Q.   I'm sorry.  I didn't hear you say.

A.   Yes.

MR. WEIGLE TO MR. ABDI

Q.   You discussed this with the agents who arrested you?

A 75 613 050                    33                    March 9, 2004

b

A. (In English) 1972.

A. I was born in 1972.

Q. You testified that you applied for refugee status in Canada. Is that correct?

A. Yes, that's correct.

Q. Why did you do that?

A. The reason that I went to Canada was that because it was easy to get accepted in Canada, plus, that they had a lot of other help, that they were helping all those who apply asylum there. They would teach you the language. They would help you until you get situated while, all those things, you get a medical services. All of these things, you don't get it in the United States. So that was the reason that I went to Canada.

Q. Sir, you told us that you applied for asylum in Canada because it was easy to get, because you could get medical benefits. Correct?

A. Yes, and that they would give you some money, they would pay for your rent.

Q. Sir, if you were applying for asylum, why aren't you telling me that you applied because you were afraid? all you wanted were these government benefits?

A. I didn't understand that that's what you were trying to get to, the reason that I did that. But the question that you asked me and I was answering about to, was that why did I not apply in the United States, I went to Canada. So that's

A 75 613 050                    63                    March 9, 2004

why I was telling you, the counsel, these differences.  Then simply that I was afraid, that was no reason, everybody (indiscernible) Canadian official in their application for asylum is required that you show them that if they take you back home, that you will be injured or someone will do you harm.

Q.   So it's your testimony that you filed for asylum in Canada because you were afraid you would be persecuted, tortured, or killed in Somalia?  Is that your testimony, sir?

A.   Yes, he answered the question before I explained.  So but I believe he understands.  So it's yes.

Q.   Okay, sir.  If you were truly and genuinely afraid of being persecuted in Somalia and that's why you applied for asylum in Canada, where it's easier to get, why didn't you wait for your decision?  Why did you leave?

A.   That was my plan.  I was trying to stay there.  But then my mother told me that she wanted me to come back, she wanted me to come to the States, and I was there alone by myself.  So I did want to, I came back because of my family.

JUDGE TO MR. ABDI

Q.   Sir, didn't you say previously that you were living with an uncle?

A.   But what I'm referring to is my mother, my siblings are here.

Q.   Well, sir, you were not alone.  You said you were alone.

A 75 613 050                    64                    March 9, 2004

which case, sir, you come before me, as I alluded to in this transcript, as an individual requesting mercy from the Court as an orphan when you killed your parents. It's the same thing, sir. I am going to deny your application for deferral of removal since you have failed to meet the standards necessary to establish that governmental action would result in your torture should you return.

JUDGE TO MR. WEIGLE

Q. Do you understand my decision, Mr. Weigle?

A. I have advised my client of his rights to appeal and the rights of reserving appeal, and he has instructed me he wishes to waive appeal at this time.

JUDGE TO MR. ABDI

Q. Is that correct, sir?

A. (In English) Yes.

MR. WEIGLE TO MR. ABDI

Q. I also advised him that once appeal is waived, it is waived.

A. And it is a final order.

Q. It is a final order.

A. Thank you.

JUDGE TO MR. DOBSON

Q. Mr. Dobson?

A. Your Honor --

JUDGE FOR THE RECORD

A 75 613 050                    130                    March 9, 2004

b

I will.  The order will reflect that the respondent will be deported to Somalia.

MR. DOBSON TO JUDGE

Q.   Yes, that was my --

JUDGE FOR THE RECORD

All of the factual allegations are sustained and the charges of removal on all grounds are sustained.

MR. DOBSON TO JUDGE

Q.   There was a matter that I brought up at the conclusion of the master, on January 28th, but the Court indicated that I was premature.  There is -- You have not made a formal finding that his asylum status is terminated and I would ask the Court to make that finding.

A.   I indeed will and you are correct, Mr. Dobson.

JUDGE FOR THE RECORD

The regulations provide that it is before this Court and pursuant to the provisions of the regulation, the respondent's asylum status is terminated, since the Court finds that based upon his testimony, it was indeed procured by fraud and the record will so reflect.

MR. DOBSON TO JUDGE

Q.   The Government waive it's right to appeal.

A.   Okay.

JUDGE TO COUNSEL

Q.   Is there anything further?

A 75 613 050                         131                      March 9, 2004

# UNPUBLISHED DECISIONS

900 F.2d 260 (Table)
900 F.2d 260 (Table), 1990 WL 47353 (6th Cir.(Mich.))
Unpublished Disposition
(Cite as: 900 F.2d 260, 1990 WL 47353 (6th Cir.(Mich.)))

Page 11

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206. for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Edward NAPIOR, Defendant-Appellant.
No. 89-2028.

April 16, 1990

On Appeal from the United States District Court for the Western District of Michigan, 88-00108, Hillman, D.J.

W.D.Mich.

AFFIRMED.

Before DAVID A. NELSON and ALAN E. NORRIS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.

PER CURIAM.

**1 This is an appeal by defendant Robert Napior from a conviction and sentence for manufacturing marijuana. Mr. Napior makes four claims: (1) that the police seized and questioned him without any reasonable and articulable suspicion; (2) that although he waived his Fifth Amendment rights as to questions about an offense he had not committed, there was no knowing and voluntary waiver as to questions about the offense he did commit; (3) that the application of Sentencing Guidelines violated his due process rights; and (4) that the court and the prosecutor violated a plea agreement. We find no merit in any of these claims, and we shall affirm the judgment of the district court

I

On August 12, 1988, a car occupied by defendant Napior and his co-defendant, Stephen Tonkovich, caught fire on a rural Michigan road. A group of firemen led by Assistant Fire Chief Rod McGuire arrived on the scene first Deputy Sheriff Rod Sadler arrived soon thereafter. When Sheriff Sadler arrived, Fire Chief McGuire told because there were fires both

in the engine compartment and toward the back of the car. Sadler called for backup, and Deputy Sheriff Jerry Ackley arrived five minutes later

Sadler told Ackley of the suspicions about the fire. According to Sadler, Ackley was skeptical that the fire could have been arson. Nevertheless, each of the occupants was interviewed by a sheriff. Sheriff Ackley, who interrogated defendant Napior, said that he was going to ask him some questions about the car fire and advised him of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Mr. Napior signed a waiver. After 15 to 20 minutes of questioning, the two deputies compared Tonkovich's and Napior's stories. They then searched a ditch along the road by the car and discovered some maps of the county, clothes, and a bag of fertilizer. Some of the maps were marked with X's at locations which Ackley knew were swampy and unpopulated.

About five minutes after the first interview, Sheriff Ackley returned to his car to ask defendant Napior more questions. The district court found that the sheriff did not remind Mr. Napior of his *Miranda* rights, but Napior admitted he remembered them. Mr. Napior answered questions posed by Sheriff Ackley about the maps and about marijuana production. Napior denied any involvement with marijuana. He admitted that the maps belonged to him, but claimed that he was a contractor and that the marks indicated places where he had done masonry or other work. This interview lasted about five minutes.

Sheriff Sadler then drove Messrs. Napior and Tonkovich to a nearby town so they could arrange for a ride. Sheriff Ackley remained on the scene and conducted a search that soon led to discovery of a number of marijuana plants growing some distance from the road. Ackley then radioed Sadler and told him to return Napior and Tonkovich. When the men got back, Sheriff Ackley reminded defendant Napior of his *Miranda* rights and tried to question him again. Napior refused to answer any further questions regarding the marijuana.

**2 Mr. Napior was charged in three counts with conspiracy to manufacture marijuana, manufacturing marijuana, and possession of marijuana with intent to manufacture it. He moved to suppress all of the evidence discovered after he was questioned about the maps. After a hearing, the district court denied the motion. Pursuant to a plea bargain, Mr. Napior

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

900 F.2d 260 (Table)
(Cite as: 900 F.2d 260, 1990 WL 47353, **2 (6th Cir.(Mich.)))

subsequently pleaded guilty to one count of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1). He was sentenced to 74 months in prison.

## II

In contesting his seizure, Mr. Napior makes a two-part argument. First, he argues that the police made a *Terry* -stop without adequate cause. See *Terry v. Ohio*, 392 U.S. 1 (1968). Second, he contends that even if the stop was proper, the scope of the interrogation conducted during the stop was too broad.

### A

"[A] policeman may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 109 S.Ct. 1581, 1585 (1989), quoting *Terry* 392 U.S. at 30. A number of facts support the conclusion that a reasonable suspicion existed in the case at bar. Sheriffs Ackley and Sadler, whose knowledge may be taken collectively, see *United States v. Poulos*, 895 F.2d 1113, ---- n. 6 (6th Cir. 1990), [FN1] knew that: (1) the burning vehicle did not belong to Mr. Napior; (2) either the gas cap or the license plate was missing; (3) Mr. Tonkovich had told Fire Chief McGuire that the firefighters could "have this car"; (4) there were two separate burn patterns on the car; (5) Chief McGuire thought the fire was suspicious. In evaluating the validity of a stop, we must consider the totality of the circumstances. *Rose*, 889 F.2d at 1495, citing *United States v. Cortez*, 449 U.S. 411 (1981). *In toto*, it seems to us, the facts presented here form the basis for a reasonable and articulable suspicion of wrongdoing.

### B

*Terry* -stops must be "reasonably related in scope to the justification for their initiation." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975), 392 U.S. at 29. There are a number of facts which, taken together, justify Sheriff Ackley's question about marijuana--a question, it will be recalled, that was not posed until after the discovery of the bag of fertilizer:

1. Napior and Tonkovich were residents of Detroit, which was nearly one hundred miles away;

2. The burning car and its occupants were on a minor road in a rural area;

3. A quick search of a nearby ditch in which Napior and Tonkovich had been walking revealed clothing,

fertilizer and marked maps;

4. Ackley had personal knowledge that the highlighted areas on the Eaton County maps were suitable for growing marijuana;

5. Napior was carrying a large amount of cash; and

6. Napior gave "not convincing" responses to questions about the maps and their markings.

**3 In attempting to refute these grounds for suspicion, Mr. Napior relies primarily on Sheriff Ackley's testimony that his question about growing marijuana was "just out of the blue." Mr. Napior does not deny, however, that Ackley had personal knowledge that the marks on the map indicated swampy, unpopulated areas suitable for growing marijuana. He does not deny that there was no apparent reason, other than an illicit one, why he was present in rural Eaton County. Although he denied that the fertilizer was his, he does not deny that it was present or that fertilizer is normally more useful in agricultural pursuits than in "masonry" or other construction work. We do not know exactly what Sheriff Ackley meant in saying that his question was "out of the blue," but the justification for the question seems perfectly obvious.

## III

Mr. Napior admits that he was properly warned of his *Miranda* rights before being questioned, and he admits that he voluntarily signed a written waiver form acknowledging "I also understand that any statements that I might make or any answers that I might give to questions can and will be used against me in court." He argues, however, that Sheriff Ackley affirmatively limited the scope of the questioning and of the waiver by saying that he was going to question Mr. Napior about a suspected arson.

*Colorado v. Spring*, 479 U.S. 564 (1987), left open the question of whether a waiver of Miranda rights would be valid in the face of "an **affirmative misrepresentation by law enforcement officials as to the scope of the interrogation.**" Mr. Napior disclaims any suggestion that Sheriff Ackley *misrepresented* the scope of the questioning, but argues that he *limited* the scope of the questioning. We do not read *Spring*, however, as suggesting that what Sheriff Ackley did deprived Mr. Napior of his rights under the Fifth Amendment. The *Spring* Court noted that:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

900 F.2d 260 (Table)
(Cite as: 900 F.2d 260,  1990 WL 47353, **3 (6th Cir.(Mich.)))

"In this case there is no allegation that Spring failed to understand the basic privilege guaranteed by the Fifth Amendment.   Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials."
*Id.* at 575.

This being the case, the Court concluded:

"We hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege ." *Id.* at 577.

Napior acknowledged in writing that "any" statements he made could be used against him.   Absent actual misrepresentation as to the scope of the questioning, the waiver is unquestionably valid.

IV

In challenging the application of the Sentencing Guidelines, Napior claims he was denied his due process rights by the use of hearsay (out-of-court statements by co-defendant Tonkovich) and by not being accorded a hearing on the number of marijuana plants he grew.   (The offense level turned on the number of plants.)

**4 Hearsay evidence may be considered at the sentencing stage as long as the defendant has an opportunity to refute it and as long as the evidence bears "some minimal indicia of reliability in respect of defendant's right to due process."   *United States v. Robinson*, --- F.2d ---, No. 88-4020, slip op. at 8 (6th Cir. March 13, 1990).   Tonkovich's statements meet this standard.

The district court did not deny Mr. Napior the opportunity to present evidence on the number of marijuana plants he grew.   He chose not to take the stand because he did not want to be questioned about plantings in prior years.   We see no due process problem here; whether there was a breach of the plea agreement is a different issue, of course.

V

Mr. Napior argues that his plea bargain was violated in three ways:   (1) he was foreclosed from showing the probation officer how many marijuana plants were grown;  (2) he was denied a reduction for acceptance of responsibility; and (3) he was threatened with adverse use of information regarding marijuana grown in

previous years.

The first two claims are based on incorrect facts.   The probation officer mistakenly took the indictment's statement on the number of plants as binding upon her, but she corrected her mistake in a revised sentencing report.   And the presentencing report included a two-point reduction for acceptance of responsibility, as did the calculations at the sentencing hearing.

Neither was there any breach of the plea bargain insofar as prior years' plantings were concerned.   Mr. Napior did not, as he claims, "bargain for the right to be able to testify to his quantity contentions without having to fear that his answers to questions about his prior years plantings would be used as a basis for increasing his sentence."   Section § 1B1.8 of the sentencing guidelines provides that:

"(a) Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and the government agrees that self-incriminating information so provided will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement."

This section applies only to out-of-court statements.   See, *e.g.*, *United States Newsome*, 894 F.2d 852, 855 (6th Cir.1990); *United States v. Shorteeth*, 887 F.2d 253, 256-57 (10th Cir.1989).   Mr. Napior acknowledged when he pleaded guilty that the written agreement constituted "the entire agreement," and during plea discussions it was stated only that Napior's statements *to the probation officer* regarding his plantings in prior years would not be used against him.

Those statements were not used to increase his sentence.   During negotiations Napior stipulated to a base level of 28 (adjusted to 26 for the acceptance of responsibility), but only "if legally the Court is allowed to consider prior years."   Because Napior does not now deny that the court could consider the prosecution's independent evidence of such plantings, we find no error in the district court's reliance upon the stipulation.   The sentence was within the guideline range to which Mr. Napior agreed.

**5 The judgment and sentence of the district court are AFFIRMED.

FN1. Napior's argument that the collective knowledge doctrine does not apply to *Terry*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

900 F.2d 260 (Table)
(Cite as: 900 F.2d 260, 1990 WL 47353, **5 (6th Cir.(Mich.)))

stops is not persuasive. In evaluating a *Terry* -stop, the Fifth Circuit has held that " 'reasonable suspicion' is to be determined by considering the totality of the circumstances, including the 'collective knowledge' of all officers in assessing the facts." *United States v Miranda-Perez*, 764 F.2d 285, 289 (5th Cir.1985) In *Hensley v. United States*, 713 F.2d 220 (6th Cir.1983), *rev'd on other grounds*, 469 U.S 221 (1985), we noted the general rule that probable cause could be based on "the collective knowledge of police officers who were directly involved in the investigations that prompted the various arrests," 713 F.2d at 223 (citations omitted), but we refused in the context of a *Terry* -stop to extend the rule to officers not directly involved. The Supreme Court did not object to our statement of the general rule, or to its application to *Terry* -stops, but held that in some situations the knowledge of officers not involved in the stop may establish a reasonable suspicion. 469 U.S at 232. Because both Sadler and Ackley were directly involved in this investigation at the scene of the car fire, that holding is not relevant here

900 F.2d 260 (Table), 1990 WL 47353 (6th Cir.(Mich.)), Unpublished Disposition

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                   **Page 1**
2005 WL 1285712 (6th Cir.(Ky.)), 2005 Fed.App. 0445N
(Cite as: 2005 WL 1285712 (6th Cir.(Ky.)))

Briefs and Other Related Documents

This case was not selected for publication in the
Federal Reporter.

NOT RECOMMENDED FOR FULL-TEXT
PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific
situations. Please see Rule 28(g) before citing in a
proceeding in a court in the Sixth Circuit. If cited, a
copy must be served on other parties and the Court.

Please use FIND to look at the applicable circuit court
rule before citing this opinion. Sixth Circuit Rule
28(g) (FIND CTA6 Rule 28.)

United States Court of Appeals, Sixth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Dumonde WILEY (04-5601) and Sidney Fletcher
(04-5696), Defendants-Appellants.
No. 04-5601, 04-5696.

May 26, 2005.

Background: Following a jury trial, defendants were
convicted in the United States District Court for the
Western District of Kentucky of multiple counts of
interference with interstate commerce by threat of
violence, Hobbs Act violation, and multiple counts of
using a firearm in a crime of violence. Defendants
appealed.

Holdings: The Court of Appeals, Reeves, District
Judge, held that:
(1) defendant's confession was knowing and
voluntary;
(2) defendant's activities of robbing multiple stores,
hotels, and restaurants had a de minimis impact on
interstate commerce, as required to sustain defendant's
Hobbs Act conviction;
(3) defendant was not entitled to severance of trials;
(4) sentences of 3,184 months for committing 11
armed robberies in less than six weeks did not
constitute an extreme disparity between crime and
sentence; and
(5) statutory mandatory minimum sentence was not
unconstitutional.
Affirmed.

[1] Criminal Law ☜520(2)

110k520(2)
Defendant's confession was knowing and voluntary,
and not coerced, even if detectives allegedly promised
to inform the prosecutor of defendant's cooperation;
testimony demonstrated that detectives read his
*Miranda* rights at 12:57 p.m., he signed a *Miranda*
waiver at 1:00 p.m., witnessed and co-signed, and,
later, during the interview, detective again reviewed
with defendant his constitutional rights and had
defendant initial the form advising him of his rights.

[2] Extortion and Threats ☜25.1
165k25.1
Defendant's activities of robbing multiple stores,
hotels, and restaurants had a de minimis impact on
interstate commerce, as required to sustain defendant's
Hobbs Act conviction, given that testimony indicated
that all of the businesses affected sold to out-of-state
customers, or received business supplies from out-of-
state suppliers. 18 U.S.C.A. § 1951.

[3] Criminal Law ☜622.7(3)
110k622.7(3)

[3] Criminal Law ☜622.7(7)
110k622.7(7)
District court's decision to deny defendant's severance
motion did not result in substantial prejudice and was
not a clear abuse of discretion, notwithstanding district
court's failure to allow defendant to identify co-
defendant and another as the source of the fingerprints
found in the car that was involved in final robbery;
defendant was permitted to elicit testimony that his
prints were not found, and, further, during closing
arguments, defendant's counsel stressed that his prints
had not been recovered from any crime scene.

[4] Robbery ☜30
342k30
Defendants' sentences of 3,184 months for committing
11 armed robberies in less than six weeks did not
constitute an extreme disparity between crime and
sentence. U.S.C.A. Const.Amend. 8.

[5] Robbery ☜30
342k30
Defendant's statutory mandatory minimum sentence did
not violate Eighth Amendment's prohibition on cruel
and unusual punishment; defendant's sentence was
based on individualized factors, specifically that
defendant committed 11 armed robberies.

[5] Sentencing and Punishment ☜1503

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2
(Cite as: 2005 WL 1285712 (6th Cir.(Ky.)))

350Hk1503

Defendant's statutory mandatory minimum sentence did not violate Eighth Amendment's prohibition on cruel and unusual punishment; defendant's sentence was based on individualized factors, specifically that defendant committed 11 armed robberies.

On Appeal from the United States District Court for the Western District of Kentucky.

Terry M. Cushing, Asst. U.S. Attorney, Monica Wheatley, Asst. U.S. Attorney, Thomas W. Dyke, Asst U.S. Attorney, Louisville, KY, for Plaintiff-Appellee.

James A. Earhart, Mark Wettle, Louisville, KY, for Defendants-Appellants.

Sidney Fletcher, Inez, KY, Pro Se.

Before ROGERS and SILER, Circuit Judges; and REEVES, District Judge. [FN*]

### OPINION

REEVES, District Judge.

*1 Defendants-Appellants Dumonde Wiley and Sidney Fletcher appeal their jury convictions and sentences for eleven counts of interference with interstate commerce by threat of violence, a violation of the Hobbs Act, 18 U.S.C. § 1951(a), and eleven counts of use of a firearm in a crime of violence, a violation of 18 U.S.C. § 924(c)(1)(A). For the reasons set forth below, we AFFIRM the judgment of the district court.

### BACKGROUND

In February and March 2001, numerous Louisville businesses were robbed at gunpoint by Dumonde Wiley and Sidney Fletcher. Their crime spree ended on March 22, 2001, when Officer Larry Singleton of the Louisville Police Department observed the Defendants running toward a getaway car parked in an alley behind a Subway restaurant that had just been robbed. Officer Singleton called for backup and a K-9 unit was dispatched. The police dog followed the suspects' scent and alerted officers to a nearby shed. Fletcher, who was hiding inside, turned himself in to police. He was arrested and taken to police headquarters. Once there, he was read his rights, which he waived, and was questioned. During questioning, Fletcher admitted to the robberies and provided the police with details about them.

Although Wiley escaped initially, Louisville police later discovered his whereabouts, resulting in his arrest

on June 13, 2001. Wiley was advised of his rights, executed a waiver, and also confessed to his involvement in the robberies. Wiley, like Fletcher, also provided police extensive details about the crimes.

After state charges had been filed, the Defendants were indicted under the Hobbs Act, 18 U.S.C. § 1951, for thirteen robberies committed in the Louisville area during February and March 2001. [FN1] Because firearms were used in the commission of the robberies, the Defendants were also charged with separate counts of using a firearm in relation to crimes of violence in violation of 18 U.S.C. § 924(c).

The Defendants were tried together over their objections in February 2004. Following the close of the United States' proof, the district court granted a motion to dismiss counts related to two of the robberies because the requisite testimony concerning interstate commerce revealed only that the hotels involved had "out of town" guests instead of "out of state" guests. Thus, the required interstate nexus was not met to support a conviction for these offenses. The jury found the Defendants guilty of all counts submitted to it for the eleven remaining robberies. Both Wiley and Fletcher were sentenced to 3,184 months.

### STANDARD OF REVIEW

This Court reviews factual findings regarding a confession for clear error, but reviews the ultimate question of voluntariness de novo. United States v. Marks, 209 F.3d 577, 581 (6th Cir.2000). In addition, constitutional challenges to criminal convictions are reviewed de novo, as questions of law. United States v. Smith, 182 F.3d 452, 455 (6th Cir.1999). If the proper standard was applied, "when a defendant challenges the sufficiency of the evidence to support a conviction, we inquire whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt." Id. at 456. Finally, the denial of a severance motion is reviewed "for clear abuse of discretion." United States v Critton. 43 F.3d 1089, 1098 (6th Cir.1995).

### DISCUSSION

*2 The Defendants raise four arguments on appeal: (1) Wiley's confession was not knowing and voluntary and it violated his right to counsel; (2) the de minimis contact with interstate commerce test for Hobbs Act jurisdiction oversteps the federal government's power under the commerce clause and, regardless, the burglaries in this case did not satisfy the de minimis test; (3) the district court erred in denying Wiley's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

severance motion; and (4) the sentences violate the Defendants' Fifth, Sixth, and Eighth Amendment rights.

I. Wiley's Confession

[1] Wiley maintains that his confession was not voluntary and should have been suppressed because: (1) he was coerced into confessing by the promise of a reduced sentence; (2) he was never permitted to contact an attorney and was questioned after he invoked his right to counsel; and (3) he was never asked to read the rights waiver form that he signed. A suppression hearing was held in the district court concerning the admissibility of both Defendants' statements. The magistrate recommended denying the motions, a decision the district court affirmed after conducting a *de novo* review.

This Court has recently reviewed the relevant consideration for claims of a coercive confession.

> The state bears the burden of proving that a defendant "voluntarily, knowingly, and intelligently waived his right to silence and counsel." *United States v. Bentley*, 726 F.2d 1124, 1126 (6th Cir.1984). This Court uses a "totality of the circumstances" [test] to determine whether a petitioner's statements were involuntary. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The Supreme Court has stated that, in conducting this test, a court should consider factors such as: (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). Coercive police activity is a necessary element for finding that a confession was involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

*Abela v. Martin*, 380 F.3d 915, 928 (6th Cir.2004). Although Wiley notes the length of his interrogation and his ninth-grade education, his claim fails because there is no evidence of police coercion, as found by the district court.

At the suppression hearing, the magistrate heard testimony from the Defendants, Detective Rick McCubbin, Detective Larry Duncan, Detective Mark Handy, Detective Ray Patterson, and Detective Mark Hickman. The detectives testified that Wiley was read his Miranda rights at 12:57 p.m. He signed a Miranda

waiver at 1:00 p.m., witnessed and co-signed by Detectives McCubbin and Handy. Later, during the interview, Detective Duncan again reviewed with Wiley his constitutional rights and had Wiley initial the form advising him of his rights. Detectives Duncan, Handy, Hickman and McCubbin all testified that Wiley never asked for an attorney.

*3 Wiley claims that he asked to call a lawyer--a request refused by Louisville police. He also claims that he did not read the rights waiver form, instead relying upon Detective Handy's statement that the form was "waiving [his] rights." After hearing the testimony, the magistrate did not give credence to Wiley's claim that he had requested an attorney on several occasions, noting that "[a]ll the detectives involved in Wiley's interrogation consistently testified that Wiley made no request for the presence of an attorney at any time following his arrest." He further found that Wiley acknowledged orally and in writing that he understood his *Miranda* rights. Finally, he noted that Wiley had previous experience with the criminal justice system and was admittedly familiar with his constitutional rights. After conducting a *de novo* review, the district court found no error in the magistrate's findings and adopted them as the court's findings. The findings that Wiley had: (1) been read his rights; (2) read and signed the Miranda waiver form; and (3) failed to request an attorney, are supported by the record and Wiley has failed to show these factual conclusions were clear error. *See United States v. Cruse*, 59 Fed. Appx. 72, 77 (6th Cir.2003) (where defendant claimed he was not read his rights and was denied access to an attorney upon request, but police officers testified otherwise, court found that district court's decision to discredit the defendant's testimony was not clearly erroneous).

Wiley also argues that he was coerced into waiving his rights by the promise of a reduced sentence. Detectives Duncan, Handy, Hickman and McCubbin all testified that no promises had been made to Wiley concerning leniency or a reduced sentence. Detective Hickman, however, testified that someone else might have suggested to Wiley that he would be best served by confessing to all of his crimes at one time, because it would spare him multiple trials and might reduce his total sentence. Wiley claims that the detectives promised to talk to the prosecutor in order to help him receive a lighter sentence. He also maintains that he was promised a 10-year sentence for his cooperation.

The magistrate found that, while the detectives told Wiley that the police would inform the prosecutor of his cooperation, they did not promise Wiley a specific

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        **Page 4**
(Cite as: 2005 WL 1285712, *3 (6th Cir.(Ky.)))

sentence. The magistrate noted that the detectives had no way of knowing what charges would be filed and did not hold the ultimate authority to determine Wiley's sentence. Further, the detectives testified that no one had promised Wiley a certain sentence, or even a range of sentences. Detective McCubbins simply testified that he might have told Wiley that, while cooperation helps, ultimately the plea-bargain decisions are left to the prosecutor. In addition, Detective Hickman testified that someone may have suggested that confessing to all of the robberies at once may result in a lower possible punishment. The district court's factual determination that the detectives did not promise Wiley a specific sentence is not clearly erroneous.

*4 The magistrate further concluded, as a matter of law, that the detectives' promise to inform the prosecutor of Wiley's cooperation did not render his confession involuntarily coerced. This Court dealt with similar facts in a recent unpublished case:

> the only undisputed evidence of alleged coercion consists of Sergeant Hallenback's statements that Defendant would be brought into federal court and that the 5K1.1 motion was a possibility upon his cooperation with the government. Although "a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced," *Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir.1997), a statement about possible leniency upon cooperation is not generally impermissible. *See Williams v. Withrow,* 944 F.2d 284, 289 (6th Cir.1991) (acknowledging that some degree of "carrot-and-stick approach to eliciting information from an uncooperative suspect" is acceptable), *rev'd on other grounds,* 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993).

*Cruse,* 59 Fed. Appx. at 78 (internal citation omitted). Further, promises to inform a prosecutor of cooperation do not, *ipso facto,* render a confession coerced. *United States v. Shears,* 762 F.2d 397, 401-402 (4th Cir.1985); *United States v. Robinson,* 698 F.2d 448 (D.C Cir.1983); *United States v. Curtis,* 562 F.2d 1153, 1154 (9th Cir.1977), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978); *United States v. Pomares,* 499 F.2d 1220, 1222 (2d Cir.1974), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974); *United States v. Springer,* 460 F.2d 1344, 1347 (7th Cir.1972). This is so, even when the promise to inform the prosecutor is "accompanied by a promise to request leniency or by speculation that cooperation will have a positive effect." *United States v. Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988); *see also United*

*States v. Westbrook,* 125 F.3d 996, 1005-1006 (7th Cir.1997). Here, the detectives' alleged promise to inform the prosecutor of Wiley's cooperation did not render the confession coerced, even if the detectives suggested that such cooperation may have a positive impact on Wiley's sentence.

II. Hobbs Act Jurisdiction

[2] Fletcher maintains that this Court should follow a stricter test than the traditional *de minimis* interstate commerce impact test for the establishment of federal jurisdiction under the Hobbs Act, 18 U.S.C. § 1951. If, however, the Court is inclined to follow the *de minimis* impact test, he argues that the United States failed to meet its burden for establishing that the robberies had a *de minimis* impact on interstate commerce.

In *United States v. Smith, supra,* this Court reviewed the *de minimis* impact test for Hobbs Act convictions in light of the Supreme Court's restriction of interstate commerce jurisdiction in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The *Smith* Court reaffirmed that the "proper standard for Hobbs Act convictions is the long-standing *de minimis* effect on interstate commerce." *Smith,* 182 F.3d at 456. Fletcher, however, cites language from *United States v. Wang,* 222 F.3d 234, 240 (6th Cir.2000), restricting Hobbs Act jurisdiction for robberies involving private citizens. The *Wang* Court, however, did not overrule the *Smith* Court's decision that the *de minimis* impact test survived *Lopez* (nor could it). Rather, *Wang* held that robberies of *private individuals* that have only a "speculative" effect on interstate commerce do not meet the requirements for federal jurisdiction under the commerce clause. *Id.* at 238-39. This Court recognized that in *Smith* "we decided that *Lopez* did not require realignment of the Hobbs Act's jurisdictional nexus because individual instances arising under the statute could, through repetition, have a substantial effect on interstate commerce" and that "[t]he Hobbs Act's *de minimis* standard survives *Lopez* by virtue of the aggregation principle." *Id.* This Court held, however, that "[p]er *Lopez,* a small sum stolen from a *private individual* does not, through aggregation, affect interstate commerce merely because the individual happens to be an employee of a national company, or happens to be on his way to a store, or happens to be carrying proceeds from a restaurant." *Id.* at 239 (emphasis added). Because the robberies in this case involved robberies of commercial businesses and not private citizens, the *de minimis* impact test would be applicable under both *Smith* and *Wang.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5
(Cite as: 2005 WL 1285712, *4 (6th Cir.(Ky.)))

*5 Fletcher argues that, even if the *de minimis* impact test applies, the government failed to meet its burden of demonstrating a *de minimis* impact on interstate commerce. Trial testimony produced the following evidence of the connection between the robberies and interstate commerce:

> J.C.'s Cigarettes: items sold at the stores came from Illinois, Ohio, California, New York, and South Carolina. The store also has out-of-state customers, a fact gleaned from checking drivers' licenses for the sale of tobacco and liquor.
>
> Annie's Pizza received its business supplies from two different suppliers in Indiana. It also had out-of-state customers, including numerous truck drivers.
>
> Days Inn regularly had out-of-state guests, a fact learned from checking identification of arriving guests.
>
> The Hampton Inn estimated, from checking guest identification, that 90-95% of its guests were from out of state.
>
> McDonald's received its products from a supplier in Indiana and through an instate supplier that received its goods from Illinois. Based upon license plates and discussions with customers, the store manager testified that the restaurant served out-of-state patrons.
>
> Diversa-Com had out-of-state customers.
>
> Subway's products came from "all over the country," including Indiana and Wisconsin.
>
> Powertel sold Nokia phones made in Finland and received its products from Georgia, Pennsylvania, and Washington.

In *Smith*, this Court found sufficient for purposes of federal jurisdiction, evidence "proving that the stores Smith robbed did a substantial business in beer, wine, and tobacco products and that virtually none of such products originate in Michigan." *Smith*, 182 F.3d at 456. Viewing the evidence in the light most favorable to the government, a rational trier of fact could find beyond a reasonable doubt that Fletcher's activities had a *de minimis* impact on interstate commerce. *Id.*

III. Severance Motion

[3] Wiley argues that it was a clear abuse of discretion for the district court to deny his motion to sever his trial from Fletcher's. Several days before the trial began the United States discovered that prints on the vehicle involved in the final robbery came from Fletcher and George Lee. No prints were found of Wiley. Due to the late disclosure, the district court did not permit the United States to use this evidence against Fletcher. The court, however, allowed Wiley to elicit testimony that none of the prints were his but, to protect Fletcher from the late disclosure, it did not allow Wiley to have the prints identified as Fletcher's and Lee's.

Wiley claims that the district court's actions prejudiced him because he was not able to inform the jury that Lee had a criminal history, including armed robbery, and that Lee was acquainted with Fletcher. In denying the severance motion, the district court noted that:

> the Defendant has been afforded effective use of the evidence that his prints were not on the vehicle or could not be lifted from the vehicle or his prints were not identified from the vehicle, and ... it is not necessary or appropriate in this matter that he identify whose prints they were as long as they can identify and prove to the jury that they were not his. His defense is that he was not guilty of the crime, so that evidence can be proven that he did not have prints there.
>
> *6 As this Court has noted previously,
>
> [a]s a general rule, persons jointly indicted should be tried together because there is almost always common evidence against the joined defendants that allows for the economy of a single trial. Severance should be granted only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. The fact that a defendant may have a better chance at acquittal if his trial were severed does not require the judge to grant his motion: the defendant must show "substantial," "undue," or "compelling" prejudice.

*United States v. Lopez*, 309 F.3d 966, 971 (6th Cir.2002) (citations omitted).

In this case, the district court's failure to allow Wiley to identify Lee and Fletcher as the source of the fingerprints found in the car did not amount to substantial, undue or compelling prejudice. Wiley was permitted to elicit testimony that his prints were not found. Further, during closing arguments, Wiley's counsel stressed that his prints had not been recovered from any crime scene. Clearly, the most damaging evidence to Wiley was his detailed confession. Testimony linking Lee to Fletcher and the robberies would have been of questionable value. Wiley still would have had to deal with his detailed confession. At best, the jury would likely have believed that Lee was somehow involved in Wiley and Fletcher's robbery spree. The district court's decision to deny the severance motion did not result in substantial prejudice and was not a clear abuse of discretion.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IV 3,184-Month Sentences

The district court imposed 100 months for each of the eleven Hobbs Act violations, with the sentences to run concurrently. For the violations of 18 U.S.C. § 924(c), the district court sentenced the Defendants to the mandatory minimum of seven years, for the first count, and the mandatory minimum of twenty five years, for the ten remaining 924(c) counts, to run consecutively, pursuant to 18 U.S.C. § 924(c)(1)(D)(ii). Thus, the sentences totaled 3,184 months (or over 265 years). Wiley makes two arguments regarding the sentence. First, it is disproportionately severe. Second, he argues that the prosecutor's ability to "charge bargain" violates the separation of powers, the Defendants' due process rights and his Sixth Amendment right to trial by jury. Fletcher joins in the first argument.

### A. Eighth Amendment

The Defendants argue that their lengthy sentences, which are essentially life sentences, violate the Eighth Amendment. They note that in *Solem v. Helm*, 463 U.S. 277, 290-92, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Supreme Court identified three relevant criteria in reviewing a disproportionate punishment claim: (1) the nature of the crime and the punishment imposed; (2) the punishment for other offenses in this jurisdiction; and (3) the punishment for similar offenses in other jurisdictions. In *Harmelin v. Michigan*, 501 U.S. 957, 1004-1005, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), Justice Kennedy noted in a concurrence that *Solem* did not announce a rigid three-part test and stated that *Solem* "did not mandate such inquiries." One of the *Solem* factors alone may be sufficient to determine the constitutionality of a sentence. *Id.* In fact, a "reading of our cases leads to the conclusion that intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* at 1005. This conclusion was later echoed by the Court in *Ewing v. California*, 538 U.S. 11, 23, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003), noting that "Justice Kennedy's concurrence also stated that *Solem* did not mandate comparative analysis within and between jurisdictions. The proportionality principles in our cases distilled in Justice Kennedy's concurrence guide our application of the Eighth Amendment..."

*7 Because several Supreme Court and Sixth Circuit cases have upheld punishments similar to those received by the Defendants, it is not necessary to undertake an extensive *Solem* analysis. In *United States v. Marks*, 209 F.3d 577, 581, 583 (6th Cir 2000), this Court rejected an Eighth Amendment challenge for two defendants who were sentenced to 1,395 months for six armed robberies and 2,242 months for nine armed robberies. *See also United States v. Collins*, 61 F.3d 904 (table), 1995 WL 441622 at *3 (6th Cir. July 25, 1995) (rejecting an Eighth Amendment attack against a 627 month sentence for three armed robberies). In upholding the sentences in *Marks* and *Collins*, this Court cited the Supreme Court's decision to uphold a 105-year sentence for six armed bank robberies in *Deal v. United States*, 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993). In *Deal*, the Court did not specifically consider the case on Eighth Amendment grounds; rather, it was asked to consider whether multiple charges in the same indictment under § 921(c) qualify for the enhanced and consecutive nature of subsequent § 921(c)(1)(C) convictions. In concluding that multiple § 921(c) charges contained in a single indictment can trigger the provisions of § 921(c)(1)(C), however, the Court noted that:

> we need not tarry over petitioner's contention that the rule of lenity is called for because his 105-year sentence "is so glaringly unjust that the Court cannot but question whether Congress intended such an application of the phrase, 'in the case of his second or subsequent conviction.' " Br for Pet. 24. Even under the dissent's reading of § 924(c)(1), some criminals whose only offenses consist of six armed bank robberies would receive a total sentence of 105 years in prison. We see no reason why it is "glaringly unjust" that petitioner be treated similarly here, simply because he managed to evade detection, prosecution, and conviction for the first five offenses and was ultimately tried for all six in a single proceeding.

*Id.* at 137.

[4] The Eighth Amendment is "offended only by an extreme disparity between crime and sentence." *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir.1991). The Defendants' sentences of 3,184 months for committing eleven armed robberies in less than six weeks do not constitute an "extreme disparity between crime and sentence." As noted *supra*, both the Supreme Court and this Court have upheld similar sentences for similar crimes.

### B. Mandatory Minimum Sentences

[5] Wiley also claims that mandatory minimum sentences impermissibly remove discretion from the judiciary and vest it in the executive, allowing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    **Page 7**
(Cite as: 2005 WL 1285712, \*7 (6th Cir.(Ky.)))

manipulation of sentences through the use of "charge bargaining" and threats of federal prosecution. He also argues that their use violates due process by failing to consider the individual circumstances of his case and also that mandatory minimums violate his Sixth Amendment right to trial by jury by attempting to extract a plea bargain through coercive charging tactics. At oral argument, Wiley attempted to mold his arguments to conform to *United States v Booker*, 542 U.S. ----, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), asserting that the lack of judicial discretion under a mandatory minimum sentencing scheme, coupled with his lengthy sentence, violated the Eighth Amendment.

\*8 While Wiley correctly notes that some jurists and commentators have discomfort with mandatory minimum sentences, this Court has upheld their application. *United States v Dumas*, 934 F.2d 1387 (6th Cir.1991); *cf. Mistretta v United States*, 488 U.S. 361, 364, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (Congress has power to fix sentence for federal crime and judicial discretion to determine sentences is subject to congressional control). In addition, *Booker* had no impact on statutory minimum sentences and cannot be read for the proposition that statutory minimums are unconstitutional. Further, Wiley's sentence was based on individualized factors, *i.e.*, the number (eleven) and type (armed) of robberies he committed. In short, his sentence was severe because he was convicted of committing a series of separate and distinct serious crimes--eleven armed robberies.

Finally, there is absolutely no evidence that the United States sought to coerce a plea from Wiley by threatening federal prosecution, or engaged in any other type of "vindictive prosecution." *Bragan v Poindexter*, 249 F.3d 476, 481-82 (6th Cir.2001). Regardless, "a federal indictment obtained against one who has been threatened with federal prosecution for refusing to plead guilty to state charges is not subject to dismissal on grounds of 'vindictive prosecution.' " *United States v Forrest*, 402 F.3d 678, 691 (6th Cir.2005) (citation omitted); *see also Bordenkircher v Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) ("While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'--and permissible--'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.' " (citation omitted)). Many crimes are punishable in either state or federal court. The decision to prosecute in federal court is vested in the sound prosecutorial discretion of the Attorney General. *See Wayte v United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (citations omitted) ("In our criminal justice system, the Government retains broad discretion as to whom to prosecute. So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. This broad discretion rests largely on the recognition that the decision to prosecute is particularly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.