**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | **No. 2:04cr:88** |
| | ) | **Judge Algenon Marbley** |
| | ) | |
| v. | ) | |
| | ) | |
| NURADIN ABDI, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' MOTION IN LIMINE**
**TO ADMIT EXPERT TESTIMONY**

**PRELIMINARY STATEMENT**

The United States intends to call Dr. Rohan Gunaratna, an expert with specialized

knowledge in the field of international terrorism, as a witness at trial.  Dr. Gunaratna's

proposed testimony is reliable and relevant, as required by Rule 702 of the Federal Rules

of Evidence, *i.e.,* it is based upon a reliable methodology that can be applied to the facts

of this case, and should be admitted at trial.  *Kumho Tire Co., Ltd v. Carmichael*, 526

U.S. 137 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**ARGUMENT**

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact
to understand the evidence or to determine a fact in issue, a witness qualified as
an expert by knowledge, skill, experience, training, or education, may testify
thereto in the form of an opinion or otherwise, if (1) the testimony is based on
sufficient facts or data (2) the testimony is the product of reliable principles and
methods, and (3) the witness has applied the principles and methods reliably to
the facts of the case.

The Supreme Court has held that Rule 702 requires the district court to perform a gate-keeping function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 589.  In *Daubert*, the Supreme Court identified a number of factors that may bear upon the reliability of an expert's testimony, including whether his theory or technique can be or has been tested; whether it has been subject to peer review and publication; whether a technique has a high known or potential rate of error; and whether the theory or technique enjoys general acceptance.  509 U.S. at 592.

When, as here, the proffered expert testimony is not scientific in nature, the district court must still perform the gate-keeping function.  In *Kumho Tire Co.,* 526 U.S. at 150, the Supreme Court explained that the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending upon the nature of the issue, the expert's particular expertise, and the subject of his testimony.  Instead, in fulfilling its gate-keeping function, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  526 U.S. at 152; *see id.* at 142, 153 ("broad latitude" in determining reliability of opinion testimony).

The Sixth Circuit has also recognized the need for flexibility in applying the *Daubert* factors to non-scientific expert testimony.  In *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 332 (6th Cir.2001), the court held that:

> [T]he fact that [the purported expert's] opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible.  In *United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir.), *cert. denied*, 521 U.S. 1127

2

(1997), this court recognized that the four specific factors utilized in Daubert may be of limited utility in the context of non-scientific expert testimony. We noted that "if [the Daubert ] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony--that derived substantially from practical experience--would be excluded.  Such a result truly would turn Daubert, a case intended to relax the admissibility requirements for expert scientific evidence, on its head." Id. at 1158.[1]

The admissibility of terrorism experts in terrorism prosecutions has been approved in this Circuit as well as others.  In *United States v. Damrah,* 412 F.3d 618, 625 (6th Cir. 2005), this Circuit recently agreed that testimony by the government's expert terrorism witness was admissible under Rule 702.  Referring to the district court's finding that expert Matthew Levitt's methodology – which included reliance on books on the Palestinian Islamic Jihad, press releases, newspaper articles and U.S. government publications –  [w]as 'the gold standard in the field of international terrorism,'" 412 F.3d at 625 & n.4, the court of appeals upheld the district court's finding.

Similarly, the Fourth Circuit, sitting *en banc,* affirmed the district court's finding of admissibility of expert Matthew Levitt's testimony in *United States v. Hammoud*, observing that "Levitt identified his methodology as one generally employed in the social sciences, and . . .  testified that he actually applied this methodology in reaching his conclusions regarding this case."  *United States v. Hammoud,* 381 F.3d 316, 337-38 (4th Cir. 2004) (*en banc*), *sentence vacated on remand from the Supreme Court in light of Booker*, *United States v. Hammoud,* 405 F.3d 1034 (4th Cir. 2005).  The *en banc*

---

[1] The Advisory Committee Notes to Federal Rule of Evidence 702 (2000 Amendments) cite this Circuit's decision in *United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997), for the proposition that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."

*Hammoud* court had before it the following evidence:

> Levitt testified that his expertise regarding Hizballah derived from his previous experience with the FBI and his current employment with a think tank, at which he specialized in Middle Eastern terrorist groups. Levitt testified that as part of his duties, he spent "a lot of [his] time ... on Hizballah." . . . . Levitt described his general methodology . . . 'Well, we're talking about a social science here. This is not scientific research. Basic academic intellectual research combined with the techniques I was taught in ... various courses I took as an analyst for the government both taught that the best way to go about making sense of something in the social sciences is to collect as much information as possible and to balance each new incoming piece of information against the body of information that you've built to that point . . . . So it's a constant vetting process. And the more rigorous you are, the better your information will be.' . . . Levitt further testified that his work was subject to "tremendous peer review," . . . and that his regular practice was to discuss his findings and conclusions with others to ensure their soundness. Levitt stated that he followed this process in reaching his opinion in this case.

381 F.3d at 337.

Other courts have also permitted expert testimony on terrorist organizations in "material support" cases. *See e.g., United States v. Khan*, Crim. No. 03-296-A (N.D. Va. 2004) (material support of Al Qaeda; permitted expert testimony concerning relationships between Al Qaeda, the Taliban, Lashkar-e-Tiba, Laskar Jihad and *jihad* fighters in Bosnia and Chechnya); *United States v. Al-Hussayen*, Crim. No. 03-48 (D. Idaho 2004) (permitted expert testimony concerning use of internet by terrorist organizations for recruitment and fund-raising). Consequently, in the field of terrorism prosecutions, the courts have permitted the use of experts who utilize a combination of experience and traditional research methodologies, including peer review.

Courts have permitted the use of such expert terrorism testimony in a variety of other contexts. *See, e.g., United States v. Alwan*, 279 F.3d 431, 439-440 (7th Cir. 2002) (finding proper government's use of Hamas expert to rebut defendant's coercion defense

4

in a contempt case); *United States v. Damrah*, 334 F. Supp.2d 967, 982 (N.D. Ohio 2004) (in prosecution for unlawfully obtaining citizenship, government's terrorism expert testified regarding violent nature and activities of Palestinian Islamic Jihad to demonstrate materiality of defendant's omission about association with the group in his citizenship application); *Peterson v. Islamic Republic of Iran*, 264 F. Supp.2d 46, 51-52 (D.D.C. 2003) (in wrongful death suit under Foreign Sovereign Immunities Act for terrorist bombing of U.S. Marine barracks in Beiruit, court permitted extensive expert testimony on nature of Hizballah and Hizballah's responsibility for the bombing); *Barapind v. Enomoto*, 360 F.3d 1061, 1065 (9th Cir. 2004) (in extradition proceeding, noting testimony of "expert on international violence and terrorism" that petitioner was "a folk hero who has great popular support among Sikh Separatists"); *Campazano v. Islamic Republic of Iran*, 281 F. Supp.2d 258, 262 (D.D.C. 2003) (in civil damages action relating to Hamas suicide bombing, relying on expert testimony to establish that, inter alia, Iran's support of Hamas was $30,000,000 in 1995 and between $20,000,000 to $50,000,000 annually in the past).

The admission of expert testimony on terrorism follows the same rationale as that for organized crime, which is routinely admitted.  For example, in *United States v. Tocco*, 200 F.3d 401, 418 (6th Cir. 2000), this Circuit considered whether an FBI agent could testify as an expert on "the structure, the organization, the rules, the interpretation of phrases, and jargon . . .  used in [the] trial, on the tapes, the hierarchy and the roles of individuals."   The court ruled that the expert's testimony was certainly relevant and reliable under the principles of *Daubert*:

> This type of evidence regarding the inner-workings of organized crime has been held to be a proper subject of expert opinion because such matters are "generally beyond the understanding of the average layman." *Thomas*, 74 F.3d at 682; *see also United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir.1994); *United States v. Locascio*, 6 F.3d 924, 936-37 (2d Cir.1993); *United States v. Pungitore*, 910 F.2d 1084, 1148- 49 (3d Cir.1990).  Further, to the extent that Tocco challenges [agent] Ruffino's qualifications on the subject about which he testified, we reject any such contention in light of the undisputed facts.  Ruffino has extensive experience in the investigation of organized crime in the Detroit area, including 22 years with the FBI, 17 of which were spent in organized crime investigations, and his role since 1990 as the Cosa Nostra coordinator for the Detroit division, and as liaison with other FBI offices and FBI headquarters.  Thus, he was amply qualified to opine about the machinations of organized crime.

200 F.3d at 419.  In the Second Circuit cases relied upon by the *Tocco* court, *Amuso,* 21 F.3d at 1263, and *Locascio*, 6 F.3d at 936-37, as well as in *United States v. Daly*, 842 F.2d 1380, 1388 (2nd Cir. 1988), the Second Circuit upheld expert testimony concerning, for example: (1) the nature and function of organized crime organizations; (2) the structure of the organizations; (3) rules; (4) interpretation of conversations, including the meaning of certain jargon and code words; (5) identification of specific members and associates of the organization and their titles, ranks and functions; (6) identification of individuals by their voices; and how organized crime has infiltrated other entities such as labor unions.

Expert testimony on these issues is helpful to the jury "to provide background for the events alleged in the indictment" and to provide the jury with an "understanding of the nature and structure of organized crime families," given that this information "is outside the expectable realm of knowledge of the average juror."  *Daly*, 842 F.2d at 1388.  As the Second Circuit observed in *Locascio*:

> Despite the unfortunate fact that our society has become increasingly familiar with organized crime and its activities from [the media], it is still a reasonable

assumption that jurors are not well versed in the structure and methods of organized crime families.

6 F.3d at 937.

Just as expert testimony concerning the nature, structure, members and other aspects of organized crime families is relevant and admissible in RICO cases, expert testimony concerning the nature, structure, members and other aspects of terrorist organizations is relevant and admissible in a case charging material support of terrorism and terrorist groups. While al Qaeda and terrorist activity has become considerably more publicized in the United States since September 11, 2001, jurors are still not well-versed concerning these entities, the composition of their heirarchies, and how they function.

A. **The Testimony of Dr. Gunaratna is Reliable**.

Dr. Gunaratna's anticipated testimony comports with the standards of *Daubert and Kumho Tire*, and indeed, he has twice previously offered his expert opinion in terrorism prosecutions. In *United States v. Lindh*, No. CR. 02-37-A (E.D. Va. 2002), Dr. Gunaratna interviewed John Walker Lindh as a defense consultant, and submitted a report to the court. *See also United States v. al Hussayen*, Cr. No. 03-048-C-EJL (D. Idaho 2004), Trial Transcript at 84-85 (Dr. Gunaratna was tendered as an expert with regard to world terrorist groups, including their operational manifestations and support infrastructure).

The purpose of Dr. Gunaratna's testimony is both to (1) educate the jury about general matters such as the background, structure, and operations of Islamic fundamentalist terrorist groups such as al Qaeda; and (2) how those general principles apply to this specific case, *i.e.*, whether the defendant's conduct is consistent with that of

7

a terrorist supporter or member of such an organization.

Dr. Gunaratna will testify that he has twenty years of academic, policy and operational experience in counterterrorism.   He has also been involved in the analysis of data relating to terrorist support and operational networks, with extensive field experiences in Asia and the Pacific, the Middle East and North Africa, Latin America, and North America and Europe.  Consequently, he has studied terrorist groups, including al Qaeda; its *modus operandi,* and its international operations pertaining to financial and logistical support.  He is, *inter alia,* an extensively-published author and advisor and has managed the RAND Corporation-University of St. Andrews, UK International Terrorism Database, as demonstrated by his Curriculum Vitae, attached as Exhibit 1, and as will be shown through testimony.

The government will show that Dr. Gunaratna's professional views and conclusions are based upon interviews with members of terrorist organizations, documents generated by the groups themselves, transcripts of legal proceedings against terrorists, government documents, including those from foreign governments, scholarly articles and books, news accounts, including major wire services, domestic and foreign, and newsletters, bulletins, and magazines published by terrorist groups themselves, internet sites attributed to terrorist groups or their affiliates, internet communications by terrorists, and from speaking with other experts, language specialists, and persons living in the regions; and travel to various conflict zones.

Dr. Gunaratna will also testify that his methodology is based upon principles of social science - to collect as much information as possible and balance each new

incoming piece of information against the body of information already compiled at that point.  Dr. Gunaratna will testify that his professional colleagues follow the same data collection and balancing process, which also involves cross-checking conclusions with the views of other analysts and authors.  Thus, the government will establish that Dr. Gunaratna possesses expertise with respect to the ways of terrorist groups in general and al Qaeda in particular.  It will also establish that Dr. Gunaratna followed an established methodology in arriving at conclusions relating to their operations.

**B.  The Testimony of Dr. Gunaratna will be Relevant and Helpful to the Jury**.

As in *Hammoud*, where the Fourth Circuit concluded that the government terrorism expert's testimony "was critical in helping the jury understand the issues before it," 381 F.3d at 377, so too, in this case, expert testimony is relevant and will be helpful to the jury on several grounds.  The expert testimony is necessary to provide background for the events alleged in the indictment, and it will also show how the defendant's actions parallel those of supporters and members of terrorist groups.

In its case in chief, the government will show*, inter alia,* that: the defendant conspired to provide material support to a terrorist act when he took steps to obtain military-style training overseas -- in the Ogaden region of Ethiopia –  to prepare himself to fight in jihads or Muslim conflicts, such as those taking place in Kosovo and Chechnya; the defendant also took steps to obtain military-style training overseas in order to ingratiate himself into a group of co-conspirators in Columbus, two of whom he believed to be members of al Qaeda and messengers of Usama Bin Laden; the defendant was recruited by one of these co-conspirators, whom he believed was a member of al

9

Qaeda who fought in Afghanistan and Bosnia; and the co-conspirator urged him to view videotapes and websites pertaining to radical Islam and al Qaeda as a way of indoctrinating him into the group.  The government will also show that the defendant conspired to provide material support to al Qaeda when he assisted a co-conspirator to purchase equipment to be sent overseas to al Qaeda, and when he participated in the development of various violent plots with co-conspirators.

Dr. Gunaratna will provide testimony as to the nature, organization, personnel, and history of radical Islamic fundamentalist terrorist networks, such as al Qaeda, and its recruitment strategies and tactics; (2) terrorist networks and their capabilities for providing equipment and supplies; and (3) the nature of the Muslim conflicts overseas and the opportunities for military style training.

 More specifically, he will be testify as to how al Qaeda operates; how it communicates with its members; how it finances its operations and other forms of support; how it recruits and trains terrorists and how it conceals its activities.  Dr. Gunaratna will also offer testimony about terrorist training opportunities in the Ogaden region of Ethiopia during the 1995-2000 time frame, *i.e.,* when the defendant learned of training opportunities and then traveled to obtain them.  Dr. Gunaratna will also testify about the nature of the conflicts in Kosovo and Chechnya during the 1999-2000 time frame, during which defendant Abdi was seeking training in Africa.

Dr. Gunaratna will further testify to the significance of certain physical evidence the government will introduce at trial, including, photos, websites, documents, a jihad manual, equipment, and the manner in which such items relate to the charges which

defendant Abdi is facing.  Dr. Gunaratna will testify that the conduct of the defendant parallels that of members and supporters of terrorist groups, Fed. R. Evid. 704, but he will not express a view with respect to what intentions the defendant may have had, as that type of opinion would be inadmissible under Fed. R. Evid. 705.

In a case alleging that defendant conspired to provide material support to al Qaeda, it is essential that the jury hear expert testimony on what al Qaeda is, what its purposes and structure are, and how it functions, such as how it finances terrorist activities, uses money, recruits and trains terrorists, carries out attacks and conceals its activities.  It is also important -- in view of the charge that the defendant provided material support to a terrorist act, *i.e.,* he conspired to obtain military style training so that he could participate in jihads such as in Kosovo and Chechnya -- to show such opportunities for training and the nature of the conflicts in those regions.  Without such expert testimony, the jury will not understand the defendant's actions.

Accordingly, Dr. Gunaratna's years of research and experience with respect to terrorist groups, in combination with a review of the exhibits offered in this case, make such testimony both relevant, reliable and helpful to the jury.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court admit the expert testimony of Dr. Rohan Gunaratna.

Respectfully submitted,

GREGORY G. LOCKHART.
UNITED STATES ATTORNEY


By:      /sDana M. Peters_____
DANA M. PETERS (0034226)
Assistant U.S. Attorney
303 Marconi Blvd., 2nd Floor
Columbus, Ohio 43215
Phone: (614) 255-1634
Fax: (614) 469-5653
Dana.Peters@usdoj.gov

       /s Sylvia T. Kaser_____
SYLVIA T. KASER (D.C. Bar No. 360918)
Trial Attorney
U.S. Department of Justice
Criminal Division
Counterterrorism Section
10th St. and Pennsylvania Ave., N.W.
Suite 1539
Washington, D.C.  20530
Phone: (202) 305-9148
Fax: (202) 353-0778
Sylvia.Kaser@usdoj.gov

Attorneys for the United States

# Exhibit 1

**CURRICULUM VITAE: ROHAN GUNARATNA**

**PROFILE:**

Specialist knowledge of terrorist support and operational networks; extensive field experience in the Asia-Pacific (including Central Asia); Middle East and North Africa; Latin America; and North America and Europe; and, ability to work under pressure, meet deadlines, and function as a team member in a multicultural environment.

Twenty years of academic, policy, and operational experience in counter terrorism (CT); advice policy and decision makers on threat and response; trainer of NATO and Asian military, enforcement and intelligence agencies; consultant to prosecution services and expert witness in landmark terrorist court cases in the US, Canada, UK and Bosnia-Herzegovina; and assisted government contractors to design and develop state-of-the-art global security methods, tools and systems for assessing risk and reducing threat.

*PERSONAL DATA:*

| | |
|---|---|
| Date of Birth: | Sept. 4, 1961, Colombo, Sri Lanka |
| Contact Address: | Rohan Gunaratna<br>Institute of Defence and Strategic Studies<br>Nanyang Technological University<br>South Spine S4 Level B4, Nanyang Avenue<br>Singapore 639798<br>Phone: 65-94357191 email: isrkgunaratna@ntu.edu.sg |
| Citizenship: | Sri Lankan |

*CURRENT POSITIONS:*

Associate Professor, and previously Visiting Senior Fellow, Institute for Defence and Strategic Studies, Singapore, since July 2002. As the founding head of the International Centre for Political Violence and Terrorism Research (ICPVTR), the first IDSS centre of excellence, I provide strategic direction to centre staff; develop new research and advocacy projects; brief Singaporean and other leaders; provide CT requirements to Singapore's Home Ministry; maintain existing and forge new links with major foreign CT partners, including academic institutions; conduct basic, advanced and specialized CT courses for Singaporean, ASEAN and coalition partners; teach the CT module at IDSS; and supervise the institute's PhD candidate.

Senior Fellow, Combating Terrorism Centre, United States Military Academy, West Point [March 2003-_].

Honorary Fellow, International Policy Institute for Counter-Terrorism, Israel [Jan 1999-_]

**KEY ASSIGNMENTS:**

As Senior Advisor to the Maritime Intelligence Group in Washington DC (US government contractor) since 2002, I assisted in the design of the Vigilance Vessel Profiling System (VVPS), a maritime platform for government agencies to profile the global commercial fleet.

As a Consultant to Risk Management Solutions in California (leading insurance analysis firm) since 2003, I assisted in the design of the US and the Global Terrorism Risk Models, used by both governments and the private sector.

As a Consultant to the United Nations in December 2003, I led the specialist team that designed and built the UN Database on the Mobility, Weapons, Finance of Al Qaeda, Taliban and their Entities. IDSS analysts staffed the team.

As a Consultant to the ASEAN Secretariat in Jakarta in January-February 2005, I will write a project document to increase the capacity of ASEAN and its Member Countries to respond to regional and international requirements in dealing with transnational crime, specifically, counter-terrorism and sea piracy.

*EDUCATION:*

**Ph.D. International Relations,** University of St. Andrews, UK (1996-1999) Thesis title *"Dynamics of Diaspora-Supported Terrorist Networks – Factors and Conditions Driving and Dampening International Support for PIRA, LTTE, PKK and Kashmiri groups."* [Supervisor: Bruce Hoffman; Internal Examiner: Paul Wilkinson; and External Examiner: Gerard Chaliand]

**MA International Peace Studies,** University of Notre Dame, Institute for International Peace Studies, USA (1995-1996). Thesis title: *Changing Nature of Warfare.* [Supervisor: George A. Lopez; Examiners: R. Scott Appleby and Bill DeMars]

**Graduateship Course in Chemistry**, Institute of Chemistry, Sri Lanka, (1982-1984).

**Advanced Level, Certificate of General Education**. Stella Maris College, Malta, Europe (1979-1981) Biology B, Physics B, Chemistry B, General Knowledge A, Religious Studies A. [Supervisor: Brother Louis Camilleri FSC]

*FELLOWSHIPS*

Visiting Rosen Fellow, Washington Institute for Near East Policy, Washington DC August-September 2003

British Chevening Scholar, Foreign and Commonwealth Office Award, UK to support Ph.D., 1996-1999

Theodore M. Hesburgh Scholar, University of Notre Dame to support MA, 1995-96.

Foreign Policy Fellowship, Centre for International and Security Studies at Maryland, College Park, 1995 (four months). Faculty Advisor: Admiral Stansfield Turner

Ford Foundation Fellowship, Office of Arms Control, Disarmament, and International ecurity (ACDIS), University of Illinois, 1994 (four months) Grantee of Professor Stephen Cohen, leading US specialist on South Asian security.

UNESCO Fellowship, Asian Institute of Journalism, Ateneo de Manila University, Communication Foundation for Asia, Manila, 1990 (three months).

## *ACADEMIC GRANTS:*

Project on Managing Contemporary Insurgencies, United Nations University, Tokyo, 2000-2 (co-director with Albrecht Schnabel)

Project One [Terrorist Escalation and De-escalation], United Nations Terrorism Prevention Branch, Vienna, 2000-2

Terrorist Information Operations Project, Defence Evaluation Research Agency, Ministry of Defence, London, 2001-2 (Principal investigator with Kweilin Kimmelman and Angus Muir)

Asia-Pacific Foundation Award for Asian terrorism research, UK, 2001

Grantee, President's Fund, Sri Lanka, to support terrorism research, 1997

History and International Relations Scholarship, University of St Andrews, 1996-9.

USIS/IVP grantee for practitioners and scholars in conflict resolution and confidence building to visit US centres of excellence on conflict research, 1991.

## *PROFESSIONAL AND OCCUPATIONAL EXPERIENCE*

Senior Fellow and Special Assistant to the Chairman, Centre for the Study of Political Violence and Terrorism Research, and Fellow, University of St Andrews, 1999-2003. After Bruce Hoffman left St Andrews in 1999, I was entrusted with the responsibility to manage the RAND-St Andrews International Terrorism Database. With Major Eric Bray of the US military, I designed and build the first worldwide Domestic Terrorism Database. As the first recipient of the Senior Fellowship endowed by the Maritime Intelligence Group in Washington DC, I assisted in the design and creation of the VVPS, the state-of-the-art platform for profiling the commercial fleet for terrorism risks.

Teaching/Research Assistant to Director, Institute for International Peace Studies, University

of Notre Dame, Indiana, 1995/6

Special Assistant to the Science Advisor, Office of the Science and Technology Advisor to the President of Sri Lanka, 1988-1994

Member, Advisory Council, World Bank-supported Poverty Alleviation Program, 1993-1994:

**USAID-International Science and Technology Institute, Washington DC Consultant to** the Mahaweli Authority, Asia's largest resettlement program, to develop large, medium and small scale businesses, including in the terrorist-affected borderland areas.

1988-1991: Office of President J.R. Jayewardene of Sri Lanka, **Research Assistant to the Executive President of Sri Lanka**, and after 1989, to the retired President.

1988-1990: Headquarters of the Joint Operations Command, subsequently, Operational Headquarters Ministry of Defence Sri Lanka. At the height of the JVP insurgency, **I developed the first psyops strategy to disrupt recruitment and support for terrorism.**

1986-1991: Institute of Fundamental Studies, Sri Lanka  (national think tank and premier scientific institute). **Jr. Research Associate**/Division of the Social Sciences and

As **head of the communications office**, I worked with the earth, space, physical, chemical, life, biological, social sciences, and mathematics divisions and was responsible for the nationwide popularization of science program**.**

*PROFESSIONAL AND ACADEMIC MEMBERSHIPS*

**Chairman,** NATO—PfP Working Group on Counter-Terrorism, Garmish, Germany, Oct. 2002-todate. Together with West Point Professor Russ Howard, I chair the Working Group (created by the US Defence Secretary) to transfer CT capabilities to Eastern Europe and FSU.

**Fellow**, Royal Society of Arts, UK [2001-_]

Steering Committee Member, Homeland Security Policy Institute, George Washington University, Washington DC [2003-_].

Previous:

Member, Advisory Board, Asia-Pacific Foundation, UK [appointed in 2001-2002]

Founder Member and Member, South Asian Network on Conflict Research (SANCOR) [since 1991]

Member, Regional Centre for Strategic Studies (RCSS), Sri Lanka [1993-4]

Council Member, Asia-Pacific Peace Research Association (APPRA), Japan [1994-1999]

Visiting Fellow, Institute of Strategic Studies (ISS), Pakistan, [1993-6]

Co-Chairperson, International Commission on Internal Conflicts (ICON) [1998-2000]

Member, Nominations Committee, International Peace Research Association [1996-1999]

Member, International Advisory Council, Toda Institute for Peace and Public Policy, Hawaii [1998-2000]

Visiting Scholar, Asian Social Institute, Philippines [1990].

Visiting Scholar, National Centre for Linguistic and Historical Research, Maldives, [1986-9].

EXPERT WITNESS TESTIMONONIES

Accepted as an expert to testify in US, Canadian, UK and Bosnia-Herzegovina courts

Landmark cases:

Two expert reports for the RCMP, first terrorist to be prosecuted under Canada's new terrorism act, 2001.

Expert report for the Crown Prosecution Service,  first Al Qaeda court case in the United Kingdom, 2002

Expert report for the defence of John Walker Lindh [American Taliban], first terrorist case to be prosecuted by the US Department of Justice after 9/11.

Crown Prosecuting Service, London, Specialist Report on UK Terrorism Act 2000, 2002

Expert Witness on terrorism, Kent and Leicester police forces and New Scotland Yard, 2001-2.


*CONSULTANCIES AND COMMISSIONED STUDIES*

Trident Maritime UK, Commissioned Study on Changing Face of Maritime Terrorism, 2001-2

International Peace Academy, New York, Multi-Year Study on Economic Agendas in Civil Wars: Policies and Practices for Regulating Resource Flows to Armed Conflict, 2001-2

Ministry of Foreign Affairs, Japan, Commissioned Report on Asia-Pacific Terrorist Threats, G8 Security Briefing, Okinawa, Japan, July 2000

RAND Study on Terrorist Support Networks, 2000

RAND Study on Access Control to White House, Pennsylvania Ave, 2000.

Monterey Institute of International Studies, Center for Non-proliferation Studies, Washington DC. Propensity of terrorist groups to employ CBRN, 2000.

United States Institute of Peace, Washington DC, Principal Investigator, Project to Study the Causes, Consequences, and Characteristics of Suicide Terrorism in the Middle East and in South Asia, 1999-2000

PKK Organisation in Europe, NATO, Netherlands, 1999

Institute of Strategic Studies, Ministry of Defence, Sri Lanka. LTTE Air Capability, Potential and Likely Future Trends, 1999.

TPI Productions, Virginia. Advisor to Mind of the Terrorist, Cyber Warfare, and Piracy, US Films, 1997-1998.

Carnegie Commission for the Prevention of Deadly Conflict, New York. With Dr Bruce Hoffman, the propensity of terrorists to employ CBRN, 1997.

Research Grant to work on UN-NGO reform, Toyota Foundation, Japan, 1998.

International Alert, UK. Sri Lankan peace negotiations (1991, 1997) and socio-economic costs of warfare (1997).

Institute of Strategic Studies, Ministry of Defence, Sri Lanka Illicit procurement and shipping operations of the LTTE, 1996.

Regional Centre for Strategic Studies, Sri Lanka. Constitutional reform and conflict management, 1994.

Swiss Foreign Office. Organisation and operations of the Liberation Tigers of Tamil Eelam (LTTE), 1994.

Office of the Maldivian President, National Research Programs, 1986-1989.

*SELECT PUBLICATIONS*

*Books*

With Arabinda Acharya, and Sabrina Chua, *Conflict and Terrorism in Southern Thailand* (Singapore, Marshall Cavendish Academic, 2005)

With Graeme C.S. Steven: *Counterterrorism: A Reference Handbook* (Contemporary World Issues) (Santa Barbara: ABC-ClIO, 2004)

(editor) *The Changing Face of Terrorism* (Singapore: Eastern Universities Press, 2004)

(editor) *Terrorism in the Asia-Pacific; The Threat and Response* (Singapore: Eastern Universities Press, 2003)

With Peter Chalk [RAND], *'Jane's Counter Terrorism,'* London and Washington, 2002

*Inside Al Qaeda: The Global Network of Terror* (New York: Colombia University Press, 2002) 200 pp. Also, simultaneously published in several European countries.

*Sri Lanka's Ethnic Conflict and National Security* (Colombo: South Asian Network on Conflict Research, 1998) 429 pp.

*International and Regional Security Implications of the Sri Lankan Tamil Insurgency* (London: International Foundation of Sri Lankans, 1997) 152 pp.

*Indian Intervention in Sri Lanka* (Colombo: South Asian Network on Conflict Research, 1993) 402 pp.

*Sri Lanka; A Lost Revolution?* (Colombo: Institute of Fundamental Studies, 1991) 375 pp.

*War and Peace in Sri Lanka* (Colombo: Institute of Fundamental Studies, 1988) 84 pp.

*Sino-Lankan Connection*. (Colombo: Ministry of State, 1986) 129 pp.

*Book Chapters, journals, and entries:*

'Global Ethno-political Conflicts,' UNESCO Encyclopaedia, Paris, 2002 (forthcoming)

'Financing Strategies of Terrorist Organisations,' Alex Schmid, Combating Terrorism Through International Co-operation (Rome, ISPAC and UN Terrorism Prevention Branch, 2001) pp. 150-182

'Transnational Terrorism: Threat and Response,' Stanford Journal of International Relations, Vol.1 No. 5. Summer 2001 pp. 38-48    'Blowback: Al Qaeda Organisation,' Jane's Intelligence Review, Vol. 13, No. 7, August 2001, pp. 42-45 (lead article)

'Taking on the Kidnappers' Global Crime Watch, Jane's Intelligence Review, Vol. 13, No.

5, May 2001, pp 10-11 (with Magnus Ranstorp)

'The Structure and Nature of GAM,' Jane's Intelligence Review, Vol. 13, No. 4, April 2001, pp 33-35.

'Terrorist Trends Suggest Shift of Focus to National Activities,' Jane's Intelligence Review, Vol. 13, No. 6, June 2001, pp. 47-49

'LTTE Adopts Heavy Artillery,' Jane's Intelligence Review, Vol. 13, No. 6, June 2001, pp. 25-27.

'Al Qaeda Infrastructure in Asia,' Jane's Intelligence Review, Vol. 14, No. 1, January 2002, pp. 18-20.

'Transnational Threats in the post-Cold War era,' Jane's Intelligence Review, Vol. 13 No. 1, January 2001 pp 46-50 (lead article)


'Cracking down on Terrorist Financing,' Jane's Intelligence Review, Vol. 13 No. 11 October 2001 p. 4.

'Special Report: Terror from the Sky' Jane's Intelligence Report, Vol. 13 No 10 September 2001 p. 14-17

'Nepal's Insurgents Balance Politics and Violence,' Jane's Intelligence Review, Vol. 13 No. 10 September 2001 p. 10-13.

'Intelligence Failures Exposed by Tamil Tiger Airport Attack,' Jane's Intelligence Review, Vol. 13 No. 9 August 2001 p. 6-9.

The Evolution and Tactics of the Abu Sayyaf Group,' Jane's Intelligence Review, Vol. 13 No. 7, June 2001 p. 8-11.

'Terrorism Act Proscribes 21 Groups,' Jane's Intelligence Review, Vol. 13 No. 4 April 2001 p. 4.


'Sea Tiger Success Threatens the Spread of Copycat Tactics,' Jane's Intelligence Review, Vol. 13 No. 3 March 2001 p. 8-11.


'Transnational Threats in the post-Cold War Era,' Jane's Intelligence Review, Vol. 13, No 1, January 2001 (lead article) pp. 5-8.

'Anti-Ocalan faction emerges in PKK,' Jane's Intelligence Review, Vol. 12, No. 10, September 2000 p. 3

'Suicide Terrorism in Sri Lanka and India,' In Boaz Ganor ed, Combating Suicide Terrorism (Israel, International Policy Institute for Counter Terrorism, 2001) pp. 40-50

"Suicide Terrorism" In Leo Gleser, ed, Security 2000 – Israel (Israel, International Security & Defence Systems, 2001)

"Suicide Terrorism: Threat and Response," In Gerard Chaliand, Trends in Terrorism, Paris, (Military Academy of France, 2000)  pp. 55-75.

'Suicide Terrorism: A Global Threat,' Jane's Intelligence Review, Vol. 12 No. 5, April 2000, pp. 24-27

"The State-of-the-Art in the Illicit Trafficking of Conventional Weapons:  The Impact and Response of the State and the International Community," (Ministry of Defence, Switzerland, 2000)

'Bankrupting the Terror Business,' Jane's Intelligence Review, Vol. 12, No. 8, August 2000, pp. 51-55.

'Terrorist Threats Targets Asia,' Jane's Intelligence Review, Vol. 12 No. 9, July 2000 pp. 37-41

'Transnational Terrorism: Support Networks and Trends,' In KPS Gill and Ajai Sahani, Faultlines, Writings on Conflict and Resolution, Vol. 7 (New Delhi: Bulwark Books and the Institute for Conflict Management, 2000)

'Regional Conflicts and Peacemaking in South Asia,' In Majid Tehranian ed. Asian Peace: Security and Governance in the Asia-Pacific Region (London, I.B. Taurus, 1999) pp. 112-131

'Illicit Transfer of Conventional Weapons – The Role of State and Non-state Actors in South Asia,' In, Jayantha Dhanapala, Mitsuro Donawaki, et al, (ed). Small Arms Control, Old Weapons, New Issues, (Aldershot, UNIDIR and Ashgate, 1999) pp. 251-278

"Impact of the Mobilized Tamil Diaspora on the Protracted Conflict in Sri Lanka." In Kumar Rupesinghe, ed. Negotiating Peace in Sri Lanka: Efforts, Failures and Lessons. (London: International Alert, 1998). pp. 301-328.

"Internationalisation of the Tamil Conflict. Conflict and Community in Sri Lanka." In I.B. Watson and Siri Gamage eds., Journal of South Asian Studies, Special Issue, XX (1997). Pp. 119-155. Also as a book chapter by Sage, London, 1999.

Sri Lanka, Word Terrorism Encyclopaedia, New York,1997, pp 340-461.

Kashmir, Word Terrorism Encyclopaedia, New York,1997, pp 260-296.

'US Response to Terrorism in South Asia,' Monograph Series, Centre for International and Security Studies at Maryland, 1995.

"Regional and International Security Implications of the Kashmiri and Tamil Insurgencies." Journal of Strategic Perspectives, Vol. 3, No. 3 (1995). Pp. 33-56.

"The Burden of Ethnicity, Insurgency and Security in Sri Lanka." In Marvin Weinbaum and Chetan Kumar eds. South Asia Approaches the Millennium-Re-examining National Security. Colorado: Westview Press, 1994.

I have also published in Jane's Global Assessment, UK; Jane's Navy International, UK; Pointer, UK; Foresight, Japan; Himal, Nepal; Frontline, India; The Australian; The Scotsman; The Sunday Times, UK; and several other quality newspapers.

### *REFEREES:*

Dr. Bruce Hoffman
Director Washington Office and Former Vice President for External Affairs, RAND
1200 South Hayes
Arlington
Virginia 22202-5050 USA

Benny Lim
Second Permanent Secretary
Ministry of Home Affairs
New Phoenix Park
28 Irrawwady Road
Singapore 329560

Brigadier General Russ Howard
Founder Head and Senior Fellow
Combating Terrorism Centre
United States Military Academy
West Point New York USA 10996

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 7, 2005, I served the foregoing United States'

Motion in Limine to Admit Expert Testimony, and Exhibit 1, by electronic case filing on:


Mahir T. Sherif, Esq.
3376 30th Street
San Diego, California 92104


s/Sylvia T. Kaser
Sylvia T. Kaser
Trial Attorney