**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No. 2:04-CR-88** |
| | : | |
| **NURADIN ABDI,** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **Defendant.** | : | |

**<u>OPINION AND ORDER</u>**

**I.  INTRODUCTION**

This matter comes before the Court on Defendant's Motion to Suppress All Statements Allegedly Made By Defendant and All Evidence Seized in Violation of the Fourth Amendment; Defendant's Motion to Suppress Statements for Violations of Defendant's Fifth Amendment Rights; and Defendant's Motion to Dismiss for Government Misconduct.  On August 25 and 26, 2005, the Court held an evidentiary hearing on these motions.

For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion to Suppress All Statements Allegedly Made By Defendant and All Evidence Seized in Violation of the Fourth Amendment.  This Court holds that Defendant's November 28, 2003 warrantless arrest violated 8 U.S.C. § 1357(a)(2), but finds that the taint of the unlawful arrest sufficiently dissipated after Defendant met with counsel on December 7, 2003.  Thus, statements made prior to Defendant's December 7, 2003 meeting with counsel are hereby suppressed.   The remaining motions are **DENIED**.

## II.  FACTS

The essential background facts are as follows.  Defendant, Nuradin Abdi, first came to the government's attention in March 2003.  At that time, the Federal Bureau of Investigation ("FBI") learned from Iyman Faris, a now convicted Al Qaeda operative, that sometime in late 2002 or early 2003, Defendant had expressed anger to him about the ongoing conflicts in Afghanistan and Iraq.  According to Mr. Faris, Defendant, in the presence of Mr. Faris and another male, had indicated his desire to shoot Columbus mall shoppers with an AK-47.

On April 3, 2003, the FBI interviewed Defendant about his relationship to Mr. Faris and whether he made the alleged statement.  Defendant denied making the statement, but admitted that he knew Mr. Faris.  In June 2003, law enforcement interviewed Mehmet Aydinbelge, an informant, who confirmed the relationship between Mr. Faris, the Defendant, and the third male, explaining that the three men often met after prayer services at their mosque.

In April or May of 2003, the FBI retrieved a July 31, 2001 email from Defendant to Mr. Faris in which Defendant suggested that Mr. Faris review several websites, all of which sold spyware.[1]  On June 5, 2003, the FBI opened an official case against Defendant.  The FBI then began tracking Defendant's phone calls.  From June 15, 2003 through November 2003, Defendant made phone calls to approximately forty separate phone numbers that the FBI

---

[1]At the evidentiary hearing, FBI Senior Supervisory Agent James Turgal defined spyware as follows:

> Spyware in this context is, for lack of a better explanation, it is kind of cold war era items . . . . It is methods by which you secrete information.  It's night vision goggles, small cameras, listening devices.  It's a place where you purchase items that, for the most part, were used during that particular era.  But these is also a number of new technology hardware items that you can use to secrete your purpose, your operations, information, things of that nature.

associated with terrorism-related activities.[2]

The FBI, which was at that point working in tandem with Immigration and Customs Enforcement ("ICE"), concluded that Defendant was a national security risk and should be arrested.  The two agencies, officially linked by the Joint Terrorism Task Force ("JTTF"), decided that because Defendant's actions violated immigration laws, an administrative arrest would be the most expedient way to effectuate Defendant's arrest.  FBI Senior Supervisory Agent James Turgal, working with information provided by FBI Special Agent Steven Flowers, began to draft a document, hereinafter the "Turgal Declaration," which contained the probable cause required for an administrative arrest.

By November 1, 2003, SA Flowers, who had been investigating Defendant since March 2003, had provided virtually all of the underlying information to SSA Turgal, who then submitted a finalized version of the Turgal Declaration to ICE's Headquarters.[3]  SSA Turgal, SA Flowers and ICE's Resident Agent in Charge, Richard Wilkens, testified that the document arrived at ICE approximately two weeks to one month before the arrest.[4]  From the agents' testimony, it appears that FBI and ICE spent part of October and the majority of November determining what portion of the Turgal Declaration, a five page document, was classified,

---

[2]SA Flowers testified that these forty numbers were almost all associated with different terrorism suspects.

[3]On or about October 1, 2003, SA Flowers provided SSA Turgal with a memorandum containing information to support probable cause.  On November 1, 2003, SA Flowers sent SSA Turgal a revised memorandum that included the recently completed analysis of Defendant's cell phone records.

[4]RAC Wilkens testified that although he is usually permitted to issue an administrative warrant, he cannot do so when the suspect is a national security risk.  In such cases, the administrative warrants must be issued by ICE's National Security Law Division.

unclassified, declassified or about to be declassified.  Because the agencies were unable to resolve the dispute by November 28, 2003, the day after Thanksgiving, and because the agents feared that Defendant would carry out his plan on the busiest shopping day of the year, the agents arrested Defendant without a warrant.

On Friday, November 28, 2003 at approximately 6:00 a.m., RAC Wilkens and Special Agent Robert Medellin, both from ICE, accompanied SA Flowers and FBI Special Agent John Corbin to Defendant's home, where they arrested him as he was leaving his house on his way to morning prayer.  RAC Wilkens read him his *Miranda* rights, after which he consented to a search of his home and his car.  *See* Govt.'s Ex. 3.  At that point, the agents took him to the Columbus FBI office where, at 7:42 a.m., he signed a *Miranda* waiver.  *See* Govt.'s Ex. 3.  Here, SA Medellin and SA Flowers interviewed Defendant for approximately forty-five minutes.

Later that same day, the FBI transported Defendant to the Kenton County Detention Center, a facility near Cincinnati, where he would remain until December 15, 2003.[5]  According to the agents who testified, Defendant was not interviewed again until November 30, 2003.[6]  On that date, agents transported Defendant to the ICE Office in Cincinnati, Ohio.  There, SA Medellin and RAC Wilkens Mirandized Defendant and interviewed him from approximately

---

[5]On Defendant's first night in Kenton County Detention Center, he made ten collect phone calls, six of which were to the unindicted co-conspirator that Mr. Faris identified as Defendant's associate.  The charges for the first five phone calls were refused, and Defendant hung up before the sixth phone call was completed.  Defendant made four phone calls to his family, but did not reach anyone.  *See* Govt.'s Ex. 5.  After Defendant's first night in Kenton County Detention Center, Defendant was isolated from the general prison population and prohibited from having any outside contact.

[6]Defendant's affidavit states that on November 29, 2003, various agents, including RAC Wilkens, SA Corbin, SA Flowers, and SA Medellin, interrogated him three times and refused Defendant's multiple requests to contact his family.

11:00 a.m. until 4:00 p.m, taking intermittent breaks.[7]  Although SA Flowers and SA Corbin did not participate in the interview, they remained outside of the interview room and listened to the interrogation session.  Approximately fifteen minutes into the interview, Defendant admitted that he falsified his asylum application in its entirety.

At approximately 1:35 p.m., SA Flowers and SA Corbin, believing that the interview was ending, left the building briefly.  Upon their return, they learned that Defendant had admitted to taking part in a conversation with Mr. Faris and another male in which Defendant suggested killing Columbus mall-goers with an AK-47.  *See* Def.'s Ex. I.  Due to the gravity of the confession, an ICE employee, at approximately 5:00 p.m., began to type the agents' notes into transcript form.  At 10:00 p.m., Defendant signed each page of the transcribed notes and agreed to be interviewed by SA Flowers and SA Corbin.[8]  Defendant signed a *Miranda* waiver at 10:40 p.m. and the interview lasted from 10:45 p.m. until 12:45 a.m., after which Defendant was transported back to Kenton County Detention Center.  RAC Wilkens and SA Flowers testified that at no point during the day did Defendant ask to see his family or request counsel.

Defendant asserts that throughout these initial interviews, he had no knowledge that the questions pertained to his own alleged criminal activity; instead, he believed the agents were interested in his immigration violations only.  Defendant claims that he cooperated because the agents said that if he did not, he and his family, including his pregnant wife and two small children, would be deported.  Additionally, Defendant claims that after three days of isolation

---

[7]SA Flowers testified that the interrogation lasted approximately three to three and one-half hours and that Defendant received a break at least every hour and thirty minutes.

[8]Between the hours of approximately 4:00 p.m. and 10:00 p.m., Defendant was in a holding cell.

and several denials of his requests to see his family, he believed that signing the waiver on the evening of November 30, 2003 was his only option.

The following day, December 1, 2003, Defendant signed a *Miranda* waiver and was again interrogated.  At 5:35 p.m., nearly eighty-four hours after his initial arrest, SA Medellin served Defendant a Notice of Intent to Terminate Asylum Status, Notice to Appear at Removal Proceedings, and an administrative arrest warrant.  Despite the extensive hours spent on the Turgal Declaration, these documents were grounded almost exclusively in the previous day's admission that Defendant falsified his asylum application, only peripherally mentioning national security concerns.[9]

Agents Mirandized and interrogated Defendant on December 2, 3, and 5, 2003.  During the interrogation on December 5, 2003, two different attorneys, both claiming to represent Defendant, contacted SA Medellin.[10]  Defendant signed a waiver as to both, stating that neither attorney represented him.  *See* Govt.'s Ex. 14.  Agents Mirandizied and questioned Defendant on December 6 and 7, 2003,[11] and he agreed to take a polygraph test.  On December 7, 2003, during the polygraph test, Attorney Douglas Weigle arrived at the interrogation site, claiming that he

---

[9]Specifically, the Notice to Appear states, inter alia, that Defendant's asylum status should be terminated because "you procured that status by fraud, to wit, you admitted in a sworn affidavit that you filed an application for asylum containing false information" and because "there are reasonable grounds for regarding you to be a danger to the security of the Untied States." *See* Govt's. Ex. 9.  Despite the mention of national security in the Notice to Appear, the statutes listed therein focus solely on fraudulent entry.

[10]Attorney Mark Nesbit faxed SA Medellin on December 5, 2003.  The fax stated, in part, "Please be advised that I have been retained by Safia Muse, wife of Mr. Abdi, in this immigration matter." *See* Govt.'s Ex. 14.  Similarly, Attorney Laura Jasinsky left a voicemail for SA Medellin indicating that she had been retained to represent Defendant. *Id*.

[11]On December 6, 2003, SA Flowers testified that Defendant told them new information about a then unknown co-conspirator.

represented Defendant.  At this point, Defendant accepted counsel, but, according to SA

Flowers, opted to finish his polygraph test before meeting with counsel.

Defendant met with Mr. Weigle on December 7, 2003 and at some point afterward,

informed the agents that he would continue his *Miranda* waivers.  Defendant, now accompanied

by Mr. Weigle, who indicated to the agents that he represented Defendant on both immigration

and criminal matters, submitted to four more interviews.  During these subsequent interviews,

which occurred on December 10, 2003, January 6, 2004, January 15, 2004, and February 17,

2004, Defendant repeated much of the same information he had previously divulged to the

agents.[12]  With regard to these post-December 7, 2003 interviews, Defendant asserts that he

cooperated because Mr. Weigle informed him that doing so would lead to his release, that any

incriminating statements would not be used against him in future criminal matters, and that SA

Medellin would held Defendant obtain employment authorization.

On December 15, 2003, Defendant was moved from the Kenton County Detention Center

to the Seneca County Jail.  There, Defendant was prohibited from contacting anyone but his

attorney.  Additionally, the staff, at the government's direction, precluded Defendant from

knowing his geographic location, limited his reading materials to *USA Today* and the Koran, and

segregated him from all other inmates.  Moreover, the prison staff only knew him as "John Doe."

On December 26, 2003, Defendant was transferred to Pickaway County Jail, where he remained

until May 22, 2004.  There, the terms of his confinement were similarly severe, though

Defendant was permitted a television set.

---

[12]Defendant signed a separate *Miranda* waiver at each of these four interviews.  *See* Govt's. Exs. 18-21.  On January 6, 2004, Defendant also signed a consent form allowing the government to obtain and search all of his financial records.

On January 28, 2004, Mr. Weigle represented Defendant at a preliminary deportation proceeding before an immigration judge, who continued Defendant's detention on national security grounds.  On March 9, 2004, Defendant, accompanied by Mr. Weigle, again appeared before an immigration judge.  At this hearing, Defendant admitted that he had falsified information on his asylum application, and the judge terminated his asylum status and entered a deportation order.  On May 7, 2004, the government offered Defendant a plea agreement on the forthcoming criminal indictment, which Defendant rejected.

On May 16, 2004, Defendant began exhibiting some troubling behavior.  According to Larry Mosley, Operations Sergeant for the Pickaway County Sheriff's Office, Defendant had been a model inmate, both cooperative and polite, during his first six months at Pickaway.  In mid-May, however, Defendant returned his jail-issued television set, stating that he no longer wanted to watch stories about prisoner abuse in Iraq.  Later that week, Defendant began chanting and praying, refusing to communicate with the prison guards.  Sergeant Mosley testified that he called ICE Official Neal Baker two times between May 16, 2004 and May 22, 2004 regarding Defendant's need for medical attention.  Perhaps in an effort to aid Defendant, Defendant's mother and wife were permitted to visit him on May 21, 2004.  At that meeting, his mother spoke to him in Somali, but Defendant only grunted in response.  According to Sergeant Mosley, Defendant aggressively stood up, pushing his chair backward toward the floor.  At this point, he was restrained by ten agents and removed from the room.

At Sergeant Mosley's request, ICE transferred Defendant to Seneca County Jail on May 22, 2004.  That same day, he saw a social worker who ultimately discontinued the session because of Defendant's odd behavior.  Around this time, monitoring forms indicate that his

behavior became even more bizarre.[13]  He began drinking toilet water, refusing meals, and growling.  Defendant had to be periodically restrained.

On June 10, 2004, he was indicted by a grand jury on four counts.[14]  He had an initial court appearance before a magistrate judge on June 14, 2003, and acted abnormally at that hearing as well.  The next day, he refused to shower, urinated on his cell floor, smeared feces around his cell, flooded his cell, and chanted to the walls.  He visited with the jail psychiatrist later that day, but the psychiatrist apparently saw no signs of mental illness.[15]  On June 16, 2005, Defendant appeared in front of Magistrate Judge Abel for his detention hearing.  Judge Abel granted Defendant's motion for a competency hearing.

On June 29, 2004, Defendant was transferred to the Federal Medical Center in Rochester, Minnesota for evaluation, where he remained until August 4, 2004.[16]  Upon his early August return to the Franklin County Correction Center, he continued to exhibit signs of mental instability and was placed on suicide watch.  Throughout September and October of 2004, Defendant's mental condition gradually improved.  He began to receive frequent visits from his

---

[13]On May 28, 2004, the prosecution and SA Corbin visited Defendant and asked him to sign a waiver of the statute of limitations for his forthcoming indictment.  Because Mr. Weigle unavailable on that day, his colleague, Matthew Benson, represented Defendant at this meeting.  Defendant did not sign the waiver and acted strangely throughout the meeting.  The government left the waiver with Defendant, who never signed it.  *See* Govt.'s Ex. 25.

[14]The indictment charged Defendant with Conspiracy to Provide Material Support to Terrorists, Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization, and two counts of Fraud and Misuse of Documents.

[15]The same jail psychiatrist observed Defendant again on June 18, 2005, and, at that point, noted some bizarre behavior.

[16]On August 16, 2004, the evaluators, Andrew Simcox, Ph.D., ABPP and Daniel J. Shine, Jr., M.D., concluded that Defendant was malingering and therefore competent to stand trial.  *See* Govt.'s Ex. 24.

family, and, on September 24, 2004, he moved to the regular housing units. On November 11, 2004, the staff removed him from suicide watch. To ensure Defendant's competency, this Court authorized a second psychiatric evaluation, which occurred in mid-November.[17] On January 11, 2005, the Court declared Defendant competent to stand trial.

Defendant now challenges his arrest and the statements he made incident to his arrest. He claims that his warrantless arrest violated the Fourth Amendment's warrant requirement and that the statements obtained while he was illegally detained are, hence, inadmissible.

### III.  ANALYSIS

### A.  Warrantless Arrests By an Authorized Immigration Officer

Immigration agents are permitted, by statute, to make a warrantless arrest under certain circumstances. As provided by 8 U.S.C. § 1357(a)(2):

(a)     Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant--

* * *

(2)     to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States . . . .

8 U.S.C. § 1357(a)(2). Thus, when making a warrantless arrest pursuant to this statute, probable

---

[17]On December 23, 2004, Dr. Robert T.M. Phillips, M.D., Ph.D., F.A.P.A., issued his report. In addition to concluding that Defendant was competent to stand trial, Dr. Phillips stated that Defendant may have been malingering, but that "atypical psychosis" was an "equally possible" explanation for his behavior. *See* Govt.'s Ex. 25.

cause must be present *and* the suspect must be an escape risk. *Id*.

The government claims it had probable cause to execute a warrantless administrative arrest. The facts allegedly underlying probable cause are as follows. On November 28, 2003, the date of Defendant's arrest, ICE knew that Mr. Faris, an admitted Al Qaeda member who had thus far shown himself to be a reliable cooperator, recounted Defendant's statement that he wanted to "kill Americans in a Columbus area shopping mall with an AK-47." *See* Def.'s Ex. I. Mr. Faris had also told the FBI that another man had been present at that conversation, and upon further investigation, the FBI discovered that Defendant and the other male were, indeed, associated with one another. When followed, these two men engaged in counter surveillance techniques in an apparent attempt to evade investigation. In June of 2003, the FBI interviewed Mehmet Aydinbelge, who stated that Mr. Faris, Defendant, and the unnamed male were all close associates who were affiliated with a more radical branch of Islam. Prior to Defendant's arrest, an email analysis of Mr. Faris' computer yielded a July 31, 2001 email from Defendant to Mr. Faris pointing the latter toward various websites containing spyware products. Additionally, through phone analysis, the FBI learned that Defendant, from June 15, 2003 through November 2003, had made telephone calls to approximately forty phone numbers associated with terrorism-related activities.

The Court does not disagree with the government's assessment that ICE had probable cause to execute an administrative arrest.[18] The government, however, failed to demonstrate that

---

[18]According to the government, by the time of Defendant's arrest, ICE had probable cause to believe that Defendant was a national security risk, as defined by 8 U.S.C. § 1182. Specifically, the government alleges Defendant violated three separate inadmissibility grounds:

(1)　　membership in a foreign terrorist organization in violation of 8 U.S.C. § 1182(a)(3)(B)(i)(V);

Defendant was "likely to escape" on November 28, 2003.  8 U.S.C. § 1357(a)(2) (permitting warrantless arrest if the officer has "reason to believe that the alien so arrested is in the United States in violation of any such law or regulation *and is likely to escape before a warrant can be obtained for his arrest*") (emphasis added).  The critical question is whether law enforcement believed that Defendant was likely to flee before a warrant could be obtained.  *See United States v. Harrison*, No. 97-4178, 1999 WL 26921, at *4 (4th Cir. Jan. 25, 1999).  To answer this question, "a court examines the objective facts within the knowledge of the [arresting] agents." *Id*.

In *Harrison*, immigration officers arrested the defendant for illegal reentry.  The government, citing *Contreras v. United States*, 672 F.2d 307 (2d Cir. 1982), argued that "when the alien's deportability is clear and undisputed, that circumstance alone may provide a sufficient basis for an INS officer to believe that escape is likely before a warrant can be obtained." *Harrison*,1999 WL 26921, at *4 (citing *Contreras*, 672 F.2d at 309).  The *Harrison* court rejected the government's argument, holding that such an interpretation "is contrary to the statute itself, which requires that the INS must have reasonable belief both that the alien is in the country illegally *and* that the alien is likely to escape before a warrant can be obtained." *Id*; *see also United States v. Cantu*, 519 F.2d 494, 496-97 (7th Cir. 1975) ("The likelihood of defendants escaping is a more troublesome question. This is a statutory limitation.  It is always seriously applied.").

---

(2)     has engaged in terrorist activity by threatening use a firearm in violation of 8 U.S.C. § 1182(a)(3)(B)(i)(I) and 8 U.S.C. § 1182(a)(3)(B)(iii)(V) and (VI); and
(3)     planning inciting and soliciting terrorist activity with intent to cause death or serious bodily harm in violation of 8 U.S.C. § 1182(a)(3)(B)(iv)(I)-(II), (V).

As explained by the court in *Harrison*, the "critical question" is whether the arresting officers believed the defendant was likely to flee before a warrant could be obtained:

> In making such a determination, a court examines the objective facts within the knowledge of the INS Agents.  The district court found that the agents in this case had sufficient time within which to procure a warrant and that the objective risk of flight from Harrison was minimal.  The record evidence outlined above offers ample support for this finding.

*Id*. at \*4; *see also Westover v. Reno*, 202 F.3d 475, 481 (1st Cir. 2000) (commenting that an immigration arrest was "in direct violation" of § 1357(a)(2) because "[w]hile INS agents may have had probable cause to arrest Westover by the time they took her into custody, there is no evidence that Westover was likely to escape before a warrant could be obtained for her arrest").

Upon consideration of the facts known to the arresting agents on November 28, 2003, the Court cannot conclude that the objective facts known to the officers, taken together, made Defendant an escape risk.  Defendant had no prior criminal history.  Defendant had been aware of the investigation since the FBI had interviewed Defendant and searched his house in April 2003, but had neither changed his location nor made any travel plans.  Additionally, Defendant had strong ties to the community.  He owned a cell phone business, leased the business space, and leased an apartment, in which he lived with his then-pregnant wife and their two young children, both of whom were born in the United States.  Moreover, his mother and at least two brothers, all citizens of the United States, had lived in Columbus for several years prior to Defendant's arrest.

The government contends that Defendant was an escape risk because he engaged in counter surveillance and had his car keys in his hand when he was arrested.  The Court is

unpersuaded and finds no indication the Defendant intended to leave the country on or about November 28, 2003.   In *United States v. Cantu*, 519 F.2d 494, 497 (7th Cir. 1975), the court, in holding that the likelihood of escape was a serious threat thereby justifying a warrantless arrest, stated as follows:

> From the time [the officer] received his informant's telephone tip until the time defendants were arrested, Cantu and her companions were highly mobile. Throughout the entire two-day period they were in a moving car, possessing the capacity to change momentarily their location and direction. . . . From one moment until the next their location was uncertain and their destination not entirely predictable.

*Cantu*, 519 F.2d at 497.  Here, the facts are inapposite.  The government adduced no evidence that Defendant, who became aware of the investigation in April of 2003, changed his home address, his business address, or the mosque at which he attended religious services.  Nor did the government present evidence that Defendant, when arrested, intended to drive anywhere other than the mosque for the morning prayer session.  More generally, the government argues that a national security risk is a per se escape risk; however, interpreting the statute as the government suggests would read out the statute's requirement that the suspect be an escape risk.

Alternatively, the government argues that law enforcement could not wait for a warrant because exigent circumstances required an immediate arrest.  Defendant, according to the government, was about to discharge a gun in a shopping mall, and thus had to be arrested in the pre-dawn hours of November 28, 2003, the busiest shopping day of the year.  This argument is also without merit.  First, the government adduced absolutely no evidence that Defendant intended to commit any offense on that day.  Second, the arrival of November 28, 2003 does not constitute an exigent circumstance.  It is beyond peradventure that the agents were aware of the day's status as a high volume shopping day, and its advent was no surprise.

Moreover, the Court finds the government's inability to procure a warrant troublesome. The government conceded at the evidentiary hearing that it had information sufficient to establish probable cause long before the final iteration of the Turgal Declaration.  Once the government discovered and corroborated that Defendant had conceived a plan to harm Columbus mall-goers, it had probable cause.  It was within the government's prerogative to surveil Defendant during the intervening months; indeed that was savvy investigatory strategy that allowed the government to obtain additional information.  During those months, as the government amassed more evidence, the strength of its probable cause case did not weaken; instead, it grew stronger as the government developed its case and SSA Turgal refined his Declaration.  Procuring a warrant with this vast body of evidence should have been accomplished with some dispatch.

The government attempts to rationalize the delay by pointing to the inter-agency debate regarding the warrant's classification status.  This excuse, however, is unconvincing.  The majority of the warrant's provisions were not in dispute at the time of Defendant's arrest.  SA Flowers testified that the source of "greatest consternation" was Paragraph 8, which details the cell phone and email analyses completed between June and October 2003.  If this paragraph had been eliminated, the remaining provisions would have supported a finding of probable cause.  In other words, but for an inability for ICE and the FBI to hammer out classification problems efficiently, an arrest warrant would have been issued in a timely manner.  The Court will not overlook the statute's warrant requirement because of bureaucratic sloth.  In sum, the Court finds that the government should not have effectuated a warrantless arrest pursuant to 8 U.S.C. § 1357(a)(2) because Defendant was not an escape risk.

Because the government's actions violated the governing statute, subsequent confessions are tainted unless the prosecution "can demonstrate not only that the confession was voluntary, but also that a sufficient break in the events occurred to undermine the inference that the confession was caused by the Fourth Amendment violation." *United States v. Crowder*, 62 F.3d 782, 786 (6th Cir. 1995). Stated differently, the statement can be admitted if the causal chain between the illegal seizure and the voluntary statement has been broken. *United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003).

The government argues that the November 30, 2003 confession, during which Defendant initialed each page of a confession transcript after having been left alone for over twenty-four hours, should be admissible because it was both voluntary and sufficiently attenuated from any unconstitutional arrest. Defendant counters that his statements were neither voluntary nor sufficiently attenuated from the warrantless arrest.

Assuming, *arguendo*, that the *Miranda* waivers and subsequent confessions were voluntary, the Court must determine at what point, if any, the Defendant's statements were sufficiently attenuated from the unlawful arrest. In *Brown v. Illinois*, 422 U.S. 590 (1975), the seminal case on attenuation, the Supreme Court considered whether a properly Mirandized confession should be suppressed. There, two police officers broke into defendant's house, conducted a warrantless search, and then arrested the defendant at gunpoint when he returned home. *Id*. at 591. After seven hours of interrogation, which included the defendant's waiver of his *Miranda* rights, the defendant confessed to murder. *Id*. The Supreme Court held that the *Miranda* warnings, alone, did not purge the taint of the illegal arrest. *Id*. at 603 ("[T]he *Miranda* warnings, alone and per se, cannot always . . . break, for Fourth Amendment purposes, the causal

-16-

connection between the illegality and the confession.").

The Court outlined several factors to aid courts in determining whether a voluntary statement is sufficiently attenuated from the illegal act perpetrated by the government:  (1) the length of time between the illegal seizure and the statement; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of the official misconduct; and (4) whether the officers read the suspect his *Miranda* rights before he confessed.  *Brown*, 422 U.S. at 603-04; *see United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003).  Applying these factors, the Court finds that Defendant's incriminating statements were not sufficiently attenuated from the illegal circumstances of his arrest until he met with counsel on December 7, 2003.[19]

With regard to the first factor, the length of time between the illegal seizure and the statement, courts have held that twenty-four hours can help to dissipate sufficiently the taint of an illegal seizure.  *See United States v. Jackson*, No. 97-2135, 1998 WL 964236, at *2-*3 (6th Cir. Dec. 28, 1998) (finding a confession sufficiently attenuated from the illegal arrest and a product of free will, reasoning that appellant had confessed approximately twenty-four hours after his arrest, he was left alone by potential police interrogators in the interim, and he was not subject to lineups, questioning, or custodial transfers).  Here, this factor augurs in favor of the admission of Defendant's November 30, 2003 confession and the confessions made thereafter. Defendant was arrested on November 28, 2003, subject to only one custodial transfer in the first

---

[19]Defendant argues that Mr. Weigle failed to adequately represent him because Mr. Weigle advised him to continue his *Miranda* waiver and because Mr. Weigle had represented Mr. Aydinbelge in an interview in which Mr. Aydinbelge had implicated Defendant.  To the extent Defendant wishes to make an ineffective assistance of counsel argument regarding an attorney who no longer represents him, an evidentiary hearing is not the proper forum for such an argument.

twenty-four hours, and, at least according to government testimony, not questioned until November 30, 2003.[20]

The second factor, the presence of intervening circumstances, does not favor admissibility.  From his arrest until December 7, 2003, Defendant's only contacts were agents. He was in total isolation.  He was not permitted to make telephone calls, nor was he permitted any visitors.  Here, there were no intervening circumstances until Defendant met with his lawyer ten days after his arrest.

The third factor, the purpose and flagrancy of the official misconduct, augurs in favor of suppression.  As a threshold matter, as discussed above, the Court finds that law enforcement acted without a warrant despite Defendant's not being an escape risk.  Moreover, the Court finds that the government likely engaged in a pretextual civil detention.  In other words, Defendant appears to have been arrested and interrogated with an eye toward the FBI's ongoing investigation into alleged criminal activity, not civil immigration violations.  The Supreme Court, in *Brown*, based its decision to suppress, in part, on the fact that the defendant was arrested for investigatory purposes:

> The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was for investigation or for questioning.  The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was affected gives the appearance of having been calculated to cause surprise, fright, and confusion.

*Brown*, 422 U.S. at 605.  Here, too, Defendant was arrested and interrogated for the purposes of

---

[20]Defendant contends he was interrogated on November 29, 2003.  *See supra* note 6.

-18-

an investigation into his criminal activity.  According to SA Flowers' testimony, the evidence suggested some sort of ongoing terrorist plot, but law enforcement "did not know that it was necessarily . . . active or not."  SA Flowers testified that when the FBI was searching for a way to detain Defendant so as to investigate the plot's status, "[ICE] offered the idea that there could be an arrest on national security grounds."  Likewise, SSA Turgal conceded that Title 8 is "a tool in law enforcement's tool box . . . in order to investigate these cases."  Furthermore, the agents continually alluded to the criminal nature of Defendant's alleged activities, his collusion with various co-conspirators, and how Mr. Faris, an alleged associate, received a twenty year sentence pursuant to a criminal conviction for similar activities.  The Court concludes that the arrest's primary goal was not deportation, but investigation of an allegedly ongoing felonious plot.  The governmental misconduct in this case may have been more subtle than flagrant, but the Court finds that it was calculated to ensure that the government's investigation continued unimpeded by the requirements of criminal procedure.  Thus, the third factor augurs in favor of suppressing Defendant's statements until he had counsel by his side.

The fourth factor, whether Defendant was Mirandized, militates in favor of admissibility. The Court credits the agents' testimony that Defendant received his *Miranda* rights before each day of confession and notes that Defendant signed a written *Miranda* waiver for each day of interrogation.

As stated by *Brown*, "no single fact is dispositive."  *Id*. at 603 ("The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test.").  Taking into account each of the above factors, the Court finds that no sufficient intervening cause occurred until

Defendant met with his attorney on December 7, 2003. It is well established that consultation with counsel is a "crucial factor" in finding the taint of the initial illegal act sufficiently attenuated. *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990) (citing *United States v. Wellins*, 654 F.2d 550, 555 (9th Cir. 1981) ("There are some circumstances in which consultation with an attorney, by itself, might provide sufficient attenuation")); *see generally Brown*, 422 U.S. at 611 (Powell, J., concurring in part) (indicating that a defendant's consultation with an attorney might be sufficient even in the most flagrant of circumstances). Thus, the Court holds that all statements made prior to Defendant's meeting with his attorney on December 7, 2003 are hereby suppressed.

### B. Fifth Amendment Rights

At oral argument, Defendant conceded that all of his *Miranda* waivers were made knowingly and intelligently, but asserted that they were not made voluntarily because of psychological coercion. An admission is coerced if "the conduct of law enforcement officials is such as to overbear the accused's will to resist." *Ledbetter v. Edwards,* 35 F.3d 1062, 1067 (6th Cir. 1994). Such coercion may be mental as well as physical. *Arizona v. Fulminante,* 499 U.S. 279, 287 (1991). The burden of proof of the voluntariness of the waiver is on the government by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986).

Defendant's affidavit alleges that the government overbore his will and coerced his waivers by threatening to deport his family if he did not cooperate. Defendant also asserts that the conditions of his confinement, including isolation from other prisoners, lack of familial contact, and long hours of interrogation, contributed to the coercive setting. RAC Wilkens and SA Flowers, however, testified that Defendant was wholly cooperative, never asked to see his

family, and did not accept counsel until December 7, 2003.  Moreover, the government justifies

Defendant's isolation by claiming that he may have attempted to pass messages to co-

conspirators, noting that Defendant called an unindicted co-conspirator six times on the day of

his arrest.  Although the Court need not reach the Fifth Amendment issue with regard to the

*Miranda* waivers made prior to Defendant's December 7, 2003 meeting with counsel, as those

statements have already been suppressed, the Court addresses Defendant's arguments for

completeness and concludes that the statements would not have been suppressed on Fifth

Amendment grounds.[21]

In determining whether a confession has been elicited through coercive tactics, the Court

looks to certain factors concerning whether a defendant's will was overborne, including age,

education, intelligence, whether the accused has been informed of his constitutional rights, the

interrogations' lengths, whether the questioning was repeated and prolonged, and the use of

physical punishment, such as the deprivation of food or sleep.  *United States v. Haynes*, 301 F.3d

669, 684 (6th Cir. 2002).

An analysis of these factors does not weigh in Defendant's favor.  Defendant was thirty-

one years old at the time of his arrest.[22]  He is of above average intelligence, and virtually fluent

in English.[23]  Moreover, Defendant appears to have had extensive experience navigating this

---

[21]To the extent that Defendant is arguing that his *Miranda* waivers after meeting with counsel were coerced, the Court finds this argument without merit.  Defendant had ample opportunity to speak with Mr. Weigle prior to continuing his *Miranda* waiver and to understand the repercussions of such a decision.

[22]Defendant's date of birth is May 22, 1972.

[23]According to Dr. Phillips' Report, Defendant "completed his secondary or high school education in the United Arab Emirates" and "described himself as a good student who never got into difficulty."  *See* Govt.'s Ex. 25.  Additionally, Defendant's friends and family, when

country's immigration laws, as evidenced by his asylee status.  Although the Court does find the conditions of his confinement severe, the Court credits Flowers' testimony that Defendant received ample breaks throughout interrogation sessions and suffered no deprivation of food, water or sleep.  In light of the above factors, the Court concludes that the alleged threats to deport his family "were not of such a gravity that an ordinary person, much less someone of [Defendant's] age and experience," would have lost the will to resist.  *Haynes*, 301 F.3d at 684.

Thus, Defendant's Motion to Suppress Statements for Violations of Defendant's Fifth Amendment Rights is **DENIED**.

### C. Motion to Dismiss Indictment for Governmental Misconduct

Defendant asserts that the government's misconduct in this case was so egregious that due process bars the government from continuing prosecution.  The government conduct highlighted by Defendant includes the lengthy nature of his interrogations before and after December 7, 2003, the government's refusal to allow Defendant to see or talk to his family from November 28, 2003 until May 21, 2004, Defendant's isolation from other prisoners, the government's decision not to inform him of his location or allow his name to be used, and the government's alleged collusion with Mr. Weigle.  Defendant argues that these conditions were so severe that they resulted in Defendant's psychological breakdown, suggesting that the only remedy for such conduct is for this Court to dismiss the Indictment pursuant to its supervisory powers.  Defendant also asserts that as a result of his mental illness, his ability to mount a proper defense has been prejudiced.  The psychological evaluations delayed the trial six months,

---

interviewed by Dr. Phillips, described him as "highly intelligent and always willing to assist community members with their needs for translation because of his command of the English language." *Id*.

making it more difficult for Defendant to gather evidence and for witnesses to recall events. With regard to both of these arguments, the government counters that the Court cannot exercise its supervisory powers and dismiss the Indictment unless the government's behavior shocks the conscience, noting that this high standard is rarely met.

The government's argument is well-taken.  The "shock the conscience" language comes from *Rochin v. California,* 342 U.S. 165, 172 (1952), where the Court held that police conduct in pumping a suspect's stomach in search of evidence violated due process standards.  *Id*.  The circumstances of this case do not mirror those present in *Rochin* or its progeny.  *See United States v. Toscanino*, 500 F.2d 267, 275 (2d Cir. 1975) (explaining that the *Rochin* standard would be met where an accused is kidnapped and forcibly brought within the jurisdiction, finding that the court would be entitled to overturn the conviction so as to prevent the government from exploiting its own misconduct."); *cf. White v. Rochford,* 592 F.2d 381, 383-84 (7th Cir. 1979) (holding that police abandonment of an arrestee's children on a highway late on a cold night shocked the conscience).  To the extent that the government engaged in any misconduct, it does not meet the high standard set forth in *Rochin*.

Likewise, the Court finds Defendant's argument regarding prejudice suffered by the six month delay due to his mental illness without support.  Defendant failed to name any specific pieces of evidence or particular witnesses that have proved difficult to obtain or interview due to the delay.  Moreover, Defendant omits the fact that this delay was the necessary result of two competency evaluations, both granted at Defendant's request.  Thus, the Court **DENIES** Defendant's Motion to Dismiss for Government Misconduct.

## IV.  CONCLUSION

The Court **GRANTS in part** and **DENIES in part** Defendant's Motion to Suppress All Statements Allegedly Made By Defendant and All Evidence Seized in Violation of the Fourth Amendment; **DENIES** Defendant's Motion to Suppress Statements for Violations of Defendant's Fifth Amendment Rights; and **DENIES** Defendant's Motion to Dismiss for Government Misconduct.


**IT IS SO ORDERED.**


        **s/Algenon L. Marbley**
        **ALGENON L. MARBLEY**
        **United States District Court Judge**


**DATED: September 12, 2005**